JOHN DOE,
PO Box 483
Isleton, CA 95641
415-737-4225
x92qt77@proton.me
Plaintiff, Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, | Case No.: 3:25-cv-10779-EMC |
| Plaintiff, | |
| vs. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; | COMPLAINT FOR INJUNCTION, DECLARATORY RELIEF, DAMAGES, CIVIL PENALTIES, AND OTHER EQUITABLE RELIEF |
| ASHOK AJOY, in his individual capacity; | |
| REBECCA NICOLE LOPEZ, in her individual and official capacities; | |
| RICHARD KENT LYONS, in his official capacity; | DEMAND FOR JURY TRIAL |
| SAMANTHA GROSS (a/k/a SAMANTHA LACHLER), in her individual capacity; | |
| and DOE DEFENDANTS 1-20 | |
| Defendants | |

## **INTRODUCTION**

1. Plaintiff, John Doe, is a 2010 graduate of the University of California, Berkeley ("UC Berkeley"), where he earned a Bachelor of Arts degree, graduating Phi Beta Kappa and summa cum laude.

2. Plaintiff published a book that was formally acquired by UC Berkeley's Doe Library, where it remains in the Gardner Stacks as part of UC Berkeley's own holdings and scholarly infrastructure—making him not only a former student, but also a published author in UC Berkeley's own collections.

COMPLAINT - 1

3. Plaintiff remains an active UC Berkeley alumnus. He retains an active CalNet account and a functioning Berkeley.edu email address, has been invited to and attended campus events such as the Golden Bear Orientation and scholarship galas to the present day, and has served as an essay grader and phone-bank volunteer for scholarship programs administered through UC Berkeley's campus.

4. In August 2020, Plaintiff returned to UC Berkeley to pursue a second undergraduate degree, while simultaneously working as a campus employee, first in a physics/chemistry lab under Defendant Ashok Ajoy ("Ajoy") and later in the Residential Student Services Program ("RSSP"), supporting food-insecure students.

5. During the period of February 2021 to August 31, 2022, Plaintiff was both a student and a campus employee, placing him squarely within the protections of Title IX and state and federal employment laws, including the Fair Employment and Housing Act ("FEHA"), and—upon reporting misconduct—by anti-retaliation provisions applicable to Title IX and to his employment.

6. As of May 2022, Plaintiff has completed all academic requirements and, in substance, earned his second undergraduate degree.

7. On October 7, 2021, while Plaintiff was employed in Ajoy's lab and enrolled as a student, Defendant Ajoy sexually battered Plaintiff in Ajoy's campus office in Stanley Hall, and later threatened to destroy Plaintiff's academic career if he ever reported it.

8. Following Plaintiff's notice to Ajoy of his intent to report the sexual battery and Plaintiff's report of Ajoy's misconduct to the University's Office for the Prevention of Harassment and Discrimination ("OPHD")—the only campus office authorized to investigate sexual violence and sexual harassment ("SVSH")—the University through its agents assembled and maintained a retaliatory felony-level "computer sabotage" narrative, for which there is still no coherent technical explanation or reliable forensic proof, in order to impose a retaliatory hold on Plaintiff's completed 2022 degree, a hold that was most recently upheld, without meaningful explanation, on July 1, 2025.

9. UC Berkeley compounded the harm by:

    a. Orchestrating, through the University of California Police Department ("UCPD"), an ultra vires, secretly recorded interrogation inside Plaintiff's

home in another county, *without coordination with local law enforcement*;

    b.   Submitting a perjured phone-records search-warrant affidavit to the Alameda County Superior Court, containing demonstrably false statements about Plaintiff's campus employment, the continued public accessibility of which poses an ongoing threat to Plaintiff's reputation;

    c.   Conducting student conduct proceedings before a biased external hearing officer who curtailed Plaintiff's questioning of his assailant (Ajoy) while relying on UCPD's and Ajoy's unsupported narrative and ignoring the District Attorney's rejection of the case and the lack of any civil claims;

    d.   Conducting a biased SVSH investigation of Plaintiff's sexual-battery complaint (under state and federal employment laws and Title IX, owing to Plaintiff's dual status) that relied on those student-conduct findings as a shield from liability;

    e.   Excluding Plaintiff from the campus January 19, 2024 SVSH hearing while his assailant (Ajoy) and the assailant's "witnesses" testified for five hours in Plaintiff's absence; and

    f.   Concealing that SVSH hearing from outside civil-rights agencies investigating Plaintiff's complaint.

10. Today, Plaintiff remains in an absurd limbo: UC Berkeley still recognizes him as a valued alumnus—with an active CalNet account and Berkeley.edu email, invitations to on-campus and off-campus alumni events, and participation in alumni programming—while it refuses to release the second degree that he fully completed in 2022, based on a contrived and retaliatory computer-sabotage narrative that Plaintiff lacks the technical knowledge to carry out, for which no credible explanation exists, and from which no criminal or civil action has ever arisen.

11. The ongoing injury is concrete and continuing, as UC Berkeley continues to:

    a.   Withhold a completed degree based on illegal UCPD conduct embedded in the process;

    b.   Maintain a stigmatizing mark on Plaintiff's transcript and a false student disciplinary record;

COMPLAINT - 3

    c. Refuse to correct its misrepresentations to the state court and state and federal civil-rights agencies; and

    d. Obstruct access to the illegal warrant materials and records (if any exist) that UC Berkeley used to construct the pretextual case.

12. Plaintiff received a Right-to-Sue notice from the California Civil Rights Department ("CRD") under FEHA, related to the October 7, 2021 sexual battery and retaliatory "computer sabotage" narrative, and invokes supplemental jurisdiction for his FEHA claims since they arise from the same nucleus of operative facts as the federal claims.

13. The Equal Employment Opportunity Commission ("EEOC") is currently investigating Plaintiff's inquiry concerning the University's post-charge retaliation within the CRD process (*vide infra*), and Plaintiff will amend his Complaint when the Title VII Right-to-Sue notice is issued.

14. Plaintiff's primary objectives are to restore his earned degree, correct his student record**,** and ensure that UC Berkeley is held accountable for the unlawful conduct it used to justify and preserve the degree hold.

15. Plaintiff brings this action to:

    a. Vindicate his rights under Title IX, 42 U.S.C. § 1983, and FEHA**;**

    b. Obtain injunctive relief compelling UC Berkeley to confer his completed 2022 degree, remove retaliatory notations from his student record, correct the Title IX record, and cease relying on an unlawful, pretextual "computer sabotage" narrative; and

    c. Recover damages for sexual battery, retaliation, discrimination, constitutional violations, and resulting economic and emotional harm.

## **JURISDICTION**

16. This action arises under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; and 42 U.S.C. § 1983.

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

18. This Court has jurisdiction under 28 U.S.C. § 1343(a)(3)-(4) because this action seeks to

redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

19. This Court has supplemental jurisdiction over Plaintiff's related state-law claims—including claims under FEHA, Cal. Gov. Code § 12900 et seq. and common-law tort claims—under 28 U.S.C. § 1367(a), because Plaintiff's claims arise from the same nucleus of operative facts as his federal claims: the sexual battery by Ajoy, the retaliatory computer-sabotage narrative, the defective search and seizure, the biased student-conduct and SVSH proceedings, UC Berkeley's misrepresentations to CRD, and the ongoing withholding of Plaintiff's completed degree.

20. Plaintiff has received a FEHA Right-to-Sue Notice from CRD dated December 17, 2024—covering the October 7, 2021 sexual battery, the retaliatory computer-sabotage narrative, and related conduct—and files this action within the one-year limitations period.

## **VENUE**

21. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Alameda County, which is located in this District, and because The Regents of the University of California reside in this District for venue purposes.

## **INTRADISTRICT ASSIGNMENT**

22. This action is properly assigned to the San Francisco/Oakland Division of this Court because a substantial part of the events or omissions which give rise to this lawsuit occurred in Alameda County.

## **PARTIES**

23. Plaintiff John Doe ("Doe") is an adult resident of California. Plaintiff is a 2010 graduate of the University of California, Berkeley and, during the events described in this

Complaint, was both a student and an employee at the University. Plaintiff's true name has been provided to the Court under seal and is not withheld from Defendants.

24. Defendant The Regents of the University of California ("The Regents") is a constitutional corporate entity and instrumentality of the State of California that operates the University of California system, including the Berkeley campus ("UC Berkeley") and its departments, offices, and University of California Police Department ("UCPD"). Unless otherwise indicated, references to "the University," "UC Berkeley," or "The Regents" refer to the same public entity. The Regents receive federal financial assistance and are therefore subject to Title IX. The Regents also employ or employed the individuals referenced herein, making them subject to applicable state and federal employment laws.

25. Defendant Richard Kent Lyons ("Lyons") is, and at all relevant times was, employed by The Regents as Chancellor of UC Berkeley (having assumed the role on or about July 1, 2024). As Chancellor, Lyons has ultimate authority over degree conferral and the ability to correct wrongful disciplinary outcomes.

26. Defendant Rebecca Nicole Lopez ("Lopez") is, and at all relevant times was, employed by The Regents as Director of the Center for Student Conduct ("CSC") and Associate Dean of Students at UC Berkeley. Lopez has direct authority over student conduct records and the decision to maintain or lift the retaliatory degree hold.

27. Defendant Ashok Ajoy ("Ajoy") is, and at all relevant times was, employed by The Regents at UC Berkeley as a faculty member and as Plaintiff's lab supervisor. Ajoy acted under color of state law in his role as a UC Berkeley professor when he sexually battered Plaintiff and when he provided false and retaliatory information to University Human Resources ("People and Culture" or "HR"), UCPD, CSC, and external agencies.

28. Defendant Samantha Gross (a/k/a Samantha Lachler) ("Gross") was at all relevant times employed by The Regents as a sworn peace officer with UCPD, assigned, from 2016 to 2022, to the Threat Management Unit. She conducted an ultra vires custodial interview of Plaintiff in his home in Solano County, secretly recorded the interview on an Axon body-worn camera, obtained a search warrant based on material falsehoods, coordinated with CSC to establish and maintain the degree hold, and thereafter left UCPD for Bozeman, Montana.

29. DOES 1–20 are individuals and entities whose identities are presently unknown to Plaintiff. Each is believed to have participated in, directed, or ratified the constitutional and statutory violations alleged herein, including but not limited to UCPD supervisors, UC Berkeley administrators, People & Culture/Employee & Labor Relations ("ELR") personnel, and other decisionmakers. Plaintiff will amend this Complaint to substitute the true names and capacities of Doe Defendants when they are ascertained.

## STATEMENT OF FACTS

A. Plaintiff's Background and Return to Berkeley

30. Plaintiff obtained his B.A. from UC Berkeley ("UC Berkeley" or "the University") in 2010, graduating Phi Beta Kappa and summa cum laude. He remains an active alumnus, participating in campus events and alumni activities.

31. After graduation, Plaintiff published a book that was formally acquired by UC Berkeley's Doe Library and cataloged into the Gardner Stacks, reinforcing his status as an author within UC Berkeley's own scholarly collection.

32. In August 2020, Plaintiff enrolled at UC Berkeley to pursue a second undergraduate degree, attending classes, engaging in the campus community, and later working in laboratory and student-support roles as an employee of the University.

B. Employment in Ajoy Lab

33. In Fall 2020, Defendant Ajoy was one of his professors in Chem 105 (Instrumental Analysis), a remote course in which Plaintiff earned an A-.

34. In December 2020, Defendant Ajoy recruited Plaintiff to work in his lab at Stanley Hall as a grant writer and hardware technician and as the sole undergraduate on payroll. Ajoy insisted Plaintiff be physically local and offered to cover housing costs in the Bay Area so that Plaintiff would work on-site.

35. In January 2021, Plaintiff secured campus housing at University Village Apartments ("UVA") in Albany, in addition to maintaining his home in a city in Northern California outside Alameda County.

36. From February 2021 to December 31, 2021, Plaintiff was a UC Berkeley employee in Ajoy's lab, holding a STDT 3 position, which ended by ordinary contract expiration.

37. From February 2, 2022 to August 31, 2022 Plaintiff was again a UC Berkeley employee in another part of the University, holding a STDT 2 position, which ended by ordinary contract expiration. Plaintiff remained in good standing as a UC employee.

38. On February 4, 2022, Plaintiff began a new UC Berkeley position with Residential and Student Services Programs ("RSSP"), supporting food-insecure students on the University Village campus. This position continued until August 31, 2022, when that contract also expired by its own terms, without termination or discipline. Subsequent UCPath records and HR correspondence confirm Plaintiff is not barred from rehire and that there is no disciplinary notation or termination in his employment history.

39. Plaintiff's employment with the University made him a covered employee for purposes of FEHA and Title VII and a "program participant" under Title IX when later discrimination and retaliation occurred.

40. In early September 2021, Ajoy directed Plaintiff to help him write a lab manual for his Chemistry 105 course, by taking dictation from Ajoy alone in his office. Plaintiff took dictation from Ajoy in his office during this time and completed the manual. Prior to this, Plaintiff had not ever worked alone with Ajoy in his office, instead completing projects remotely over Google Docs or in the laboratory space. Ajoy made Plaintiff feel uncomfortable in his office, as Ajoy chose to sit next to Plaintiff on the couch during dictation and lean over him frequently, but Plaintiff dismissed his concerns initially.

41. Around the same time, shortly after completion of the manual, Ajoy invited Plaintiff to a College of Chemistry ice cream social in the quad between Hildebrand, Lewis, and Latimer Hall, and suggested they discuss a "lab project" over dinner. Plaintiff politely declined the dinner.

C. October 7, 2021 Sexual Battery and Threat

42. On October 7, 2021, Plaintiff arrived at Ajoy's lab in Stanley Hall. Ajoy asked Plaintiff to join him in his faculty office.

43. Inside the office, Ajoy seated Plaintiff on a couch in front of and parallel to Ajoy's desk. Ajoy then pulled up a chair directly in front of Plaintiff, only a few feet away.

44. Ajoy began speaking in a highly dysregulated and emotional state, accusing Plaintiff of "pretending not to be interested in" other people in the lab and insisted Plaintiff was secretly romantically interested in individuals around him.

45. Plaintiff responded truthfully that he had no interest in anyone in the lab—including Ajoy himself—and was there only for the science and to complete his academic and professional work.

46. Ajoy then rambled about lab projects for the remainder of Plaintiff's contract—which was set for ordinary expiration on December 31, 2021—and then suddenly asked Plaintiff, "So how do you feel about me?"

47. While Plaintiff sat looking down, arms resting on his thighs and with upper body angled forward at roughly 45 degrees, Ajoy rose from his chair. Plaintiff assumed Ajoy was walking toward his desk behind him.

48. [REDACTED - details of sexual battery in sealed complaint]

49. [REDACTED - further details of sexual battery in sealed complaint]

50. While Plaintiff was standing between Ajoy and the couch, Ajoy then quietly threatened Plaintiff that he would destroy Plaintiff's academic career and that no one would believe Plaintiff if Plaintiff ever disclosed what had happened. This threat was made in Ajoy's dual capacities as Plaintiff's work supervisor and grade-generating faculty member.

51. Plaintiff left the lab in a state of shock and returned to his University Village apartment. [REDACTED - description of Plaintiff's immediate emotional and physical response to the assault]. He sat in the shower for an extended period, as he processed the shock and shame of the sexual battery before falling asleep. The incident has had lasting emotional and psychological effects on Plaintiff.

D. December 2021 – Recommendation Letter, Lost Card, and Contract Expiration

52. On December 1, 2021, Ajoy submitted to UC Berkeley's Graduate Division a letter of recommendation for Plaintiff, praising his work. Plaintiff reasonably understood this as leverage—an attempt to buy his silence about the sexual battery.

COMPLAINT - 9

53. On December 7, 2021, Plaintiff encountered Ajoy outside the Graduate School of Journalism and informed him that he intended to report the October 7 assault. Plaintiff walked away from Ajoy and returned to the lab to gather his belongings before going home. Around that same time, Plaintiff's student identification card, which doubled as a swipe card for building access, went missing.

54. On December 17, 2021, Plaintiff visited the Cal 1 Card Office in Sproul Hall, reported the card missing, requested deactivation, and received a new card *with no building access*. The Cal 1 Card record confirms a replacement card was issued on that date.

55. Plaintiff's paid lab contract ended by ordinary expiration on December 31, 2021. He was never terminated—as UC records, including UCPath verification and his personnel file—show.

56. For each period of employment in Ajoy's lab (February 2021–May 31, 2021 and June 1, 2021–December 31, 2021), Plaintiff was simultaneously enrolled in Honors Research (Chem H194) under Ajoy, earning an A+ (4 units) in Spring 2021 and an A (6 units) in Fall 2021. These grades have never been changed, underscoring that his academic performance and relationship with Ajoy were officially rated as excellent even as the later "sabotage" narrative was constructed.

E. February 2022: Protected Reporting, New Job, and Retaliation Planning

57. In early February 2022 (around February 2-4), Plaintiff reported Ajoy's misconduct to the Office for the Prevention of Harassment and Discrimination ("OPHD"). OPHD is the only campus office authorized to investigate sexual violence and sexual harassment ("SVSH") matters.

58. Around the same time, Ajoy rescinded the December 1, 2021 recommendation letter and contacted campus counsel David Robinson. Robinson, in turn, contacted the Center for Student Conduct ("CSC") to begin constructing a pretextual "computer sabotage" case against Plaintiff, allegedly based on events around December 23-24, 2021.

59. On February 2, 2022, Plaintiff began a new employment position with the University, working in RSSP at University Village in Albany to support food-insecure students. That contract ran through August 31, 2022 and likewise ended by ordinary expiration, with no

discipline or termination. UCPath employment verification confirms Plaintiff's STDT2 position from February 2, 2022 to August 31, 2022, with inactive status thereafter.

F. Ultra Vires UCPD Custodial Interview, Secret Recording, and Defective Warrant

60. On February 28, 2022, Plaintiff moved permanently from University Village in Albany back to his home in Solano County. From there, Plaintiff continued his position with RSSP and worked to complete the requirements for his second degree.

61. On or about April 27, 2022, HR partner Clarity White ("White") placed Plaintiff on paid investigatory leave from the RSSP position, without identifying a reason at the time, though it was later revealed to be in connection with the nascent computer-sabotage narrative. Plaintiff remained on paid leave until his contract expired on August 31, 2022, without any discipline, termination, or notation of cause.

62. On April 29, 2022, Defendant Gross arrived unannounced at Plaintiff's home in Solano County—outside Alameda County and well outside UCPD's ordinary jurisdiction—to question Plaintiff about alleged "computer sabotage" in Ajoy's lab, an area where Plaintiff's role had been grant writing and hardware assistance, not systems administration.

63. Gross identified herself as a UCPD detective from UC Berkeley's Threat Management Unit and conducted what was effectively a custodial criminal interview in Plaintiff's home. Gross had no coordination with local law enforcement, no apparent authorization for local jurisdiction, and secretly activated an Axon body camera to record the encounter. Plaintiff did not consent to video recording and was not informed that he was being recorded.

64. During this ultra vires police encounter, Gross falsely advanced a Penal Code § 502(c)(4) narrative that Plaintiff—a supposed disgruntled former employee—had sabotaged computers in Ajoy's lab, allegedly between December 23 and 24, 2021.

65. Plaintiff informed Gross upon her inquiry that up until February 28, 2022, he held a University Village apartment in Albany one mile from campus, a house in a Northern California city outside Alameda County, and the present home in Solano County before permanently relocating to that county.

66. In her subsequent police report that she submitted to CSC to initiate a hold on the conferral of Plaintiff's degree, Gross falsely represented that Plaintiff was a former University employee who had been subjected to "[adverse] findings of an HR investigation" for "sexual harassment" of lab colleagues and that Plaintiff thus had both motive and technical expertise to sabotage lab computers.

67. Those representations conflicted with University records showing that:

    a. Plaintiff's position in Ajoy's lab ended by contract expiration on December 31, 2021;

    b. Plaintiff was never terminated or disciplined in his employment position in Ajoy's lab;

    c. Plaintiff had never been a respondent in any SVSH investigation or received any disciplinary notation in his personnel file;

    d. Plaintiff was still an active University employee who had been rehired in February 2022 and whose contract was set for ordinary expiration on August 31, 2022;

    e. Ajoy had submitted on Plaintiff's behalf a recommendation letter on December 1, 2021 to UC Berkeley's Graduate Division; and

    f. Ajoy had submitted A-level grades for the Spring and Fall 2021 semesters, during which time Plaintiff received course credit under Honors Research (Chemistry H194) while also employed in Ajoy's lab.

68. On May 5, 2022, Gross submitted a search warrant application to a judge of the Alameda County Superior Court for Plaintiff's cellphone records (December 23-25, 2021). Less than an hour after submission, the warrant was approved.

69. In her probable cause affidavit, Gross:

    a. Falsely stated that Plaintiff had been subjected to adverse HR findings involving inappropriate contact with others in the lab;

    b. Falsely implied that Plaintiff was a terminated former employee of the University, by stating that pursuant to these HR "findings," the University had determined that Plaintiff's contract should not be renewed;

c.   Materially excluded the fact that her reported custodial interview took place outside UCPD's jurisdiction and was secretly recorded on Axon body-worn camera—all without authorization from or coordination with local enforcement, who were unaware of an ultra vires criminal investigation by UCPD;

d.   Referenced supposed co-conspirators in an elaborate sabotage scheme for which no training, expertise, or motive existed; and

e.   Requested a delayed notification order, citing an ongoing "threat" to the investigation.

70. In the UCPD police report that Gross prepared and that was later transmitted to CSC as part of the student conduct-packet, Gross expressly acknowledged that she had traveled to Plaintiff's home in Solano County, several counties away from Berkeley, and that she activated and used her Axon body-worn camera to record the custodial interview inside his home—information she withheld from her probable cause affidavit.

71. On May 9, 2022, the search warrant was executed via email on T-Mobile.

72. On May 11, 2022, the warrant return filed with the court contained only a generic return sheet listing "call detail records with cell sites", "data sessions with cells," and "subscriber information." No digital records, itemized inventory, chain-of-custody documentation, T-Mobile certification, or forensic reports were ever filed with the court, contrary to the requirements of California Penal Code §§ 1534(a) and 1537.

73. UCPD retains sole custody of whatever digital data was obtained. To this day, the University has refused to provide Plaintiff with the underlying records (if any exist) even by inspection, or a complete warrant return, despite multiple California Public Records Act ("CPRA") requests, necessitated by the Alameda County Superior Court's lack of custody of any such fruits of the warrant.

74. Furthermore, the warrant affidavit and its materially false statements about Plaintiff remain publicly available through the Clerk's Office of the Criminal Division of the Alameda County Superior Court, posing an ongoing threat and injury to Plaintiff's reputation.

COMPLAINT - 13

75. The continued public availability of Gross's warrant affidavit—containing demonstrably false statements about alleged HR discipline and sexual harassment—and The Regents' ongoing reliance on Gross's investigative narrative and her description of the purported, but undisclosed, warrant fruits, rather than on any actually produced data, in CSC processes and degree-hold decisions, constitute a present and ongoing constitutional and reputational injury, not merely a historical violation.

G. Retaliatory Degree Hold and Biased Conduct Hearing Predicated on UCPD Report

76. Throughout the surreptitious coordination between CSC and UCPD, Plaintiff continued completing degree requirements *on campus* until the Spring 2022 semester ended.

77. On May 18, 2022, one week after Plaintiff completed his final exam and satisfied all academic requirements for the second degree, CSC imposed a hold on Plaintiff's degree and accused him of "computer sabotage" based on Ajoy's complaints and Gross's defective report and search warrant.

78. On May 31, 2022, CSC Senior Conduct Coordinator Becca Wallace ("Wallace") met with Plaintiff via Zoom about the degree hold. Wallace informed Plaintiff that she had been waiting for Gross to turn her UCPD report over to CSC before imposing the degree hold, confirming CSC's reliance on UCPD's investigation and its inextricable embedding in the process. Plaintiff informed Wallace that he had previously reported Ajoy's sexual misconduct to OPHD, that he believed this hold was pretextual, and again reported the sexual battery to Wallace. Instead of considering the retaliation and reporting Ajoy's sexual battery to OPHD on Plaintiff's behalf as a mandatory reporter, Wallace, without evidence, asserted that she believed Plaintiff had driven from his off-campus home outside Alameda County to Albany (where Plaintiff then held a University Village apartment) to sabotage Ajoy's computers.

79. Internal emails between CSC, Cal 1 Card Office, and Facilities Services show that by May 2022, University officials knew that Plaintiff's student identification card had been replaced on December 17, 2021 with a new card without building access, yet they relied on the older, deactivated card number in card-access logs —the originals of which were

never provided to Plaintiff —without adequately investigating whether the card had been stolen, cloned, or misused by someone else.

80. On June 4, 2022**,** Plaintiff first learned by mail that the search warrant had been executed.

81. On or about July 19, 2022**,** CSC's in-house Independent Hearing Officer Benjamin Fils recused himself, after admitting that he had supervised Wallace's intake of Ajoy's complaint, creating a conflict.

82. Rather than appointing a neutral campus official, Former Associate Vice Chancellor and Chief of Staff of the Vice Chancellor of Student Affairs Bahar Navab ("Navab") hired Ohio-based attorney-adjudicator Stephanie Slone ("Slone") of Van Dermyden Makus Law Corporation as outside Independent Hearing Officer, thereby centralizing adjudicatory power in a single outside attorney whose employment depends on repeat assignments from institutions like UC Berkeley.

83. Around this time, Gross left UCPD after approximately eighteen years and moved to Bozeman, Montana.

84. By this time, Plaintiff was still on paid investigatory leave from his RSSP position and had never been arrested, charged, or prosecuted for any offense related to the lab computers. The District Attorney's Office ultimately rejected UCPD's pretextual case without Plaintiff's involvement.

85. On or around September 2022, Plaintiff met with OPHD again to report Ajoy's sexual misconduct. OPHD did not immediately open an investigation, but instead issued a no-contact directive between Plaintiff and Ajoy, with the explicit exception of Ajoy's participation in Plaintiff's student conduct proceeding.

86. On or around September 7, 2022, Plaintiff reported the October 7, 2021 sexual battery to UCPD.

87. On October 14, 2022, during the first phase of the student conduct hearing, Plaintiff began cross-examining Ajoy and attempted to question him about his knowledge of Plaintiff's Title IX/SVSH complaint to OPHD regarding Ajoy's sexual battery and its incipient investigation. Shortly after Plaintiff raised that topic, the hearing was paused, the recording appears to have been stopped, and Plaintiff experienced a painful flare-up of his disability, prompting a recess for medical reasons.

88. On November 3, 2022, only after the first continuation of the conduct hearing and after Plaintiff had filed a sexual battery report with UCPD, OPHD finally opened a belated Title IX/SVSH investigation into Plaintiff's complaint against Ajoy, assigning investigator Ashok Arjun Rau ("Rau").

89. Slone was aware of the Title IX/SVSH investigation from Plaintiff's last question to Ajoy during the October 14 hearing and before Plaintiff's medical emergency but did not pause or bifurcate the conduct process. Instead, she moved aggressively to limit Plaintiff's ability to directly cross-examine Ajoy, his assailant.

90. At the December 2, 2022 continuation, Slone forbade Plaintiff from continuing his direct cross-examination of Ajoy, which Plaintiff had been allowed to do prior to OPHD's opening of an investigation and prior to Plaintiff's October 14 question about Ajoy's knowledge of Plaintiff's report on Ajoy's sexual battery to OPHD.

91. When Ajoy was recalled on December 2, 2022, Slone and Navab allowed Plaintiff's questioning of Ajoy only on the condition that Plaintiff keep his camera off and microphone muted "so as not to make Ajoy uncomfortable," and that Plaintiff submit all questions in writing. Slone then skipped more than thirty of Plaintiff's proposed questions, without proper rulings, and allowed Ajoy to leave early, prior to the conclusion of questioning.

92. Because Gross had left UCPD, she was not available for direct or cross-examination. Instead, CSC called UCPD Detective Jackson Thomsen ("Thomsen"), Gross's replacement in the Threat Management Unit. Thomsen offered no technical or forensic evidence and merely lamented on the record, in response to Slone's inquiry, that the District Attorney had declined to file charges against Plaintiff —information that had been unknown to Plaintiff up until that point.

93. Thomsen admitted that Ajoy reported the alleged sabotage only after the 21-day Stanley Hall video retention period had expired, undermining any claim of diligent reporting or investigation and ensuring that no objective video evidence could be reviewed.

94. The "evidence" of "sabotage" was riddled with anomalies, including: (a) a supposed swipe-card log, never provided in the original, tied to the card that Plaintiff reported lost and whose deactivation Plaintiff requested on December 17, 2021, during his in-person

visit to the Cal 1 Card Office; (b) unexplained six-week chain-of-custody gaps in the handling of hard drives upon alleged discovery of "sabotage" up to their delivery to UCPD on or about February 6, 2022; (c) an Alameda County Crime Lab report that could not definitively tie any deletion to Plaintiff and which offered no technical explanation or expert analysis establishing how any erasure supposedly occurred; (d) the UCPD report's mere reference to an $8,400 computer setup receipt, downgraded from Ajoy's claims of millions of dollars and asserted by Ajoy as proof of financial loss but never actually introduced as evidence beyond Gross's reference in the UCPD report; (e) the UCPD report's reference to the May 5 search warrant, without production of any digital records seized; and (f) the lack of any civil suit for damages or criminal charges, despite the extreme losses and felony-level sabotage alleged.

95. At the close of the hearing, Plaintiff again stated on the record that Ajoy had sexually battered him and that the sabotage case was retaliatory. Slone responded, in a warning tone, "Now, wait—that's another case," and appeared visibly frustrated and dismissive as Plaintiff began to experience a second flareup of his disabling condition before the hearing ended.

96. Despite the lack of evidence of Plaintiff's involvement or that the alleged incident even occurred, on December 5, 2022, Slone issued a decision, finding Plaintiff responsible for computer sabotage, without citing actual forensic evidence and instead relying on summaries of the defective UCPD investigation.

97. The degree hold, Slone's conduct finding, and the subsequent recommendation of dismissal were thus predicated not on independently tested forensic evidence, but on Gross's defective, ultra vires investigation and her unverified statements about what her warrant—secured through fraudulent misrepresentations and omissions perpetrated on a Superior Court judge—supposedly showed, combined with Ajoy's retaliatory accusations. No actual warrant fruits or technical data were ever provided to the court, Plaintiff, or even to CSC, yet Gross's narrative about those alleged fruits became the core "evidence" on which CSC and Slone acted, making UCPD's misconduct and Ajoy's retaliation inseparable from the University's disciplinary outcome.

H. 2023: OPHD "Investigation," Secret Sanctions, and Biased Appeal

98. In January 2023, a former Ajoy lab member and then PhD candidate, who had abruptly left the lab in June 2021, emailed Plaintiff's Berkeley.edu account, after being contacted by Rau as part of the OPHD investigation, and described "secret, ultra negative experiences" with Ajoy.

99. In early May 2023, OPHD investigator Rau issued his "investigation" report, finding in Ajoy's favor. Rather than neutrally evaluating Plaintiff's complaint, Rau portrayed Plaintiff as a villain rather than a victim of sexual battery; imported and repeated Slone's conduct findings and Ajoy's computer-sabotage narrative; and falsely implied, through non-probative hearsay, that Plaintiff had a pattern of inappropriate behavior toward female lab members, including outlandishly false claims, that, if believed, should have involved UCPD (such as Plaintiff "chasing" or "following" a female labmate across campus in broad daylight as hundreds of students changed classes in the quad between Lewis, Latimer, and Hildebrand Halls—a statement never shared with Plaintiff while he was an employee of the lab). While admitting that these hearsay statements provided to OPHD by Ajoy were outside the scope of his investigation, Rau included them as "context" for credibility rather than for the truth of the matter asserted, using it as a basis to discredit Plaintiff while exonerating Ajoy.

100.     Rau's report was especially troubling because OPHD is the only campus office authorized to investigate SVSH matters in both educational and employment contexts, and Plaintiff has never been a respondent in any SVSH case, has never been subjected to any adverse HR findings or even investigations, and separated from employment with the University through ordinary contract expiration, not termination with cause or any discipline notation in his personnel file.

101.     On May 25, 2023, Slone, Navab, and Michael Mann ("Mann"), the representative of CSC who had acted on the University's behalf during the October and December 2022 student conduct hearing, held an ex parte sanctions hearing pursuant to Slone's biased conduct finding in Plaintiff's absence.

102.     On June 9, 2023, Slone submitted to the Dean of Students a hearing report that: (a) claimed that Plaintiff had somehow learned how to erase complex Linux systems and hard drives simply from being in the lab long enough, *illogically attributing curation of*

*lab computer systems to an undergraduate whose major and background are wholly unrelated to computer systems or computer science*; (b) misidentified Plaintiff as a graduate student, implying greater technical knowledge; and (c) referenced the defective search warrant mentioned in Gross's UCPD report but whose seized data was never disclosed to CSC or Plaintiff in any concrete form.

103.     On June 18, 2023, Plaintiff filed a charge with the California Civil Rights Department ("CRD") alleging sexual harassment, retaliation, and discrimination based on the October 7, 2021 assault and the retaliatory computer-sabotage narrative.

104.     In July 2023, Plaintiff appealed the conduct finding and degree hold. Instead of being assigned to a neutral campus official, the appeal, just like the conduct hearing, was assigned to outside attorney-adjudicator Amy Oppenheimer ("Oppenheimer")**,** the principal of Oppenheimer Investigations Group LLP.

105.     Plaintiff shared the CRD charge and cited: (a) anomalies in evidence; (b) denial of access to "evidence" referenced only in the UCPD report; (c) Slone's limitations on Plaintiff's ability to question Ajoy *only* after the SVSH investigation into Ajoy opened; (d) the retaliatory motive of the entire process arising from Plaintiff's protected report; and (e) Ajoy's definitive knowledge that Plaintiff planned to report the October 7, 2021 assault as early as December 7, 2021, when Plaintiff verbally informed Ajoy that he would do so.

106.     On or about August 16, 2023, Oppenheimer—whose business, like Slone's, depends on securing repeat contracts with the University through issuance of decisions favorable to the University—upheld the University's findings and degree hold, finding "no evidence" that the conduct and Title IX/SVSH processes were related, effectively ratifying the retaliatory conduct and exhausting Plaintiff's administrative remedies aside from the Chancellor's veto of the findings.

107.     The same firm, Oppenheimer Investigations Group, later supplied Alezah Trigueros ("Trigueros") as the Title IX/SVSH hearing officer for Plaintiff's SVSH case against Ajoy. By the time of the January 19, 2024 hearing, the same private firm that had endorsed the sabotage narrative and upheld Plaintiff's degree hold was now controlling the campus SVSH hearing, creating a structural conflict of interest**.**

108.    By accepting the sabotage finding and the degree-denial recommendation at face value—without scrutinizing the conflict between Plaintiff's sexual-battery complaint, Ajoy's unfounded accusations, Plaintiff's lack of a disciplinary record as an employee, Ajoy's recommendation letter written on behalf of Plaintiff, Plaintiff's lack of motive or ability, and the glaring evidentiary anomalies—Slone's degree withholding decision and Oppenheimer's appeal decision ratified and entrenched the same tainted narrative that originated with Ajoy, UCPD, and Gross and continues to underlie the degree hold.

I. January 19, 2024: Plaintiff's Exclusion from Ajoy's SVSH Hearing

109.    On January 19, 2024, the University convened an SVSH hearing on Plaintiff's Title IX/SVSH complaint against Ajoy, with Trigueros of Oppenheimer Investigations Group serving as hearing officer and out-of-state hearing coordinator Reese Havlatka ("Havlatka")—the University's new independent hearing officer for student conduct cases—controlling the Zoom session.

110.    Despite Plaintiff's status as the complainant, Trigueros directed Havlatka to remove Plaintiff from the Zoom session at the hearing's commencement and then conducted a five-hour ex parte hearing with Ajoy and his counsel in Plaintiff's absence.

111.    Plaintiff was thereby deprived of the ability to participate in real time, hear Ajoy's testimony, present his own account of the sexual battery, observe testimony and demeanor, cross-examine witnesses, and consult in any meaningful way with the process.

112.    Instead, the University treated Plaintiff like a quasi-respondent and framed Ajoy as a victim of a nefarious saboteur. Ajoy presented the computer sabotage narrative and defamatory hearsay claims that Plaintiff sexually harassed members of the lab, despite Plaintiff never being a respondent in any SVSH case or the subject of any workplace discipline or adverse HR findings.

113.    Rau's biased report was entered into evidence and its misrepresentations of Plaintiff could not be challenged in Plaintiff's forced absence.

114.    OPHD Director Kellie Brennan ("Brennan") and Trigueros subsequently gave conflicting, pretextual written explanations for Plaintiff's exclusion, none of which aligned with reality, the remotely controlled structure of a Zoom hearing, or basic

principles of due process or equitable participation under Title IX or related SVSH frameworks.

115.    A former Ajoy lab member and then-PhD candidate participated in the hearing as a character witness for Plaintiff.

116.    In or around March 2024, following Plaintiff's exclusion from the hearing, Trigueros issued a finding in favor of Ajoy and rescinded the no-contact directive imposed by OPHD in September 2022. Her Final Fact-Finding Hearing Report repeated Rau's biased investigative narrative, cited the retaliatory sabotage allegations, and favored Ajoy's version of events without Plaintiff's participation. The report further entrenched the institutional conclusion that Ajoy had done nothing wrong, while Plaintiff was unreliable and dangerous, despite Plaintiff having no history of criminal charges, civil actions, or employment discipline.

117.    By excluding Plaintiff from his own SVSH hearing, in which he was the complainant, while allowing his assailant Ajoy and his counsel to present the sabotage narrative and Rau's report unchallenged, Trigueros and OPHD converted the original retaliatory narrative into a barrier to Title IX relief, further entrenching the same false story that underpins the degree hold.

J. CRD / FEHA Proceedings and Bianca Bowman-Waugh's Fraudulent Submission

118.    On June 6, 2024—nearly a year after Plaintiff's June 18, 2023 CRD charge and almost five months after Plaintiff's exclusion from the January 19, 2024 SVSH hearing—Employee and Labor Relations ("ELR") consultant Bianca Bowman-Waugh ("Bowman-Waugh"), on behalf of People & Culture (the University's HR Department), submitted a 9-page "Position Statement" to CRD in response to Plaintiff's charge.

119.    Plaintiff was not given access to this submission until October 3, 2025, after a protracted appeal and protracted CPRA process with CRD's PRA Unit.

120.    Bowman-Waugh's CRD submission:

    a.    Concealed the existence of, and Plaintiff's exclusion from, the January 19, 2024 SVSH hearing, the ex parte nature of the proceeding, and the conflicts of interest

inherent in using an Oppenheimer-firm adjudicator to preside over the SVSH matter when Oppenheimer herself had already adversely decided Plaintiff's appeal of his degree hold *five months earlier*;

b.  Presented Rau's disputed May 2023 "investigation" report as the final, uncontested disposition of the matter—despite Rau's reliance on the computer sabotage narrative and uninvestigated allegations against Plaintiff that did not align with actual University records of separation due to ordinary contract expiration, without employee discipline of any kind—and failed to acknowledge that Plaintiff had been removed from a hearing where that report was at issue;

c.  Repeated the computer-sabotage narrative almost verbatim from Ajoy's account;

d.  Included dismissed, non-probative HR material that was never shared with Plaintiff while he was an employee—material that, in fact, Plaintiff viewed for the first time through CRD's CPRA release on October 3, 2025—was never included in Plaintiff's personnel file, and was, from an evidentiary standpoint, intended only to confuse and prejudice CRD against Plaintiff; and

e.  Disclosed that Plaintiff's degree was withheld, framing it as legitimate "context" for CRD, despite the University's obligation under FERPA to protect the privacy of student educational records.

121.    On December 17, 2024—relying strongly on UC Berkeley's misrepresentations and concealments in Bowman-Waugh's June 6, 2024 submission, and despite having been informed by Plaintiff of Plaintiff's SVSH participation rights violations—CRD closed the case for "insufficient evidence" and issued a FEHA Right-to-Sue Notice. That notice remains valid and unexpired as of the date of filing.

122.    On or about January 2025, EEOC commenced a substantial weight review of CRD's case file, which included Bowman-Waugh's submission to CRD on behalf of the University as well as other University responses, whose exact content was still unknown to Plaintiff.

123.    On or about February 2025, EEOC, seemingly influenced by the University's misrepresentations and omissions, closed the charge and issued a Right-to-Sue letter.

124.    On October 3, 2025, Plaintiff's CPRA request for the CRD case file was granted after a lengthy appeal and months-long disclosure process. This was the first time Plaintiff saw the full contents of the University's June 6, 2024 response and the extent of its omissions, distortions, and improper use of dismissed, non-probative HR material that had never been shared with Plaintiff while he was an employee of the University.

125.    On October 22, 2025, CRD Attorney Rebecca Pinger of the PRA Unit confirmed on letterhead that the University's June 6, 2024 submission to CRD did not contain any reference to the January 19, 2024 SVSH hearing from which the University excluded Plaintiff, confirming the University's concealment without correction or amendment.

126.    On November 11, 2025, Plaintiff filed an inquiry with EEOC, sharing the newly discovered post-charge retaliation in Bowman-Waugh's submission to CRD, including:

    a.    her omission of Plaintiff's exclusion from the January 19, 2024 SVSH hearing;

    b.    her falsification of the case's procedural history;

    c.    her inclusion of dismissed, non-probative HR material that was never shared with Plaintiff while he was an employee, and whose inclusion served no articulable purpose other than to confuse CRD and prejudice the agency against Plaintiff; and

    d.    her inversion of roles, framing Plaintiff as a harasser, even though Plaintiff was never subjected to employee discipline, termination, or adverse HR findings or investigations, and was never a respondent in any SVSH case.

127.    EEOC is currently reviewing Plaintiff's inquiry and request for a new Title VII Right-to-Sue notice based on this post-charge retaliation, and Plaintiff will seek leave to amend the Complaint to include the Title VII Right-to-Sue notice and related cause of action once issued.

128.    Bowman-Waugh's June 6, 2024 submission to CRD made no mention of UCPD's investigation or Gross by name. Instead, it selectively presented the University's internal outcomes. By packaging those internal decisions as neutral and complete, while omitting any reference to the participation violation and the retaliatory context, her submission misled CRD and blocked external remedial action in a state civil rights investigation and later EEOC substantial weight review.

K. Chancellor Lyons and Lopez's Role in Continuing Retaliation

129.    On or about July 1, 2024, Defendant Lyons became Chancellor of UC Berkeley. By virtue of his office, Lyons has ultimate authority over degree conferral and the power to revisit and correct unjust disciplinary outcomes.

130.    In October 2024, Plaintiff emailed Lyons from his Berkeley.edu address, to explain the retaliatory degree hold, the lack of evidence of any actual sabotage, the existence of a parallel Title IX/SVSH case involving Ajoy's sexual battery, Plaintiff's exclusion from Ajoy's SVSH hearing, and the harm caused by withholding a completed degree. Plaintiff also explained his longstanding relationship with UC Berkeley, his book in the campus holdings of Doe Library, and his 2010 degree.

131.    About three days after Plaintiff's email, Lyons' Chancellor's Office team denied relief without substantive explanation, stating that the "administrative process…for violations of the code of student conduct is complete and the sanctions are final."

132.    In February 2025, Plaintiff attended a gala at UC Berkeley as an invited alumnus. Lyons attended and posed for photographs with Plaintiff—who, like all attendees, wore a preprinted name tag provided at check-in by the University—further underscoring the contradiction between Berkeley's use of Plaintiff as an alumnus and its refusal to confer his completed second degree.

133.    On March 21, 2025, Plaintiff again notified Lyons about the degree hold from his berkeley.edu account. Despite the October 2024 denial of relief, Lyons disavowed any knowledge of the matter and again delegated it to his staff, who once more refused, without explanation, to reconsider the hold.

134.    Plaintiff continued serving Berkeley in alumni roles in 2025, including grading essays and phone-banking for scholarship programs administered by the University.

135.    On May 8, 2025, Defendant Lopez informed Plaintiff by email that the Chancellor's team had contacted her about Plaintiff's degree. Lopez then stated, without explanation, that the completed "degree is not eligible to be conferred," that "the case has been fully resolved," and that "all administrative procedures have been exhausted."

136.    Lopez maintained the degree hold, despite being shown that:

a.    The District Attorney had rejected UCPD's criminal charges;

   b.   Neither Ajoy nor the University had ever filed for civil relief;

   c.   HR and UCPath showed no termination or discipline of Plaintiff; and

   d.   The alleged "computer sabotage" remained unproven, and, if believed, would have constituted a real-world felony and property tort that was never tried in criminal or civil court, despite UCPD's attempts to file charges.

137.   On July 1, 2025, Lopez again wrote that the matter was "complete" and confirmed that no degree would be awarded, even after Plaintiff reminded her and Lyons that: (a) Plaintiff had never been criminally charged, despite the alleged policy violation corresponding to a serious felony in the "real world"; (b) Plaintiff had never seen the forensic evidence mentioned in the UCPD report; (c) no civil action had ever been filed; and (d) no explanation was ever provided to Plaintiff's requests as to how exactly the alleged computer erasure could even be achieved.

138.   On July 21, 2025, HR partner White confirmed by email that Plaintiff's contracts had ended by ordinary expiration, that he had not been terminated, and that nothing barred him from applying for employment with UC Berkeley—directly contradicting the "terminated disgruntled saboteur" narrative relied on in the student conduct, OPHD, and CRD processes.

139.   As of the date of filing, Plaintiff retains an active CalNet account, a working Berkeley.edu email, a University library account, and alumni access to—and attendance at—campus events, including the Golden Bear Orientation and Homecoming, but no access to the second completed degree he earned.

L. CPRA Obstruction and UCPD's Continuing Harm

140.   On April 23, 2025, Plaintiff submitted a CPRA request to UCPD Records from his Berkeley.edu account seeking warrant materials and any digital evidence obtained through Gross's May 5, 2022 warrant that had never been filed with the issuing court and remained solely in UCPD's custody. This request was ignored, despite the matter no

longer being an active investigation and the statute of limitations having lapsed on UCPD's Penal Code § 502(c)(4) case.

141.    On May 1, 2025, Plaintiff visited UCPD at 1 Sproul Hall and submitted requests on UCPD's own CPRA forms seeking: (a) the UCPD report concerning Ajoy's October 7, 2021 sexual battery; and (b) the warrant materials that were mentioned of Gross's UCPD report on computer sabotage and CSC's hearing packet. These requests were also ignored.

142.    On May 27, 2025, Plaintiff sent UCPD Records a CPRA request by certified mail, duplicating the ignored in-person submission from May 1. On May 30, 2025, Public Records Coordinator Janesa Shearer of the University's PRA Office acknowledged receipt by email but did not provide a statutory determination or production date, merely a boilerplate statement that records *might* exist and referencing a tentative August 11, 2025 production date.

143.    On July 22, 2025, Shearer sent a vague update, confirming the existence of all the requested records, invoking unrelated CPRA exemptions that "may apply," and stating that some records may be produced before the proposed production date.

144.    On August 11, 2025, the proposed production date passed without production or a meaningful update. No further updates were ever received from Shearer or the University PRA Office.

145.    On October 8, 2025, Jennifer Woods ("Woods") of UCPD Records finally released the sexual-battery police report after six months of delay via a Virtru-encrypted email link sent to Plaintiff's Berkeley.edu address. The report showed that Ajoy, when interviewed by UCPD in the same office where the October 7, 2021 sexual battery occurred, invoked the computer-sabotage narrative and fabricated claims about HR issuing warnings to Plaintiff during his employment, again framing Plaintiff as a disgruntled employee, despite Plaintiff's employment separation ending by ordinary contract expiration, without disciplinary action or termination. In the same email to which the report was attached, Woods claimed UCPD was "reviewing" Plaintiff's request for warrant materials (that were never filed with the issuing court), but no further response was furnished.

146.　　　On October 24, 2025, Plaintiff submitted an email request in the same thread for Gross's separation records pursuant to Penal Code § 832.7(b)(1)(C)–(E).

147.　　　On November 8, 2025, UCPD Lieutenant Nicole Miller ("Miller") responded in the email thread that Gross had separated "in good standing" but failed to acknowledge or fulfill Plaintiff's outstanding CPRA requests for warrant-materials and separation records. Miller also falsely disclaimed custody of warrant records and directed Plaintiff on a wild goose chase to Alameda County Superior Court, whose Criminal Division had already confirmed that UCPD was the sole custodian of those materials.

148.　　　On November 21, 2025, Plaintiff reaffirmed Alameda County Superior Court's position that UCPD was the sole custodian of those records. Miller provided no response. As of the date of filing, the University has not issued a lawful CPRA determination letter concerning the outstanding public records requests for warrant materials and disclosable separation records.

149.　　　On December 2, 2025, Plaintiff emailed Miller a follow-up—with Lyons, Woods, UCPD Records, and the University's PRA Office cc'd—reminding her of the outstanding CPRA requests for Gross's separation records and May 2022 warrant materials allegedly seized from T-Mobile as part of the defective warrant. Plaintiff also pointed out the demonstrably false material statements and omissions in Gross's May 5, 2022 probable cause affidavit, specifically:

    a.　the false statement about adverse findings of a Human Resources investigation, implying that Plaintiff was a disgruntled employee who had been disciplined or terminated;

    b.　the omission that the reported interview with Plaintiff had been conducted outside UCPD's jurisdiction, without coordination with or permission from local law enforcement to conduct a criminal investigation in their jurisdiction; and

    c.　the omission of the activation of an Axon body-worn camera within Plaintiff's residence without informing Plaintiff or local law enforcement.

150.　　　In the same email, Plaintiff also submitted to Miller a new CPRA request for:

    a.　The body-worn camera footage from Gross's visit to Plaintiff's home in Solano County, under color of law, on April 29, 2022;

b.  Records, if any, of interagency communications with the city police department or Solano County Sheriff's Office regarding Gross's visit to and custodial interview in Solano County; and

c.  UCPD records, if any, reflecting authorization, planning, or supervision of that April 29, 2022 custodial interview in Solano County.

151.  Plaintiff closed the email with questions for Miller, including:

a.  Miller's supervisory role, if any, of Gross's April 29, 2022 custodial interview in Solano County;

b.  Miller's review or approval, if any, of Gross's May 5, 2022 warrant packet;

c.  UCPD's notification or coordination with local law enforcement regarding Gross's visit and custodial interview in Solano County on April 29, 2022;

d.  The identity of the individual who authorized Gross's use of an Axon body-worn camera in Plaintiff's home and outside UCPD's jurisdiction on April 29, 2022; and

e.  Confirmation of UCPD's status as sole custodian of the warrant materials.

152.  Neither Miller nor anyone within the University responded.

153.  On December 15, 2025, in response to Plaintiff's follow-up inquiry, an Alameda County Superior Court administrator, Adam Byer, stated that "whatever is returned would be in the search warrant file" and further advised that "the proper venue" for raising "any alleged injustice" is "through legal action," and that there is "no administrative remedy." Based on that representation and Plaintiff's review of the court file, Plaintiff understands that any seized digital evidence that is not in the court's file is being retained solely by UCPD and has never been made part of the public judicial record as required by California warrant-return procedures.

154.  As of the filing of this Complaint, UCPD continues to withhold the warrant materials**,** maintains sole custody of any digital "evidence" allegedly seized as fruits of the defective warrant, refuses to allow inspection of the alleged fruits, and has not provided an itemized inventory or chain-of-custody. This continued retention and concealment is a continuing constitutional injury**,** especially given that Gross's mere mention of undisclosed fruits of the defective warrant, without any meaningful

production or entry into evidence for CSC's conduct proceedings, were used to justify the ongoing retaliatory degree hold on Plaintiff's completed degree.

M. Ongoing Injury

155.    Plaintiff's completed second degree remains withheld**.** His transcript and academic record reflect adverse status ("administrative dismissal") based on an unsupported sabotage finding rooted in UCPD misconduct and anomalous evidence never produced but merely mentioned in reports without disclosure.

156.    The student conduct findings**,** Title IX/Title VII outcome in Plaintiff's SVSH case against Ajoy**,** and the University's misrepresentations to CRD are all anchored in the same false narrative constructed after Plaintiff reported sexual battery by Defendant Ajoy, his faculty supervisor, and are part of a single continuing course of retaliation in which UCPD's misconduct is inextricably embedded**.**

157.    Furthermore, the highly prejudicial and demonstrably false statements about Plaintiff's employment in Gross's May 5, 2022 probable cause affidavit remain publicly available at the Clerk's Office of the Criminal Division of the Alameda County Superior Court, threatening reputational and economic harm to Plaintiff, *despite no arrest, criminal case, or conviction associated with the warrant*. In essence, Plaintiff suffers the stigma of a convicted felon, not on the basis of a fair trial in a court of law but on a biased, retaliatory administrative process decided by an out-of-state attorney-adjudicator whose employment depends, at least in part, on securing contracts with universities by issuing decisions in favor of the university employer.

158.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer:

   a.    Loss of the second degree that he completed in 2022 and the professional, academic, and economic opportunities that that degree would confer;

   b.    Economic injury**,** including diminished earning capacity, loss of future educational and employment prospects, and costs associated with navigating administrative and legal processes;

c.  Emotional distress, including anxiety, depression, humiliation, and trauma related to the sexual battery, retaliatory campaigns, exclusion from the process, and ongoing refusal to restore his completed degree;

d.  Reputational harm, including the stigma of being labeled a saboteur based on unfounded allegations;

e.  Constitutional injury, including infringements on his Fourth Amendment rights in the form of an unlawful search and retention of his data, and infringements on his Fourteenth Amendment rights to due process and equal protection; and

f.  A chilling of his willingness and ability to participate fully in the educational and employment opportunities to which he is entitled.

N. Timeliness of Federal Civil Rights Claims

159.    The University's conduct described in this action constitutes a continuous, escalating course of discrimination and retaliation that began after Plaintiff reported the October 7, 2021 sexual battery and has not ceased. The same core "computer sabotage" pretext and defective warrant are still being used to justify the ongoing withholding of Plaintiff's completed second degree.

160.    Key retaliatory and discriminatory acts occurred well within two years of the filing of this Complaint, including but not limited to:

a.  Plaintiff's exclusion from the January 19, 2024 Title IX/SVSH hearing, in which he was the complainant and victim;

b.  The June 6, 2024 submission of a misleading CRD response by Bowman-Waugh, which Plaintiff did not see until October 3, 2025;

c.  Chancellor Lyons' denials of relief and ratification of the degree hold, through indifference and delegation to his Chancellor's Office team, beginning in October 2024 and again in March 2025;

d.  Lopez's reaffirmations on May 8, 2025 and July 1, 2025 that Plaintiff would not receive his completed degree; and

e.  UCPD's ongoing refusal in 2025 to produce the warrant materials and chain-of-custody records Plaintiff requested under CPRA, despite UCPD being the sole custodian of the requested records.

161.    Each reaffirmation of the degree hold and refusal to correct Plaintiff's record constitutes *a fresh adverse act and part of a continuing violation, not merely a lingering consequence of a past event.* Plaintiff's injuries from the degree hold, the retaliatory handling of his Title IX/SVSH case against Ajoy, and the misuse of the defective warrant are ongoing and are inextricably linked to the same nucleus of operative fact.

162.    To the extent any discrete act is argued to fall outside a particular limitations period, Plaintiff alleges that:

a.  The constitutional and civil-rights violations are part of a single continuing course of conduct culminating in acts within the limitations period;

b.  Plaintiff is entitled to relief under the Continuing Violation Doctrine, particularly with respect to ongoing retaliation and continuing refusal to confer his degree; and

c.  The Discovery Rule tolled accrual as to certain facts—such as the full content of the University's June 6, 2024 CRD submission—until those documents were produced to Plaintiff for the first time on October 3, 2025.

163.    All of Plaintiff's federal and state claims arise from a single, interlocking narrative: after Plaintiff informed Defendant Ajoy of his intent to report Ajoy's October 7, 2021 sexual battery and then did, in fact, report the sexual battery, the University and its agents (including Ajoy, Gross, CSC, OPHD, HR, and the Chancellor's Office) constructed and/or maintained a retaliatory "computer sabotage" pretext.

164.    Gross then conducted an ultra vires, defective investigation, culminating in a false, publicly filed warrant affidavit—containing material misrepresentations and omissions—whose supposed fruits were alleged—without disclosure—in Gross's UCPD report to CSC. That report asserted nonexistent HR "findings," alleged sexual harassment of lab colleagues without any supporting investigations, and memorialized Gross's ultra vires conduct in her admission of the custodial interrogation's off-campus location and secret recording.

165.    CSC, OPHD, and later decision-makers relied not on any disclosed technical evidence, but on Gross's narrative description of those supposed fruits and on Ajoy's accusations, in order to: (a) secure a conduct finding of sabotage and degree hold, (b) defeat Plaintiff's SVSH complaint, (c) mislead CRD and EEOC, and (d) justify an ongoing degree hold and dismissal that Lyons and Lopez have repeatedly refused to correct as recently as July 1, 2025.

166.    The same defective UCPD investigation, the same set of false narratives about sabotage and sexual harassment, the same undisclosed "fruits" of the warrant, and the same retaliatory motive thus underpin Plaintiff's Title IX, FEHA, § 1983, and state-law claims.

## FIRST CAUSE OF ACTION

**Title IX: Sex Discrimination, Sexual Harassment, and Retaliation (20 U.S.C. § 1681 et seq.)**

Against The Regents

167.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

168.    At all relevant times, The Regents operated UC Berkeley and its programs and activities, including the program in which Plaintiff was enrolled, OPHD/Title IX Office, CSC, UCPD, and related student and employee disciplinary processes. The Regents receive federal financial assistance and are therefore subject to Title IX.

169.    Plaintiff was a student at UC Berkeley and participant in University educational programs and activities, and also a student-employee, when Ajoy sexually battered him on October 7, 2021.

170.    For each period of employment in Ajoy's lab (February 2021–May 31, 2021 and June 1, 2021–December 31, 2021), Plaintiff was simultaneously enrolled in Honors Research (Chem H194) under Ajoy, earning an A+ (4 units) in Spring 2021 and an A (6 units) in Fall 2021. These grades have never been changed, underscoring that his academic performance and relationship with Ajoy were officially rated as excellent even as the later "sabotage" narrative was constructed.

171.    Ajoy's conduct— sexually assaulting Plaintiff and threatening him with professional and academic ruin if he reported the assault—was severe, abusive, and objectively offensive; deprived Plaintiff of equal access to the educational environment; and constituted sexual harassment and sexual violence under Title IX.

172.    Plaintiff engaged in protected activity under Title IX when, among other things, he: (a) informed Ajoy on December 7, 2021, that he intended to report the sexual battery; (b) reported Ajoy's conduct to OPHD in early February 2022; (c) reported the sexual battery again to Wallace of CSC in May 2022; (d) reported the sexual battery to UCPD and again to OPHD in September 2022; and (e) pursued a Title IX/SVSH complaint leading to the January 19, 2024 hearing.

173.    Instead of promptly and effectively responding to Plaintiff's Title IX complaints, The Regents—through OPHD, CSC, UCPD, and their agents—delayed and distorted the Title IX process, including by: (a) failing to promptly open a Title IX/SVSH investigation after Plaintiff's 2022 reports to OPHD; (b) allowing Ajoy to weaponize a "computer sabotage" narrative as a retaliatory shield; (c) embedding the Penal Code § 502(c)(4) narrative and Gross's defective warrant and ultra vires investigation into the student conduct process; (d) maintaining the sabotage narrative, despite evidentiary anomalies and the District Attorney's rejection of UCPD's allegations against Plaintiff; and (e) delaying the opening of  OPHD's Title IX/SVSH investigation into Ajoy's sexual battery *until after* the first continuation of the conduct hearing and after Plaintiff had already been accused of sabotage.

174.    When Plaintiff made a report to OPHD on or around February 2022 about Ajoy's misconduct, the University had actual notice that a faculty supervisor had sexually assaulted a student-employee.

175.    On or around May 31, 2022, during a meeting about the hold on Plaintiff's completed degree, Plaintiff informed former CSC Senior Conduct Coordinator Becca Wallace of Ajoy's assault and shared Plaintiff's belief that the degree hold was retaliatory and a liability shield, Wallace, as agent of The Regents and a mandatory reporter, did not initiate a report to OPHD on Plaintiff's behalf. Instead, Wallace further advanced the

computer sabotage narrative, stating that she "believed" Plaintiff drove from his off-
campus home outside Alameda County to Berkeley to sabotage Ajoy's computers.

176.     The Regents, through OPHD investigator Rau, then conducted an SVSH
investigation that was structurally biased and outcome-driven, relying on the retaliatory
student conduct findings and on Ajoy's sabotage narrative, instead of fairly evaluating
Plaintiff's complaint. Running parallel to the retaliatory student-conduct proceedings,
Rau's investigation imported uninvestigated hearsay against Plaintiff to discredit him—
including outlandishly false claims, that, if believed, should have involved UCPD (such
as Plaintiff "chasing" or "following" a female labmate across campus in broad daylight as
classes changed in the quad between Lewis, Latimer, and Hildebrand Halls)—and treated
him at all times as a quasi-respondent rather than as the complainant and victim of SVSH,
despite University records showing no investigations or employee discipline or
termination of Plaintiff.

177.     On January 19, 2024, in one of the most egregious deviations from Title IX
requirements, The Regents—through OPHD, Trigueros, and Havlatka—excluded
Plaintiff, the complainant in the Title IX/SVSH case, from his own Title IX/SVSH
hearing by cutting off his Zoom feed, conducted a five-hour ex parte proceeding with
Ajoy and his counsel, and deprived Plaintiff of his right to present evidence, cross-
examine witnesses, and observe the process in real-time, while allowing Ajoy to present
the sabotage narrative and Rau's biased report.

178.     The Regents' agents OPHD Director Brennan and hearing officer Trigueros, gave
inconsistent and pretextual explanations for Plaintiff's exclusion that cannot be
reconciled with basic fairness or Title IX's requirement of meaningful participation for
complainants.

179.     That exclusion, and the subsequent finding in Ajoy's favor, constituted sex-based

discrimination and retaliation under Title IX by: (a) denying Plaintiff an equal
opportunity to participate in the Title IX process; (b) discrediting his sexual-battery
complaint by relying on a retaliatory sabotage theory; and (c) treating him as a quasi-
respondent despite being the victim/complainant in the matter.

180.     In addition, on June 6, 2024, The Regents—through ELR consultant Bowman-Waugh—submitted a response to CRD that omitted any mention of Plaintiff's January 19, 2024 exclusion from his own SVSH hearing (in which he was the complainant), revived dismissed HR material that had never been shown to Plaintiff while he was a student-employee and that never appeared in Plaintiff's personnel file, and mischaracterized his employment status and history. This submission—made after Plaintiff had filed CRD and EEOC complaints alleging sexual harassment and retaliation and not discovered by plaintiff until the PRA release on October 3, 2025—was an apparent act of post-complaint retaliation intended to chill Plaintiff's participation in the civil rights process, portray him as a dangerous and dishonest complainant, and shield Ajoy and the University from liability in both the educational and workplace contexts.

181.     The Regents further retaliated against Plaintiff for his protected complaints by: (a) maintaining and enforcing a retaliatory degree hold and "administrative dismissal" based on the same sabotage narrative; (b) allowing OPHD (through Rau) to discredit Plaintiff as a "villain" and import the sabotage allegations into the Title IX investigation; and (c) failing to remedy, and instead ratifying, Trigueros' exclusion of Plaintiff from the hearing.

182.     Key Title IX violations occurred within two years of the filing of this Complaint, including Plaintiff's January 19, 2024 exclusion from the SVSH hearing (in which Plaintiff was the complainant), Trigueros' subsequent findings and removal of the no-contact directive, the June 6, 2024 CRD submission omitting the hearing exclusion, and the Regents' continued reliance on those outcomes to refuse to release the degree hold as recently as July 1, 2025.

183.     These acts are part of a continuing course of discrimination and retaliation tied to the same nucleus of facts: the sexual battery, Plaintiff's reports, the retaliatory

sabotage narrative, and the ongoing degree hold and reputational harm.

184.     The Regents' response to Plaintiff's report was clearly unreasonable in light of the known circumstances, amounted to deliberate indifference to sex-based harassment, and

would objectively chill a complainant's participation in the Title IX process, including the reporting of sexual misconduct.

185.        As a direct and proximate result, Plaintiff has suffered and continues to suffer the injuries detailed in Section M (Ongoing Injury), including loss of his degree, economic harm, emotional distress, and reputational injury.

## SECOND CAUSE OF ACTION

### FEHA: Sexual Harassment, Hostile Work Environment, and Retaliation

(Cal. Gov't Code § 12940 et seq.)

Against The Regents and Ajoy (Individual Capacity)

186.        Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

187.        At all relevant times, The Regents were Plaintiff's employer under FEHA—from February 2021 to August 31, 2022—and Plaintiff was an employee in Ajoy's lab and later at RSSP.

188.        Ajoy, acting in his supervisory capacity as Plaintiff's lab supervisor and as a professor assigning grades to Plaintiff's Honors Research coursework, subjected Plaintiff to unwelcome sexual conduct and threats on October 7, 2021, as detailed in Section C, creating a hostile work and educational environment. The Regents, through their agents, retaliated against Plaintiff for engaging in protected activity in the ways described above, including by orchestrating a baseless sabotage narrative, subjecting him to biased investigations and hearings, and maintaining a retaliatory degree hold.

189.        Ajoy's sexual battery, lewd physical contact, and threat to destroy Plaintiff's academic career if he disclosed the assault constitute harassment "because of sex" under FEHA.

190.        After Plaintiff engaged in protected activity by informing Ajoy of his intent to report and then reporting Ajoy's misconduct to OPHD and other University officials, The Regents—through Ajoy, HR, CSC, UCPD, OPHD, and others—retaliated by: (a) rescinding the December 1, 2021 recommendation letter in February 2022; (b)

constructing and advancing the pretextual "computer sabotage" narrative; (c) supporting Gross's ultra vires investigation and false warrant application; (d) imposing and maintaining a degree hold predicated on UCPD's misconduct and Ajoy's false narrative; and (e) allowing OPHD and CSC to embed the sabotage narrative into employment-related and educational processes.

191.     On June 18, 2023, Plaintiff timely filed a CRD charge alleging sexual harassment and retaliation. CRD issued a Right to Sue on December 17, 2024, and this action is filed within one year of that notice.

192.     Bowman-Waugh's June 6, 2024 CRD submission—omitting Plaintiff's exclusion from the January 19, 2024 hearing, presenting Rau's biased report as the final disposition, and including dismissed HR material (never revealed to Plaintiff while he was an employee, never merged with Plaintiff's personnel file, and viewed by Plaintiff *for the first time after* CRD's CPRA release of the case file) as if it were disciplinary history— constituted post-charge retaliation under FEHA and falls well within the limitations period and scope of the CRD charge, especially in light of Plaintiff's lack of access to it until CRD's CPRA disclosure on October 3, 2025, the date of discovery.

193.     Ajoy is individually liable under FEHA for harassment as a supervisor, and The Regents are liable as employer for his harassment and for retaliation and hostile-environment acts by Ajoy and other agents.

194.     At all relevant times when the "computer sabotage" allegations were first fabricated, reported to UCPD, and used to place Plaintiff on investigatory leave, Plaintiff was still a UC Berkeley employee in good standing: first as STDT 3 in Ajoy's lab until December 31, 2021, and then as STDT2 at RSSP until August 31, 2022. Both appointments ended solely by contract expiration, and neither resulted in termination, discipline, or any adverse entry in Plaintiff's personnel file or UCPath record.

195.     The Regents' continuing refusal to lift the degree hold and correct Plaintiff's record is a *continuing effect* of the same retaliatory scheme that began while Plaintiff was a University employee. The "computer sabotage narrative" arose during Plaintiff's employment in Ajoy's lab and his later RSSP position; was advanced through false statements about supposed "adverse HR findings" and implied "termination" in UCPD's

report and warrant affidavit; and was used to place Plaintiff on paid investigatory leave and to justify embedding the Penal Code § 502(c)(4) accusation into the student conduct process even though: (a) his lab and RSSP appointments ended only by ordinary contract expiration; (b) his personnel file and UCPath employment verification reflect no discipline or termination; and (c) no criminal charge, civil action, or employment discipline ever resulted. The ongoing refusal to confer his completed degree, and the reliance on that same employment-based pretext to justify it, substantially interferes with Plaintiff's current and future employment opportunities and thus constitutes part of the continuing FEHA retaliation and its damages.

196.    Plaintiff timely exhausted his administrative remedies with CRD/EEOC and received a Right-to-Sue Notice on December 17, 2024.

197.    As a direct and proximate result, Plaintiff has suffered economic loss, emotional harm, and damage to his reputation and career.

### THIRD CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth Amendment (Unlawful Search and Seizure; Ongoing Retention and Use of Unlawfully Obtained Information)**

Against Gross (Individual Capacity) and Lyons (Official Capacity)

198.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

199.    At all relevant times, Defendant Gross was a UCPD detective acting under color of state law as an employee of The Regents.

200.    On or about April 29, 2022, Gross traveled several counties away from Berkeley to Plaintiff's home in Solano County and conducted a custodial interview inside his home while secretly activating an Axon body-worn camera to record the encounter. Gross had no local authorization or jurisdiction to conduct criminal investigations in Solano County and did not disclose to Plaintiff that he was being audio-visually recorded.

201.    On May 5, 2022, Gross submitted a warrant application containing materially false statements and omissions, including: (a) fabricated claims of "findings of a Human

Resources investigation," (b) mischaracterization of Plaintiff as a terminated disgruntled former employee, (c) invented "co-conspirators," and (d) omission of the ultra vires, secretly recorded nature of the Solano County interrogation outside UCPD jurisdiction. The warrant was issued and executed on Plaintiff's cellphone data, and the return was defective under California law.

202.    In a separate UCPD police report that Gross prepared and that was later transmitted to CSC as part of the student conduct packet, Gross expressly acknowledged that she had traveled to Plaintiff's home in Solano County, and that she activated and used her Axon body-worn camera to record the custodial interview inside his home. That report thus confirms that Gross knew, at the time she drafted the warrant affidavit, both the out-of-jurisdiction nature of the interrogation and the existence of her covert audiovisual recording of it.

203.    In contrast, the warrant affidavit Gross submitted to the Alameda County Superior Court omitted any reference to the Solano County location, the ultra vires nature of the interrogation, and the Axon recording, thereby concealing from the issuing judge that the interrogation had been conducted outside UCPD's jurisdiction and had been secretly recorded inside Plaintiff's home. These omissions, combined with the affirmative misstatements about HR "findings" and Plaintiff's supposed termination, demonstrate that the affidavit was not merely incomplete but affirmatively misleading, and that the false statements and omitted facts were material to her claim of probable cause.

204.    The warrant was executed on Plaintiff's cell-phone data, and the return was defective under California law, with no detailed inventory or chain of custody filed. Neither the issuing court nor Plaintiff has ever been provided with any technical fruits of the warrant, yet Gross and UCPD have retained sole custody and continue to treat those alleged fruits as operational.

205.    Gross's conduct violated Plaintiff's Fourth Amendment rights by:

a.    Conducting an out-of-jurisdiction custodial interrogation under color of law and without lawful authority;

b.    Securing a warrant through material misrepresentations and omissions; and

c.  Retaining and allowing the use of allegedly seized data without proper return or disclosure.

206.    Gross's UCPD report—revealing the Solano County location of her custodial interview and use of the Axon body-worn camera out of jurisdiction—was transmitted internally to CSC and used to support the Penal Code § 502(c)(4) "computer sabotage" narrative in Plaintiff's student conduct case. Meanwhile, her sanitized probable cause affidavit presented to the state court: (a) omitted any mention of the location of the custodial interview, falsely implying that it was conducted within UCPD jurisdiction; and (b) included the same false statements in her UCPD report coloring the Plaintiff as a disgruntled terminated employee who had been subjected to adverse HR findings— ensuring that her defective investigation simultaneously tainted both the criminal process and the student conduct process that led to the ongoing degree hold.

207.    The Regents, through their policies and practices regarding UCPD operations and oversight, and their acceptance of Gross's investigation as reliable, permitted Gross's conduct, and continue to permit the retention and reliance on the defective warrant, her report, and the supposed fruits, through reference, without disclosure, in CSC processes.

208.    Lyons, in his official capacity, is the current University officer with authority to implement prospective relief concerning the University's use of the defective warrant, the associated records, and the resulting disciplinary and degree decisions.

209.    Although the warrant and search occurred in 2022, the *continued* public availability of Gross's false warrant affidavit in the records of the Alameda County Superior Court, together with The Regents' ongoing reliance on Gross's investigative narrative and the supposed fruits of the warrant to maintain Plaintiff's degree hold and student disciplinary record—as recently as July 1, 2025—constitute *present* and *continuing* Fourth Amendment and reputational injuries for which Plaintiff seeks damages and injunctive and declaratory relief.

210.    Defendants' actions were intentional, reckless, and in bad faith and directly resulted in the invasion of Plaintiff's privacy, seizure of his electronic data, and tainting of subsequent administrative and Title IX proceedings.

211.    As a direct and proximate result, Plaintiff has suffered ongoing injury, including reputational harm and emotional distress from the ongoing use of unlawfully obtained, yet undisclosed, "data" to support a retaliatory degree hold.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process

Against Lyons and Lopez (Official Capacities), and Gross and Ajoy (Individual Capacities)

212.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

213.    Plaintiff possesses a constitutionally protected property interest in the conferral of his completed second degree and the associated educational and professional benefits, and a protected liberty interest in his good name, reputation, ability to pursue his chosen profession, and freedom from "stigma-plus" deprivations caused by false accusations of felony-level misconduct or false statements about adverse HR findings while employed with the University.

214.    Defendants, acting under color of state law—through CSC, UCPD, OPHD, and the Chancellor's Office—deprived Plaintiff of those interests without constitutionally adequate process, including by:

a.  Imposing a degree hold and conducting a biased student conduct process driven by Gross's defective investigation and unproduced warrant fruits, while never disclosing or allowing Plaintiff to test the alleged technical evidence against him;

b.  Limiting Plaintiff's ability to question Ajoy about the retaliatory nature of the accusations—as well as Ajoy's knowledge of OPHD's incipient Title IX/SVSH investigation regarding the October 7, 2021 sexual battery— including by pausing the October 14, 2022 hearing and later restricting the scope and format of Plaintiff's cross-examination *after* he attempted to raise his OPHD Title IX/SVSH complaint and the incipient investigation into Ajoy's sexual battery, thereby preventing meaningful confrontation of Ajoy's retaliatory narrative and his use of the "computer sabotage" story as a shield;

c.  Recalling Ajoy on December 2, 2022, only on the condition that Plaintiff keep his camera off and microphone muted so as not to make Plaintiff's attacker (Ajoy) uncomfortable;

d.  Requiring Plaintiff to submit all questions for Ajoy in writing—unlike any other witness—and then skipping more than thirty of those questions and allowing Ajoy to leave before the completion of his "written" cross-examination;

e.  Responding to Plaintiff's on-record statement that Ajoy had sexually battered him and that the case was retaliatory, by saying, "Now, wait—that's another case," while Plaintiff visibly suffered a second flareup of his medical condition, thereby signaling that raising his sexual-battery complaint would not be tolerated within the student conduct process;

f.  Relying on hearsay summaries from UCPD and University officials in lieu of actual forensic evidence, and treating Gross's vague narrative description of the supposed warrant fruits as if it were proven fact;

g.  Hiring a conflicted out-of-state hearing officer (Slone), whose practice depends on repeat contracts with institutions such as the University, creating structural incentives to favor University narratives and recommendations, and then vesting her with the effective final authority to determine the facts, and recommend non-conferral of Plaintiff's completed degree;

h.  Excluding Plaintiff from the January 19, 2024 SVSH hearing, thereby denying him an opportunity to participate in adjudication of *his own sexual-battery complaint* or to cross-examine respondent Ajoy and investigator Rau while they presented and defended both the sabotage narrative and Rau's report;

i.  Misrepresenting the procedural posture of the case to CRD, by concealing the January 19, 2024 hearing entirely, and reviving dismissed HR material that had never appeared in his personnel file and had never been shared with him while he was an employee, thereby confusing CRD and prejudicing the agency against him while it investigated his state civil-rights complaint; and

j.  Refusing to revisit or correct the degree hold and "administrative dismissal," despite Plaintiff's repeated, well-documented requests in 2024 and 2025, and

despite the absence of any criminal case, civil suit, or HR discipline—and despite the existence of HR and UCPath records showing only contract expirations and no bar to rehire.

215. Ajoy's false statements and retaliatory accusations were knowingly used by The Regents—through Gross, CSC, OPHD, and high-level officials—as a basis for process and outcomes, further corrupting the fairness of the proceedings.

216. Lyons and Lopez, with full knowledge of the flaws in the underlying process and the lack of any criminal or civil action, ratified and prolonged the deprivation by repeatedly refusing to correct the degree hold in October 2024; March 2025; May 8, 2025; and July 1, 2025.

217. Significant procedural due process violations thus occurred within two years of filing and are continuing so long as the degree hold and "administrative dismissal" remain in place.

218. Earlier conduct (2022–2023) is part of the *continuous course of deprivation* rooted in Gross's defective UCPD investigation of Ajoy's sabotage narrative that culminated in the current harms.

219. As a proximate result, Plaintiff has suffered the injuries described in Sections M and N of the Statement of Facts, including loss of his degree, economic harm, reputational injury, and severe emotional distress.

220. The use of alleged digital "evidence" purportedly obtained through Gross's defective and misleading warrant—without ever disclosing the actual fruits of that warrant to the issuing court or to Plaintiff—combined with the denial of basic procedural safeguards in both the student conduct and SVSH hearings (including the denial of Plaintiff's full presence, meaningful participation, and cross-examination rights), violated Plaintiff's Fourteenth Amendment procedural due process rights.

221. The resulting sanctions and degree hold are arbitrary and capricious. In light of the absence of any criminal or civil action, the acknowledged defects and gaps in the alleged technical evidence, the lack of any coherent forensic explanation, and the existence of employment and educational records contradicting the sabotage narrative— including, among other things, Ajoy's December 1, 2021 recommendation letter on

Plaintiff's behalf to Berkeley's Graduate Division and Plaintiff's A+ and A grades in Honors Research (Chem H194) under Ajoy that remain unchanged on his transcript despite the stigmatizing "administrative dismissal" notation—no rational fact-finder, on the record disclosed to Plaintiff, could conclude that Plaintiff committed felony-level computer sabotage.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 — Fourteenth Amendment Equal Protection / Retaliation for Complaints of Sex Discrimination

Against Lyons and Lopez (Official Capacities), and Ajoy and Gross (Individual Capacities)

222.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

223.    Plaintiff engaged in protected activity when he informed Ajoy of his intent to report and then reported sexual battery and sex discrimination by Ajoy under Title IX and FEHA to OPHD, CSC, UCPD, and other University officials, and when he pursued related complaints with state and federal civil-rights agencies.

224.    Defendants, acting under color of state law, intentionally subjected Plaintiff to adverse and unequal treatment, motivated at least in substantial part by retaliatory animus against him as a complainant of sexual harassment and sex discrimination, including by:

a.    Allowing Ajoy to transform Plaintiff's sexual-battery complaint into a narrative that Plaintiff was a disgruntled former employee who had sexually harassed lab colleagues and sabotaged lab computers, and crediting that narrative despite the absence of any SVSH case in which Plaintiff was a respondent and the absence of any HR discipline or termination in his employment records;

b.    Enabling Gross to conduct an ultra vires investigation and secure a defective warrant—on material misrepresentations and omissions—that adopted Ajoy's retaliatory narrative, then using Gross's report and supposed warrant fruits, which were never disclosed to Plaintiff, as the foundation for the Penal Code § 502(c)(4) accusations against Plaintiff;

c.    Imposing a degree hold and pressing a student conduct case predicated on that same retaliatory narrative—after Plaintiff reported Ajoy's sexual assault to

OPHD, CSC, and later to UCPD—and treating Plaintiff, in practice, as a person to be discredited and punished rather than as the victim of SVSH;

d. Limiting Plaintiff's ability to confront Ajoy during the October 14, 2022 student conduct hearing after Plaintiff attempted to question Ajoy about his knowledge of Plaintiff's OPHD Title IX/SVSH complaint and the incipient investigation into Ajoy's sexual battery—then later recalling Ajoy only under highly restrictive conditions on December 2, 2022 that required Plaintiff to keep his camera off and microphone muted "so as not to make Ajoy uncomfortable" and to submit written questions, at least thirty of which Slone skipped;

e. Excluding Plaintiff from his own January 19, 2024 SVSH hearing (in which he was the victim), while allowing Ajoy, his counsel, and his character witnesses to present and defend the sabotage narrative and Rau's report ex parte, and frame Plaintiff as a villain with uncorroborated hearsay, thereby treating Plaintiff's complaint as a problem to be managed rather than a harm to be remedied;

f. Permitting OPHD and People & Culture—neither of which had ever investigated or disciplined Plaintiff while he was an employee or student—to mischaracterize Plaintiff in internal reports and in the June 6, 2024 CRD submission, omitting his exclusion from the hearing, and reviving dismissed, non-probative HR material never shared with him, in order to portray him as a dangerous and dishonest complainant and to protect Ajoy and the University from liability; and

g. Through Lyons and Lopez, repeatedly refusing in 2024 and 2025 to lift the degree hold or correct Plaintiff's record, even after the District Attorney rejected the sabotage case, no civil action was ever filed, HR and UCPath records confirmed no termination or discipline or bar to rehire, and Plaintiff continued to be treated as an active alumnus for all purposes *except* conferral of his completed degree.

225. These actions were not merely mistakes but reflected a consistent pattern of retaliatory and unequal treatment: rather than treat Plaintiff as the victim of a faculty member's sexual battery, Defendants re-cast him as a saboteur and quasi-respondent and used that narrative to justify harsh educational and reputational consequences that they

would not have imposed upon similarly situated students and employees who had not complained of SVSH by a faculty member.

226.     As a male victim of sexual battery by a male supervisor, Plaintiff was treated differently from similarly situated SVSH complainants within UC Berkeley's system. Rather than being treated as a victim whose safety and participation rights should be protected, Plaintiff was re-framed as a quasi-respondent, excluded from his own SVSH hearing, and portrayed as a dangerous saboteur. Upon information and belief, this disparate treatment and the credibility judgments made about Plaintiff were influenced, at least in part, by sex-based stereotypes and discriminatory assumptions that a male complainant—especially a male complainant alleging sexual battery by another man—is less credible, more disruptive, and more appropriately handled as a problem to be contained than as a victim to be believed and supported.

227.     These sex-based stereotypes compounded the retaliatory animus against Plaintiff as a complainant of SVSH and contributed to Defendants' decisions to deny him the process, participation, and relief that would ordinarily be afforded to similarly situated complainants.

228.     As set forth in the Fourth Cause of Action, the sanctions and degree hold imposed on Plaintiff are arbitrary and unsupported by coherent forensic evidence and are inconsistent with his employment and educational records—including Ajoy's December 1, 2021 recommendation letter and Plaintiff's A+ and A grades in Honors Research (Chem H194) under Ajoy that remain unchanged on his transcript despite the stigmatizing "administrative dismissal" notation. Defendants nevertheless imposed and maintained those sanctions on Plaintiff after he reported Ajoy's sexual battery, while not imposing comparable sanctions on similarly situated individuals who had not complained of SVSH by a faculty member.

229.     Equal protection and retaliation violations continued into 2024 and 2025, including: (a) Plaintiff's January 19, 2024 exclusion from the SVSH hearing by Trigueros; (b) OPHD and Trigueros' adverse disposition; (c) the University's June 6, 2024 misrepresentations to CRD, and (d) Lyons's and Lopez's reaffirmations of the degree hold and refusal to correct the record as recently as July 2025.

230.     Plaintiff has suffered the harms described in Sections M and N of the Statement of Facts as a direct and foreseeable result, including loss of his degree, diminished employment prospects, reputational injury, and severe emotional distress.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Monell and Supervisory Liability

Against Lyons (Official Capacity)

231.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

232.     Plaintiff seeks prospective injunctive and declaratory relief against Lyons in his official capacity, and damages against individual defendants as set forth in the Third, Fourth, and Fifth Causes of Action.

233.     The Regents, through UC Berkeley, maintain the policies, customs, and practices described below, which, when implemented and enforced by its senior officials, including the Chancellor, caused or contributed to the constitutional violations set forth in the Third, Fourth, and Fifth Causes of Action.

234.     Defendant Lyons, in his official capacity as Chancellor of UC Berkeley, is presently charged with authority to implement prospective relief concerning those policies and practices.

235.     These constitutional violations—including the unlawful search and seizure described in the Third Cause of Action, the denial of procedural due process described in the Fourth Cause of Action, and the equal protection / retaliation violations described in the Fifth Cause of Action—were not isolated mistakes by rogue individual employees, but the reasonably foreseeable result of The Regents' policies, customs, and deliberate indifference across two interlocking systems: (a) CSC / UCPD, where Plaintiff was treated as a respondent in a fabricated computer-sabotage case; and (b) People & Culture / HR, which misled CRD— and, by virtue of dual-filing, EEOC's substantial weight review under Title VII—in its response to Plaintiff's FEHA charge.

A. CSC and UCPD – Plaintiff as Respondent in Computer Sabotage Case

236.     There is nothing inherently improper about a faculty supervisor reporting genuinely serious misconduct both to campus police and to student conduct authorities, or about UCPD and CSC proceeding in parallel where there is actual evidence of criminal behavior and, at minimum, an arrest or charging decision.

237.     In Plaintiff's case, however, The Regents' policies and customs allowed CSC to treat Ajoy's allegations and UCPD's incomplete, ultra vires investigation as if they were proof of a felony, even though no arrest was made, the District Attorney declined to file charges, and no civil action, HR discipline, or coherent forensic explanation ever materialized.

238.     Under The Regents' policies and practices, when Ajoy alleged "computer sabotage," the matter was routed simultaneously to UCPD's Threat Management Unit and CSC, and both tracks proceeded largely on the basis of Ajoy's false narrative. UCPD opened a Penal Code § 502(c)(4) investigation, obtained a warrant based on a materially misleading affidavit, and generated a narrative report. CSC opened a matching student conduct case predicated on the same alleged incident.

239.     In the course of that process, UCPD did not arrest Plaintiff, the District Attorney ultimately rejected any criminal case, and no court ever made any finding that Plaintiff had committed any offense.

240.     Like the defective probable cause affidavit, the alleged "fruits" of the warrant—referenced vaguely without actual disclosure in Gross's report—were never provided to Plaintiff or to CSC, and neither CSC nor any campus body ever reviewed any underlying digital evidence capable of proving or disproving the alleged sabotage.

241.     Additionally, at the time of the December 2021 dates alleged by Ajoy, Gross, and CSC, Plaintiff lawfully maintained simultaneous residences in University Village in Albany, in another Northern California city outside Alameda County, and in Solano County through February 28, 2022. Plaintiff's University Village apartment was University property squarely within UCPD's jurisdiction, yet Gross never attempted to contact him there or through ordinary campus channels. Instead, Gross did not contact Plaintiff until late April 2022, when she traveled out of county to his Solano County

residence to conduct a custodial interview during the closing weeks of the spring semester, shortly before Plaintiff completed his degree requirements.

242.    Nonetheless, under The Regents' customs, CSC treated the existence of a UCPD report and Gross's untested narrative references to a warrant and an undisclosed warrant return as if they were sufficient confirmation of criminal behavior and a proper basis for severe administrative sanctions.

243.    CSC proceeded to impose and maintain a degree hold and "administrative dismissal" against Plaintiff on the theory that he had committed a felony-level act of computer sabotage, despite the absence of any arrest, criminal charges, conviction, or independent technical proof.

244.    In effect, The Regents' policies and practices allowed CSC to operate as a de facto criminal tribunal using penal-code labels and police narratives without the evidentiary burdens, procedural safeguards, or adversarial testing required in the criminal courts.

245.    Rather than limiting any parallel administrative response to situations where criminal proceedings had at least resulted in an arrest or charges, The Regents permitted CSC to treat a failed and unsupported penal investigation as if it were proof of guilt and to impose lasting educational sanctions on that basis.

B. People & Culture / HR — Plaintiff as Complainant in the FEHA/CRD Matter

246.    The Regents also maintain policies and practices within its People & Culture/HR apparatus for responding to external civil-rights agencies such as CRD, including in cases that involve SVSH and Title VII/IX overlap.

247.    In Plaintiff's case, even though OPHD was the campus body that actually conducted the SVSH investigation and oversaw the January 19, 2024 hearing, The Regents allowed People & Culture's ELR unit—through Bowman-Waugh—to speak for the institution in the June 6, 2024 response to CRD.

248.    In that submission, People & Culture:

   a.    Omitted any mention of Plaintiff's exclusion from the January 19, 2024 SVSH hearing or the very existence of such a hearing;

b. Framed Rau's flawed and disputed investigation as a neutral, final disposition of Plaintiff's sexual-battery complaint;

c. Revived and attached dismissed HR material that had never been shared with Plaintiff while he was employed and does not appear in his personnel file; and

d. Portrayed Plaintiff as a "problem employee" whom the University could not easily remove, despite UCPath and HR records showing only contract expirations, no discipline, and no bar to rehire.

249.     These actions reflect a policy and practice of allowing People & Culture / HR to craft a litigation-oriented narrative—protecting the University and faculty respondent—for outside agencies investigating civil rights complaints, rather than accurately conveying the structure of Berkeley's SVSH system (in which only OPHD investigates such claims), the limitations of HR's role in SVSH matters, or the procedural irregularities and exclusion that Plaintiff experienced.

250.     Under The Regents' customs, People & Culture was not required to distinguish for CRD that it was not the SVSH investigatory body, nor to disclose that Plaintiff had been barred from his own hearing in which he was the complainant. Instead, it was permitted to supply a selective and prejudicial narrative that undermined Plaintiff's FEHA complaint and ratified earlier actions taken by CSC and OPHD.

C. Additional Policies, Customs, and Ratification

251.     Across these two tracks, The Regents also maintains and has maintained broader policies and practices that contributed to the violations at issue, including:

a. A policy and practice of relying on outside attorney–adjudicators such as Slone, Oppenheimer, and Oppenheimer employee Trigueros—lawyers whose practices depend on repeat contracts with institutional entities like UC Berkeley and who operate with less internal accountability than University employees—in high-stakes student conduct and SVSH matters, including cases where the University itself is the formal "complainant" (e.g., the PC § 502(c)(4) student conduct case overseen by Slone and reviewed by Oppenheimer) or the institutional respondent (e.g., the SVSH matter overseen by Trigueros), thereby creating structural

incentives to favor the University's interests, to credit University and supervisory narratives, and to recommend severe sanctions against students and employees whose complaints or defenses expose the University and favored faculty to potential liability;

b.  A policy and practice of permitting UCPD to seek and execute warrants on student and employee data based on materially incomplete or misleading affidavits, and then to withhold those affidavits and any underlying digital data from the affected student and from campus adjudicators; instead, CSC relied on narrative summaries in a UCPD report. In Plaintiff's case, Gross's UCPD report—entered into evidence in the student conduct process—openly acknowledged that she traveled to Plaintiff's home in Solano County and activated her Axon body camera, yet repeated false assertions about adverse HR "findings" for sexual harassment and termination and referred vaguely to supposed fruits of the warrant. The actual warrant affidavit and any seized data were never disclosed to Plaintiff or presented as evidence in his student conduct case, yet the University treated these narrative descriptions as sufficient "evidence" to support a felony-level computer sabotage theory and severe educational sanctions;

c.  A policy and practice of excluding or marginalizing complainants in SVSH proceedings—particularly male complainants reporting male-on-male sexual battery—by restricting their participation, limiting or eliminating their ability to cross-examine respondents and key witnesses, and, in Plaintiff's case, excluding him entirely from his own January 19, 2024 SVSH hearing, while permitting the respondent, Ajoy, and OPHD's investigator to appear, testify, and defend their narratives in Plaintiff's absence;

d.  A policy and practice of using FERPA-related and privacy-related justifications selectively: allowing stigmatizing accusations and misleading narratives (such as allegations of sabotage or implications of "adverse findings") to be shared with internal decision-makers and external agencies like CRD, while denying Plaintiff

COMPLAINT - 51

reciprocal access to the underlying "evidence," HR materials, and warrant fruits needed to clear his name; and

e.  A policy and practice of ratifying and maintaining flawed disciplinary outcomes and degree holds—rather than correcting them—when they arise from these processes, including by empowering the Chancellor's Office and CSC leadership to summarily deny reconsideration requests without explanation, even where there is no criminal case, no civil case, no HR discipline, no termination, and no bar to rehire.

252.    Lopez's repeated reaffirmations of the degree hold and Lyons' tacit approval and refusal to intervene to correct Plaintiff's record in 2024 and 2025 are part of a continuing course of procedural due process and equal protection violations, including ongoing deprivation of his property interest in a completed degree and his liberty interest in his reputation. Lyons' delegated decisions and non-decisions in October 2024, March 2025, and thereafter, along with Lopez's July 1, 2025 reaffirmation of the "resolved" status of the matter, constitute ratification by officials with final authority or at least deliberate indifference to known, ongoing violations.

253.    As a direct and proximate result of these policies, customs, and ratifications, Plaintiff suffered the constitutional injuries detailed in the Third, Fourth, and Fifth Causes of Action and the harms set forth in Sections M and N of the Statement of Facts, including loss of his completed degree, diminished employment prospects, reputational injury, and severe emotional distress.

254.    Prospective injunctive and declaratory relief against The Regents and Lyons in his official capacity is necessary to prevent ongoing and future violations and to remedy the continuing effects of the degree hold and related misconduct.

### SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress (IIED)

Under California Law — Against Ajoy, Gross, and Lopez (Individual Capacities)

255.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

256.     Defendants Ajoy, Gross, and Lopez engaged in extreme and outrageous conduct beyond the bounds of decency in a civilized community, including, without limitation:

a.  Ajoy's sexual battery of Plaintiff on October 7, 2021 and his threats to "destroy" Plaintiff's academic career if Plaintiff reported the assault;

b.  Ajoy's subsequent fabrication and promotion of a computer-sabotage narrative, including false claims that Plaintiff had adverse HR findings, for the purpose of discrediting Plaintiff and shielding himself from liability;

c.  Gross's ultra vires custodial interrogation of Plaintiff at his home in Solano County without coordination with local authorities, her secret activation of an Axon body-worn camera, and her submission of a materially misleading and publicly available warrant affidavit that falsely represented, among other things, that HR had made adverse findings against Plaintiff and that his student employment "should not be renewed," thereby invading Plaintiff's privacy and placing him under the cloud of a felony investigation without probable cause;

d.  Defendants' imposition and maintenance of a retaliatory degree hold and biased conduct process that treated an uncharged, unproven Penal Code § 502(c)(4) theory as if it were established fact, relied on undisclosed or non-existent "forensic" evidence, and culminated in Plaintiff's "administrative dismissal" and permanent withholding of his completed second degree;

e.  Plaintiff's exclusion from his own January 19, 2024 SVSH hearing, in which the faculty member who sexually battered him and the University's investigator were allowed to testify at length in his absence, while Plaintiff was denied any opportunity to observe, respond to, or question them;

f.  The June 6, 2024 CRD submission by People & Culture/HR that omitted Plaintiff's exclusion from the SVSH hearing, revived dismissed HR material never previously shared with Plaintiff during his employment, mischaracterized his employment history, and portrayed him as a dangerous or "problem" employee, thereby undermining his state civil-rights complaint; and

g.  Defendants' continued refusal through 2024 and 2025—despite repeated notice of the falsity and baselessness of the sabotage narrative and the absence of any

criminal charges, civil suit, or HR discipline—to correct Plaintiff's academic record, to lift the degree hold, or to amend or retract false statements, including those embedded in Plaintiff's student conduct file and the publicly available warrant affidavit.

257.      Ajoy's conduct—including the sexual battery, threats to destroy Plaintiff's career, and participation in a retaliatory narrative to withhold Plaintiff's degree in retaliation for reporting or attempting to report Ajoy's sexual battery—was outrageous, beyond all bounds of decency, and undertaken with the intent to cause Plaintiff severe emotional distress or with reckless disregard for the probability of such distress.

258.      The Regents and its agents contributed to and ratified this outrageous conduct by weaponizing campus police, student conduct, and Title IX/SVSH processes against a sexual-battery victim, withholding a completed degree on a baseless felony "computer sabotage" narrative, and misrepresenting facts to and concealing participation rights violations from state and federal civil rights agencies.

259.      Defendants intended to cause Plaintiff severe emotional distress or, at a minimum, acted with reckless disregard of the probability that their conduct—sexually battering him, subjecting him to an unlawful criminal investigation, branding him a saboteur, excluding him from SVSH proceedings *on his own complaint*, and permanently withholding a completed degree—would cause such distress.

260.      As a direct and proximate result, Plaintiff has suffered severe emotional distress, including anxiety, humiliation, shame, depression, physical manifestations of stress and flare-ups of his disability, and harm to his mental health and quality of life, as described in Section M of the Statement of Facts.

261.      Many of the acts alleged in this cause of action occurred within the last two years—including Plaintiff's exclusion from the January 19, 2024 SVSH hearing, the June 6, 2024 CRD submission, and Lopez's and Lyons' reaffirmations of the degree hold into 2025—and, together with the continuing refusal to correct Plaintiff's records and confer his completed degree, constitute a continuing course of intentional or reckless infliction of emotional distress under California law.

**EIGHTH CAUSE OF ACTION**

**Sexual Battery (Cal. Civ. Code § 1708.5 and Related Common Law)**

Under California Law – Against Ajoy

262.     Plaintiff incorporates all preceding allegations as though fully set forth herein.

263.     On October 7, 2021, while Plaintiff was working and studying in Ajoy's lab at UC Berkeley, Ajoy intentionally engaged in nonconsensual sexual contact with Plaintiff, as described in the Statement of Facts.

264.     Ajoy's acts constituted "sexual battery" under Cal. Civ. Code § 1708.5 in that he:

  a.   Acted with the intent to cause harmful or offensive contact with Plaintiff's intimate parts, and a sexually offensive contact directly resulted; and/or

  b.   Acted with the intent to cause harmful or offensive contact with Plaintiff by use of his own intimate part, and a sexually offensive contact directly resulted.

265.     Plaintiff did not consent to this contact. The touching was harmful and offensive, occurred in the context of a faculty–student/employee power imbalance, and was accompanied by Ajoy's threats to destroy Plaintiff's academic career if he reported the assault.

266.     As a direct and proximate result of Ajoy's sexual battery, Plaintiff has suffered and continues to suffer physical and emotional pain, humiliation, anxiety, exacerbation of existing health conditions, and other damages as described in the Statement of Facts.

267.     This claim is timely under Code of Civ. Pro. § 340.16, which allows adult survivors of sexual battery to bring a civil action within ten years of the assault or three years from discovery of injury, whichever is later.

268.     Plaintiff seeks compensatory and punitive damages against Ajoy for sexual battery.

269.     To the extent permitted by law, The Regents may be vicariously liable for Ajoy's conduct under respondeat superior, as the assault occurred in the course of his supervisory and instructional relationship with Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant relief as follows:

### A.  Declaratory Relief

    a.  A declaration under 28 U.S.C. §§ 2201–2202 that Defendants' actions violated Plaintiff's rights under Title IX, FEHA, and the Fourth and Fourteenth Amendments to the United States Constitution; and

    b.  A declaration that the retaliatory degree hold and dismissal are unlawful and void.

### B.  Injunctive Relief

    a.  An order directing Defendant The Regents and Defendants Lyons and Lopez, in their official capacities, to confer upon Plaintiff his completed degree, with a conferral date reflecting his timely completion of degree requirements in 2022;

    b.  An order directing Defendants to remove all references to the "computer sabotage" finding, dismissal, and degree hold from Plaintiff's official student records, transcript, and internal student conduct files;

    c.  An order directing Defendants to correct and, where appropriate, retract or amend any internal or external representations (including to CRD/EEOC) that falsely portray Plaintiff as a saboteur or harasser;

    d.  An order directing The Regents, including UCPD and related Defendants, to destroy, return, or, where destruction is not legally possible, sequester and remove from any academic or disciplinary use, any records or data obtained under the defective May 2022 warrant (and any related filings);

    e.  An order enjoining Defendants from relying on the defective warrant or its fruits in any further actions or representations regarding Plaintiff;

    f.  An order requiring The Regents and University to implement policies, training, and oversight to ensure that Title IX complainants are not retaliated against through pretextual conduct charges, biased hearings, exclusion from SVSH proceedings, or misuse of law-enforcement narratives;

g.  An order directing The Regents and Defendant Lyons, in his official capacity, to take all reasonable steps, to the extent permitted by law, including appropriate applications in state court, to request sealing, redaction, or expungement of the May 5, 2022 warrant affidavit and related filings to the extent they contain materially false, defamatory, or misleading statements about Plaintiff's employment and alleged misconduct; and

h.  An order directing Defendants to correct UCPD and University records to remove false statements that Plaintiff was terminated after adverse HR findings or found to have sexually harassed lab colleagues.

## C.  Damages

a.  Compensatory damages for economic losses, including lost earning capacity and diminished educational and professional opportunities;

b.  Compensatory damages for emotional distress, mental anguish, and loss of enjoyment of life;

c.  Reputational damages;

d.  Punitive damages against individual Defendants where allowed by law;

e.  Other non-economic damages in an amount to be proven at trial; and

f.  Statutory damages and penalties as authorized under FEHA, and other applicable statutes pleaded in this Complaint.

## D.  Attorneys' Fees and Costs

a.  An award of reasonable attorneys' fees and costs to the extent permitted by law, if and when counsel appears, pursuant to 42 U.S.C. § 1988, Title IX, FEHA, and other applicable provisions; or

b.  An award of any appropriate equitable adjustments and costs, to the extent permitted by law, if Plaintiff proceeds to judgment pro se.

## E.  Pre- and Post-Judgment Interest

a.  Awarding pre- and post-judgment interest as allowed by law.

F. **Such Other Relief**

a. Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 17, 2025

Respectfully submitted,

/s/ John Doe

John Doe
Plaintiff, Pro Se
P.O. Box 483
Isleton, California 95641
Telephone: (415) 737-4225
Email: x92qt77@proton.me

COMPLAINT - 58