JOHN DOE,
P.O. Box 483
Isleton, CA 95641
415-737-4225
x92qt77@proton.me
Plaintiff, Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, <br><br>             Plaintiff, <br><br> vs. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; <br><br> ASHOK AJOY, in his individual capacity; <br><br> RICHARD KENT LYONS, in his official capacity; <br><br> SAMANTHA GROSS (a/k/a SAMANTHA LACHLER), in her individual capacity; <br><br> and DOE DEFENDANTS 1-20 <br><br>             Defendants | Case No.: 3:25-cv-10779-EMC <br><br> SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND OTHER RELIEF AS THE COURT DEEMS JUST AND PROPER <br><br><br> DEMAND FOR JURY TRIAL |

**<u>INTRODUCTION</u>**

1. Plaintiff, John Doe, is a 2010 graduate of the University of California, Berkeley ("UC Berkeley"), where he earned a Bachelor of Arts degree, graduating Phi Beta Kappa and summa cum laude.

2. Plaintiff published a book that was formally acquired by UC Berkeley's Doe Library, where it remains in the Main (Gardner) Stacks as part of UC Berkeley's own holdings and scholarly infrastructure—making him not only a former student, but also a published

SECOND AMENDED COMPLAINT - 1

author in UC Berkeley's own collections.

3. Plaintiff remains an active UC Berkeley alumnus. He currently holds an active CalNet account and a functioning berkeley.edu email address. To the present day—including after the events described herein—UC Berkeley has continued to invite him to campus events such as the Golden Bear Orientation programming and scholarship events, and Plaintiff has continued to attend those events. During that same time period, Plaintiff has served as an essay grader and phone-bank volunteer for scholarship programs administered through UC Berkeley.

4. In August 2020, Plaintiff returned to UC Berkeley to pursue a second undergraduate degree, while simultaneously working as a campus employee, first in a physics/chemistry lab under Defendant Ashok Ajoy ("Ajoy") and later in the Residential Student Services Program ("RSSP"), supporting food-insecure students.

5. During the period of February 2021 to August 31, 2022, Plaintiff was both a student and a campus employee. Accordingly, UC Berkeley's conduct toward Plaintiff was subject to Title IX and state and federal employment laws, including Title VII of the Civil Rights Act of 1964 and the Fair Employment and Housing Act ("FEHA"). After Plaintiff reported misconduct, anti-retaliation protections under Title IX, Title VII, and state employment law applied.

6. As of May 2022, Plaintiff has completed all academic requirements for his second undergraduate degree.

7. On October 7, 2021, while Plaintiff was employed in Ajoy's lab and enrolled as a student, Defendant Ajoy sexually battered Plaintiff in Ajoy's campus office in Stanley

SECOND AMENDED COMPLAINT - 2

Hall and later threatened to destroy Plaintiff's academic career if he ever reported it.

8. Following Plaintiff's notice to Ajoy of his intent to report the sexual battery, and Plaintiff's report of Ajoy's misconduct to the University's Office for the Prevention of Harassment and Discrimination ("OPHD")—the office that UC Berkeley represents as the only campus office authorized to investigate sexual violence and sexual harassment ("SVSH")—the University, through its agents, assembled and maintained a retaliatory "computer sabotage" narrative accusing Plaintiff of serious wrongdoing. UC Berkeley has never provided Plaintiff a coherent technical explanation or reliable forensic proof substantiating that narrative. UC Berkeley used the narrative to impose a hold preventing release of Plaintiff's completed 2022 degree and has continued to rely on it to maintain the hold, which was most recently upheld, without meaningful explanation, on July 1, 2025.

9. UC Berkeley compounded the harm by:

a. orchestrating, through the University of California Police Department ("UCPD"), a secretly recorded custodial interrogation inside Plaintiff's home, conducted several counties from campus and outside any campus safety context, without notifying or coordinating with local law enforcement;

b. submitting a phone-records search-warrant affidavit, under penalty of perjury, to the Alameda County Superior Court, containing materially false statements and material omissions about Plaintiff's campus employment—an affidavit whose continued public accessibility poses an

SECOND AMENDED COMPLAINT - 3

ongoing threat to Plaintiff's reputation;

    c.   conducting student conduct proceedings before an external hearing officer who curtailed Plaintiff's questioning of his assailant (Ajoy) while relying on UCPD's and Ajoy's unsupported narrative, notwithstanding the District Attorney's rejection of the case and the lack of reliable forensic proof;

    d.   conducting an SVSH investigation of Plaintiff's sexual-battery complaint (under state and federal employment laws and Title IX, owing to Plaintiff's dual status) that relied on those student-conduct findings as a shield from liability;

    e.   excluding Plaintiff from the campus January 19, 2024 SVSH hearing while his assailant (Ajoy) and the assailant's "witnesses" testified for five hours in Plaintiff's absence; and

    f.   concealing that SVSH hearing from outside civil-rights agencies investigating Plaintiff's complaint.

10. Today, Plaintiff remains in an absurd limbo: UC Berkeley continues to recognize him as a valued alumnus—with an active CalNet account and berkeley.edu email, invitations to on-campus and off-campus alumni events, and participation in alumni programming—while refusing to release the second degree that he fully completed in 2022. UC Berkeley justifies that refusal with a pretextual and retaliatory "computer sabotage" narrative for which it has never offered a credible technical explanation or reliable forensic evidence, and from which no criminal charge has ever arisen.

11. The ongoing injury is concrete and continuing, as UC Berkeley continues to:

SECOND AMENDED COMPLAINT - 4

a.  withhold a completed degree based on unlawful UCPD conduct embedded in the process, including the custodial interrogation and warrant process described herein;

b.  maintain a stigmatizing mark on Plaintiff's transcript and a false student disciplinary record;

c.  refuse to correct its misrepresentations to the state court and state and federal civil-rights agencies; and

d.  obstruct access to the warrant materials and related records that UC Berkeley claims to have relied upon to construct the pretextual case, while refusing to confirm whether such materials exist, were obtained, or were preserved.

12. Plaintiff received a Right-to-Sue notice from the California Civil Rights Department ("CRD") under FEHA, related to the October 7, 2021 sexual battery and retaliatory "computer sabotage" narrative, and asserts FEHA claims under supplemental jurisdiction because they arise from the same nucleus of operative facts as the federal claims.

13. Following Plaintiff's November 11, 2025 correspondence with the Equal Employment Opportunity Commission ("EEOC") regarding newly discovered post-charge retaliation arising from UC Berkeley's June 6, 2024 submission to CRD and related concealment of the January 19, 2024 hearing, Plaintiff filed a Charge of Discrimination with the EEOC on February 18, 2026. The United States Department of Justice thereafter issued a Notice of Right to Sue under Title VII. Plaintiff accordingly asserts a Title VII retaliation claim against The Regents of the University of California in this Second Amended Complaint.

14. Plaintiff's primary objectives are to restore his earned degree, correct his student record,

and ensure that UC Berkeley is held accountable for the unlawful conduct it used to justify and preserve the degree hold.

15. Plaintiff brings this action to:

    a. vindicate his rights under Title IX, Title VII, 42 U.S.C. § 1983, and FEHA;

    b. obtain injunctive relief compelling UC Berkeley to confer his completed 2022 degree, remove retaliatory notations from his student record, correct University records and prior submissions to state and federal civil rights agencies concerning the Title IX/SVSH and Title VII matters described herein, and cease relying on an unlawful, pretextual "computer sabotage" narrative; and

    c. recover damages for sexual battery, retaliation, discrimination, constitutional violations, and resulting economic, professional, and emotional harm.

## **JURISDICTION**

16. This action arises under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and 42 U.S.C. § 1983.

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

18. This Court has jurisdiction under 28 U.S.C. § 1343(a)(3)-(4) because this action seeks to

SECOND AMENDED COMPLAINT - 6

redress the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

19. This Court has supplemental jurisdiction over Plaintiff's related state-law claims—including claims under FEHA, Cal. Gov. Code § 12900 et seq., and Plaintiff's California claim for sexual battery—under 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. They arise from the same nucleus of operative facts, including the sexual battery by Ajoy; UC Berkeley's response and the retaliatory computer-sabotage narrative; UCPD's custodial interrogation and the phone records warrant process; the related student-conduct and SVSH proceedings; UC Berkeley's submissions to CRD and the resulting EEOC Title VII proceedings; and the ongoing withholding of Plaintiff's completed degree.

20. Plaintiff received a FEHA Right-to-Sue Notice from CRD dated December 17, 2024, covering the October 7, 2021 sexual battery, the retaliatory "computer sabotage" narrative, and related conduct. Plaintiff timely filed the original Complaint on December 17, 2025, within one year of that notice. Following Plaintiff's November 11, 2025 correspondence with the EEOC regarding newly discovered post-charge retaliation arising from UC Berkeley's June 6, 2024 submission to CRD and related concealment of the January 19, 2024 hearing, Plaintiff filed a Charge of Discrimination with the EEOC on February 18, 2026. The United States Department of Justice issued a Notice of Right to Sue dated March 5, 2026. This Second Amended Complaint is filed within 90 days of that notice. To the extent required, this Second Amended Complaint relates back to the original filing pursuant to Fed. R. Civ. P. 15(c).

SECOND AMENDED COMPLAINT - 7

21. Plaintiff's Title IX claim against Defendant The Regents of the University of California is not barred by sovereign immunity because, by accepting federal financial assistance, the State's Eleventh Amendment immunity is unavailable for Title IX claims pursuant to 42 U.S.C. § 2000d-7. Plaintiff's Title VII claim against the same defendant is likewise not barred because Congress validly abrogated Eleventh Amendment immunity for Title VII actions against state employers.

## VENUE

22. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including at UC Berkeley in Alameda County, California.

## INTRADISTRICT ASSIGNMENT

23. Intradistrict assignment to the San Francisco/Oakland Division is appropriate because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Alameda County, within this District.

## PARTIES

24. Plaintiff John Doe ("Doe") is an adult resident of California. Plaintiff is a 2010 graduate of the University of California, Berkeley ("UC Berkeley" or "the University") and, during the events described in this Second Amended Complaint, was both a student and an employee of The Regents of the University of California at UC Berkeley. Plaintiff's true name has been provided to the Court under seal and is not withheld from Defendants.

SECOND AMENDED COMPLAINT - 8

25. Defendant The Regents of the University of California ("The Regents") is a constitutional corporate entity and instrumentality of the State of California that operates the University of California system, including the Berkeley campus ("UC Berkeley") and its departments, offices, and University of California Police Department ("UCPD"). Unless otherwise indicated, references to "the University," "UC Berkeley," or "The Regents" refer to the same public entity. The Regents receive federal financial assistance and are therefore subject to Title IX. The Regents employed the individuals referenced herein during the relevant period and are subject to applicable state and federal employment laws. At all relevant times, Plaintiff's UC Berkeley employment was employment by The Regents.

26. Defendant Richard Kent Lyons ("Lyons") is, and at all relevant times was, employed by The Regents as Chancellor of UC Berkeley (having assumed the role on or about July 1, 2024). As Chancellor, Lyons has final authority over degree conferral and the authority to direct correction of disciplinary outcomes and student records maintained by UC Berkeley. Lyons is sued in his official capacity for prospective injunctive and declaratory relief.

27. Defendant Ashok Ajoy ("Ajoy") is, and at all relevant times was, employed by The Regents at UC Berkeley as a faculty member and as Plaintiff's laboratory supervisor. Ajoy exercised supervisory and academic authority over Plaintiff in that role. On October 7, 2021, in Ajoy's campus office in Stanley Hall, Ajoy sexually battered Plaintiff. Thereafter, Ajoy used his position and authority to threaten adverse academic consequences if Plaintiff reported the assault. Ajoy then used his UC Berkeley position to provide false and retaliatory information to University offices and agents, including

SECOND AMENDED COMPLAINT - 9

People and Culture/HR, UCPD, and the Center for Student Conduct ("CSC"), and in communications with outside agencies. Ajoy is sued in his individual capacity.

28. Defendant Samantha Gross (a/k/a Samantha Lachler) ("Gross") was at all relevant times employed by The Regents as a sworn peace officer with UCPD, assigned, from 2016 to 2022, to the Threat Management Unit. Gross conducted a custodial interview of Plaintiff inside Plaintiff's home in Solano County and secretly recorded the interview on an Axon body-worn camera. Gross then sought and obtained a phone-records search warrant from the Alameda County Superior Court based on materially false statements and material omissions. Gross also coordinated with UC Berkeley offices, including CSC, in connection with establishing and maintaining the degree hold described herein. Soon after, Gross left UCPD for Bozeman, Montana. Gross mailed Plaintiff copies of the warrant paperwork and a general return sheet without a warrant number or supporting affidavit, impeding Plaintiff's ability to locate the warrant file and supporting materials. Gross is sued in her individual capacity.

29. DOES 1–20 are individuals and entities whose identities are presently unknown to Plaintiff. Plaintiff alleges, on information and belief, that each Doe Defendant participated in, directed, approved, and/or ratified one or more of the acts or omissions herein, and that such acts or omissions were a proximate cause of Plaintiff's injuries. Doe Defendants are believed to include employees and agents of The Regents at UC Berkeley involved in the sexual violence and sexual harassment ("SVSH") process, student conduct process, People & Culture/Employee & Labor Relations ("ELR") personnel, and supervisory review within UCPD and campus administration. Plaintiff will seek leave to amend this Complaint to substitute true names and capacities of Doe Defendants when

they are ascertained.

**STATEMENT OF FACTS**

A. Plaintiff's Background and Return to Berkeley

30. Plaintiff obtained his B.A. from UC Berkeley in 2010, graduating Phi Beta Kappa and summa cum laude. He remains an active alumnus, participating in campus events and alumni activities to the present day.

31. After graduation, Plaintiff published a book that was formally acquired by UC Berkeley's Doe Library and cataloged into the Main (Gardner) Stacks.

32. In August 2020, Plaintiff re-enrolled at UC Berkeley to pursue a second undergraduate degree. He attended classes, engaged in the campus community, and later worked as an employee of The Regents at the University in laboratory and student-support roles.

B. Employment in Ajoy Lab

33. In Fall 2020, Defendant Ajoy was one of Plaintiff's professors in Chemistry 105 (Instrumental Analysis), a remote course in which Plaintiff earned an A-.

34. In December 2020, Defendant Ajoy recruited Plaintiff to work in Ajoy's lab in Stanley Hall as a grant writer and hardware technician, as an employee of The Regents at UC Berkeley. Ajoy required Plaintiff to be physically present in the Bay Area and offered to cover Plaintiff's housing costs so Plaintiff would work on-site.

35. In January 2021, Plaintiff secured campus housing at University Village Apartments in Albany, California, in addition to maintaining a separate residence outside Alameda

SECOND AMENDED COMPLAINT - 11

County. UC Berkeley Residential Services later verified Plaintiff's University Village occupancy from January 27, 2021 through February 28, 2022.

36. From February 2021 to December 31, 2021, Plaintiff was employed by The Regents at UC Berkeley in Ajoy's lab in a STDT 3 position. That appointment ended by ordinary contract expiration.

37. From February 2, 2022 to August 31, 2022, Plaintiff was employed by The Regents at UC Berkeley in a different unit of the University in a STDT 2 position. That appointment ended by ordinary contract expiration, not termination, and Plaintiff remains in good standing as a UC employee.

38. On February 2, 2022, Plaintiff began a new UC Berkeley position with Residential and Student Services Programs ("RSSP"), supporting food-insecure students on the University Village Apartments campus. This position continued until August 31, 2022, when the contract also expired by its own terms, without termination or employment discipline. Subsequent UCPath records and HR correspondence confirm Plaintiff is not barred from rehire and that his employment history contains no termination or disciplinary notation.

39. During the relevant period, Plaintiff was both a UC Berkeley student and an employee of The Regents at UC Berkeley, including at the time he reported misconduct and thereafter. As an employee, Plaintiff was covered by the Fair Employment and Housing Act ("FEHA") and Title VII of the Civil Rights Act of 1964; as a student and participant in UC Berkeley programs, Plaintiff was protected under Title IX of the Education Amendments of 1972.

40. In early September 2021, Ajoy directed Plaintiff to help prepare a lab manual for

SECOND AMENDED COMPLAINT - 12

Chemistry 105 by taking dictation from Ajoy during one-on-one meetings in Ajoy's office. Plaintiff took dictation in Ajoy's office during this time and completed the manual. Before this assignment, Plaintiff had not worked alone with Ajoy in his office and instead generally completed projects remotely (e.g., via Google Docs) or in laboratory space. During Plaintiff's lab appointment, Ajoy was rarely present in the shared laboratory space, and Plaintiff's work did not require daily in-person interaction with Ajoy. During these dictation sessions, Ajoy sat next to Plaintiff on a couch and frequently leaned over Plaintiff while Plaintiff worked, which Plaintiff found uncomfortable. Plaintiff initially dismissed those concerns.

41. Around the same time, shortly after completion of the manual, Ajoy invited Plaintiff to a College of Chemistry ice cream social in the quad between Hildebrand, Lewis, and Latimer Hall, and proposed that they discuss a "lab project" over dinner. Plaintiff declined the dinner invitation.

C. October 7, 2021 Sexual Battery and Threat

42. On October 7, 2021, Plaintiff arrived at Ajoy's lab in Stanley Hall. Ajoy asked Plaintiff to join him in Ajoy's faculty office.

43. Inside the office, Ajoy directed Plaintiff to sit on a couch positioned in front of Ajoy's desk. Ajoy then pulled a chair directly in front of Plaintiff, within a few feet.

44. Ajoy began speaking in a highly dysregulated and emotional state, accusing Plaintiff of "pretending not to be interested in" other people in the lab and insisted Plaintiff was secretly romantically interested in individuals around Ajoy.

SECOND AMENDED COMPLAINT - 13

45. Plaintiff responded truthfully that he had no interest in anyone in the lab—including Ajoy himself—and that he was focused on his academic and professional work.

46. Ajoy then rambled about lab projects for the remainder of Plaintiff's contract—which was set for ordinary expiration on December 31, 2021—and then suddenly asked Plaintiff, "So how do you feel about me?"

47. Plaintiff remained seated, looking down, with his arms resting on his thighs and his upper body angled forward. Ajoy then stood up. Plaintiff believed Ajoy was moving toward his desk.

48. [REDACTED - details of sexual battery in sealed complaint].

49. [REDACTED - further details of sexual battery in sealed complaint].

50. While Plaintiff was standing between Ajoy and the couch, Ajoy then threatened Plaintiff that Ajoy would destroy Plaintiff's academic career and that no one would believe Plaintiff if Plaintiff disclosed what had occurred. Ajoy made the threat while acting as Plaintiff's work supervisor and as a faculty member with grading authority over Plaintiff.

51. Plaintiff left the lab in a state of shock and returned to University Village Apartments. [REDACTED - description of Plaintiff's immediate emotional and physical response to the assault]. Plaintiff remained in the shower for an extended period while processing the assault. The incident has had lasting emotional and psychological effects on Plaintiff.

D. December 2021 – Recommendation Letter, Lost Card, and Contract Expiration

52. On December 1, 2021, Ajoy submitted to UC Berkeley's Graduate Division a letter of recommendation for Plaintiff praising Plaintiff's work. In the context of the October 7 assault and Ajoy's supervisory authority over Plaintiff, Plaintiff understood the letter as

SECOND AMENDED COMPLAINT - 14

an effort by Ajoy to cultivate goodwill and discourage reporting of the assault.

53. On December 7, 2021, Plaintiff encountered Ajoy outside the Graduate School of Journalism and told Ajoy that Plaintiff intended to report the October 7 assault. Plaintiff then walked away and returned to the lab to gather his belongings before going home. Around that same time, Plaintiff's student identification card—which also functioned as a swipe card for building access—went missing.

54. On December 17, 2021, Plaintiff went to the Cal 1 Card Office in Sproul Hall, reported the card missing, requested that it be deactivated, and received a replacement card without building access. Plaintiff did not request building access on the replacement card because he was finished working in the lab and had no reason to return. The Cal 1 Card record confirms that a replacement card was issued on that date.

55. Plaintiff's paid lab contract ended by ordinary expiration on December 31, 2021. Plaintiff was never terminated or disciplined, as reflected in UC records, including UCPath verification and Plaintiff's personnel file.

56. During each period of Plaintiff's employment in Ajoy's lab (February 2021–May 31, 2021 and June 1, 2021–December 31, 2021), Plaintiff was simultaneously enrolled in Honors Research (Chem H194) under Ajoy and received an A+ (4 units) in Spring 2021 and an A (6 units) in Fall 2021. Those grades have never been changed and remain on Plaintiff's transcript despite the later administrative dismissal notation added effective August 17, 2023, as UC Berkeley advanced the "computer sabotage" narrative described herein.

SECOND AMENDED COMPLAINT - 15

E. February 2022: Protected Reporting, New Job, and Allegations of "Computer Sabotage"

57. In early February 2022 (around February 2–4), Plaintiff reported Ajoy's misconduct to the Office for the Prevention of Harassment and Discrimination ("OPHD"). OPHD is the UC Berkeley office designated to receive and investigate sexual violence and sexual harassment ("SVSH") complaints.

58. Around the same time, Ajoy rescinded the December 1, 2021 recommendation letter and contacted campus counsel David Robinson. On information and belief, Robinson then communicated with CSC and other University personnel regarding allegations that Plaintiff had engaged in "computer sabotage," purportedly tied to events in late December 2021—allegations later used to justify the student-conduct process and the degree hold described herein.

59. On February 2, 2022, Plaintiff began a new position as an employee of The Regents at UC Berkeley in RSSP at the University Village Apartments campus in Albany, supporting food-insecure students. That appointment ran through August 31, 2022 and ended by ordinary expiration, without termination or employment discipline. UCPath employment verification reflects Plaintiff's STDT 2 appointment from February 2, 2022 to August 31, 2022, with inactive status thereafter.

F. UCPD Interview at Plaintiff's Home, Recording, and Phone-Records Warrant

60. On February 28, 2022, Plaintiff moved permanently from University Village Apartments in Albany to his home in Solano County. From there, Plaintiff continued his position with RSSP and worked to complete the requirements for his second degree on campus.

SECOND AMENDED COMPLAINT - 16

61. On or about April 27, 2022, HR partner Clarity White ("White") placed Plaintiff on paid investigatory leave from the RSSP position, without identifying a reason at the time. Plaintiff later learned that the leave was connected to the emerging "computer sabotage" allegations. Plaintiff remained on paid leave through August 31, 2022, when his appointment expired by its own terms, without termination, employment discipline, or a notation of cause.

62. On or about April 29, 2022, Defendant Gross arrived unannounced at Plaintiff's home in Solano County—several counties away from UC Berkeley and outside any campus or UC-property setting—to question Plaintiff about alleged "computer sabotage" in Ajoy's lab. Plaintiff's role in Ajoy's lab had been grant writing and hardware support, not systems administration, Linux administration, cybersecurity, or forensic data recovery. Plaintiff's prior degree was a Bachelor of Arts, not a degree in computer science or a related technical field.

63. Gross identified herself as a UCPD detective assigned to the Threat Management Unit and questioned Plaintiff in his home regarding alleged criminal conduct tied to events at UC Berkeley. No local law enforcement personnel were present. Gross activated an Axon body-worn camera and recorded the encounter without informing Plaintiff during the encounter.

64. During this encounter, Gross questioned Plaintiff about Plaintiff's alleged involvement in sabotaging computers in Ajoy's lab between December 23 and 24, 2021.

65. Plaintiff informed Gross upon her inquiry that up until February 28, 2022, he held a University Village apartment on University property in Albany one mile from campus, a house outside Alameda County, and the present home in Solano County before

SECOND AMENDED COMPLAINT - 17

permanently relocating to the latter county.

66. In UCPD reports later transmitted to CSC in connection with the degree-hold process described herein, and shared with Plaintiff in September 2022, UCPD recorded Ajoy's statements that Plaintiff was a former University employee who had allegedly engaged in "inappropriate contact" with lab colleagues, had been accused by female lab members of "sexual harassment," and supposedly could not have his lab contract renewed because of HR-related conclusions. Those statements supplied the false employment-discipline premise used to frame Plaintiff as a disgruntled former employee with a retaliatory motive. Those statements were false and contradicted by University records.

67. Those representations conflicted with University records showing that:

    a.   Plaintiff's position in Ajoy's lab ended by contract expiration on December 31, 2021;

    b.   Plaintiff was never terminated or disciplined in his employment position in Ajoy's lab;

    c.   Plaintiff had never been a respondent in any SVSH investigation or received any disciplinary notation in his personnel file;

    d.   Plaintiff was still an active employee of The Regents at UC Berkeley, having been rehired without restriction in RSSP in February 2022, and his RSSP contract was set for ordinary expiration on August 31, 2022;

    e.   Ajoy had submitted on Plaintiff's behalf a recommendation letter on December 1, 2021 to UC Berkeley's Graduate Division; and

    f.   Ajoy had submitted A-level grades for the Spring and Fall 2021 semesters,

SECOND AMENDED COMPLAINT - 18

during which time Plaintiff received course credit under Honors Research (Chemistry H194) while also employed in Ajoy's lab.

68. On May 5, 2022, Gross submitted a search-warrant application to a judge of the Alameda County Superior Court seeking Plaintiff's cellphone records for December 23–25, 2021. The warrant was approved less than an hour after submission. As described below, Plaintiff was not provided the warrant number or the supporting affidavit at the time the warrant paperwork was later mailed to him, and Plaintiff did not obtain the complete court file until November 2025.

69. In her probable cause affidavit, Gross, in contradiction of University records:

    a.   stated that Plaintiff had been subjected to adverse HR findings involving inappropriate contact with others in the lab;

    b.   suggested that Plaintiff was a terminated former employee of the University, in stating that pursuant to these HR "findings," the University had determined that Plaintiff's contract should not be renewed;

    c.   did not disclose that Gross questioned Plaintiff inside Plaintiff's home in Solano County and recorded the encounter on an Axon body-worn camera;

    d.   referenced supposed co-conspirators in an elaborate sabotage scheme, despite no factual basis described in the affidavit for Plaintiff's training or expertise; and

    e.   requested a delayed notification order, citing an ongoing "threat" to the investigation.

SECOND AMENDED COMPLAINT - 19

70. In the UCPD police report that Gross prepared and that was later transmitted to CSC as part of the student conduct packet shared with Plaintiff in September 2022, Gross acknowledged that she traveled to Plaintiff's home in Solano County and used her Axon body-worn camera to record the interview inside Plaintiff's home—information not disclosed in her probable-cause affidavit.

71. On May 9, 2022, the search warrant was executed via email on T-Mobile.

72. On May 11, 2022, the warrant return filed with the court consisted of a generic return sheet listing "call detail records with cell sites," "data sessions with cells," and "subscriber information." The court file did not include the underlying records, an itemized inventory, chain-of-custody documentation, a T-Mobile certification, or any forensic report.

73. UCPD retained custody of any records obtained through the warrant. To this day, the University has refused to provide Plaintiff the underlying records (if any exist), even for inspection, and has not produced a complete return or supporting materials despite multiple California Public Records Act ("CPRA") requests. Plaintiff's efforts to locate and obtain the warrant file and affidavit are described below.

74. Furthermore, the warrant affidavit and its demonstrably false statements about Plaintiff remain publicly available through the Clerk's Office of the Criminal Division of the Alameda County Superior Court, despite Plaintiff never being arrested, charged, prosecuted, or convicted in connection with the search warrant or the alleged "computer sabotage," posing an ongoing threat and injury to Plaintiff's reputation.

75. The continued public availability of Gross's warrant affidavit—containing demonstrably false statements about alleged HR discipline and sexual harassment—together with The

SECOND AMENDED COMPLAINT - 20

Regents' ongoing reliance on Gross's investigative narrative and purported warrant "fruits" that have not been produced to Plaintiff, constitutes an ongoing reputational and constitutional injury, not merely past harm.

G. Degree Hold and Student Conduct Proceedings Following UCPD Materials

76. During this period, and before CSC imposed any degree hold, Plaintiff continued completing degree requirements on campus through the end of the Spring 2022 semester.

77. On May 18, 2022, shortly after Plaintiff completed his final exam and satisfied all academic requirements for his second degree, CSC imposed a hold on Plaintiff's degree and accused him of "computer sabotage," relying on Ajoy's complaints and Gross's UCPD report and warrant materials.

78. On May 31, 2022, CSC Senior Conduct Coordinator Becca Wallace ("Wallace") met with Plaintiff via Zoom regarding the degree hold. Wallace told Plaintiff that she had been waiting for Gross to provide the UCPD report to CSC before imposing the hold. Plaintiff told Wallace that he had reported Ajoy's sexual misconduct to OPHD, that he believed the narrative was retaliatory, and he again reported the October 7, 2021 sexual battery to Wallace. Despite being a mandatory reporter, Wallace did not report the sexual battery to OPHD or otherwise initiate an SVSH referral on Plaintiff's behalf. Wallace's later June 10, 2022 proposed outcome omitted Plaintiff's report of sexual battery, recast Plaintiff's disclosure as threatened legal action for "emotional distress," and advanced the sabotage narrative based on speculative inferences about travel, card access, technical knowledge, and motive. Wallace responded by asserting—without evidence—her belief that Plaintiff had driven from his residence outside Alameda County to the Berkeley

SECOND AMENDED COMPLAINT - 21

campus in order to sabotage computers in Ajoy's lab, despite Plaintiff then also maintaining a University Village apartment in Albany, approximately one mile from campus.

79. Internal emails later produced to Plaintiff showed that, before CSC imposed the degree hold, Wallace had asked UCPD for an update in early April 2022 because CSC was "holding off on moving forward" until UCPD completed its investigation, while CSC's adjudication deadlines were approaching. UCPD Lieutenant Bill Kasiske asked whether there was "any kind of absolute deadline (graduation?)" UCPD should know about. Wallace responded that Plaintiff had a Spring 2022 expected graduation, that CSC had the ability to hold a student's degree conferral, but that CSC "need[ed] to charge the student with a violation and start [its] process prior to placing a hold," and therefore "would need to move forward by early May in order to hold the degree." Plaintiff was not copied on this exchange and did not learn of it until records were produced shortly before the student-conduct hearing in Fall 2022.

80. Internal emails between CSC and the Cal 1 Card Office reflect that by May 2022 University personnel knew Plaintiff's student identification card had been replaced on December 17, 2021 and that the replacement card lacked building access. Despite that information, University personnel relied on access logs tied to the prior card number—the card Plaintiff had reported missing on December 17, 2021. The original access-log records were not provided to Plaintiff, and the University did not adequately investigate whether the prior card had been stolen, cloned, improperly left active, or used by someone else.

81. On or about June 4, 2022, Plaintiff first learned by mail that Gross had sought and

SECOND AMENDED COMPLAINT - 22

executed the May 2022 warrant. The materials mailed to Plaintiff (mailed on June 1, 2022) included a generic return sheet but did not include the warrant number or the probable-cause affidavit, and the return listed only generic categories of records. Without a warrant number, when Plaintiff contacted the Alameda County Superior Court shortly thereafter, court staff could not readily locate the warrant file by Plaintiff's name. This impeded Plaintiff's ability to obtain or inspect the supporting affidavit. Plaintiff did not obtain the complete file from the issuing court until November 2025. Between 2023 and 2024, Plaintiff sought guidance from attorneys regarding the process for obtaining the warrant affidavit, but was unable to locate or obtain it in the absence of a warrant number or complete court file. On December 8, 2022, after Plaintiff requested additional warrant materials by email, UCPD Detective Jackson Thomsen ("Thomsen") responded that the copies of the "Search Warrants and Returns" mailed on June 1, 2022 were "what we are required to provide," and he did not provide the affidavit or the underlying call-detail records referenced in the return. In March 2025, Plaintiff again sought warrant materials from Thomsen by email and was directed to UCPD Records, after which Plaintiff pursued CPRA requests and in-person submissions described below.

82. On or about July 19, 2022, CSC's in-house Independent Hearing Officer Benjamin Fils recused himself, after admitting that he had supervised Wallace's intake of Ajoy's complaint, creating a conflict.

83. Rather than appointing a neutral campus official, Former Associate Vice Chancellor and Chief of Staff of the Vice Chancellor of Student Affairs Bahar Navab ("Navab") retained Xenia, Ohio-based attorney-adjudicator Stephanie Slone ("Slone") of Van Dermyden

SECOND AMENDED COMPLAINT - 23

Makus Law Corporation as an outside Independent Hearing Officer.

84. Around this time, Gross left UCPD after approximately eighteen years and moved to Bozeman, Montana.

85. During this period, Plaintiff remained on paid investigatory leave from his RSSP position and was never arrested, charged, or prosecuted for any offense related to the lab computers. By Thomsen's later admission in December 2022, the District Attorney's Office ultimately rejected UCPD's pretextual case without Plaintiff's involvement.

86. On or around September 2022, Plaintiff met with OPHD again to report Ajoy's sexual misconduct. OPHD did not immediately open an investigation, but instead issued a no-contact directive between Plaintiff and Ajoy, with the explicit exception of Ajoy's participation in Plaintiff's student conduct proceeding.

87. On September 7, 2022, Plaintiff reported the October 7, 2021 sexual battery to UCPD.

88. On October 14, 2022, during the first phase of the student conduct hearing, Plaintiff began cross-examining Ajoy and attempted to question him about his knowledge of Plaintiff's Title IX/SVSH complaint to OPHD concerning Ajoy's sexual battery. Plaintiff had DSP accommodations in place during the student-conduct proceedings allowing disability-related breaks as needed. Shortly after Plaintiff raised that topic, the hearing was paused and the recording stopped. Plaintiff then experienced a painful flare-up of his disability, prompting a recess for medical reasons.

89. On November 3, 2022, after the October 14, 2022 conduct-hearing session had recessed and before the December 2, 2022 continuation, and after Plaintiff had filed a sexual-battery report with UCPD, OPHD opened a Title IX/SVSH investigation into Plaintiff's

SECOND AMENDED COMPLAINT - 24

complaint against Ajoy, assigning investigator Ashok Arjun Rau ("Rau").

90. Slone was aware, from Plaintiff's last question to Ajoy on October 14, that OPHD's Title IX/SVSH process had been raised in the conduct hearing. Slone did not pause or bifurcate the conduct process. Instead, Slone limited Plaintiff's ability to continue direct questioning of Ajoy.

91. At the December 2, 2022 continuation, Slone forbade Plaintiff from continuing his direct cross-examination of Ajoy, which Plaintiff had been allowed to do prior to OPHD's opening of an investigation and prior to Plaintiff's October 14 question about Ajoy's knowledge of Plaintiff's report on Ajoy's sexual battery to OPHD.

92. When Ajoy was recalled on December 2, 2022, Slone and Navab permitted Plaintiff to question Ajoy only on the condition that Plaintiff keep his camera off and his microphone muted and submit all questions in writing. Slone skipped more than thirty of Plaintiff's proposed questions without stating individualized rulings, and Ajoy was allowed to leave before questioning concluded.

93. Because Gross had left UCPD, she was not available for direct or cross-examination. CSC instead called Thomsen, Gross's replacement in the Threat Management Unit. Thomsen offered no technical or forensic evidence. In response to questioning during the hearing, Thomsen stated that the District Attorney had declined to file charges— information that had not previously been disclosed to Plaintiff.

94. Thomsen admitted that Ajoy reported the alleged sabotage only after the 21-day Stanley Hall video retention period had expired, undermining any claim of diligent reporting or investigation and ensuring that no objective video evidence could be reviewed.

SECOND AMENDED COMPLAINT - 25

95. The asserted "evidence" of "sabotage" contained multiple anomalies, including:

    a.   supposed swipe-card log tied to the card that Plaintiff reported lost and requested be deactivated on December 17, 2021, with the original log record not produced to Plaintiff;

    b.   unexplained chain-of-custody gaps in the handling of hard drives from alleged discovery of "sabotage" through delivery to UCPD on or about February 6, 2022;

    c.   an Alameda County Crime Lab report that did not definitively attribute any deletion to Plaintiff and did not provide a technical explanation establishing how any erasure occurred;

    d.   the UCPD report's reference to an $8,749 computer setup receipt, cited as proof of loss, without the receipt being introduced as evidence in the hearing beyond Gross's UCPD narrative;

    e.   reliance on the existence of a May 5 search warrant without production of any digital records obtained through the warrant; and

    f.   the absence of any civil action for damages or criminal charges despite allegations framed as felony-level sabotage.

96. At the close of the hearing, Plaintiff again stated on the record that Ajoy had sexually battered him and that the sabotage case was fabricated and retaliatory. Slone responded, "Now, wait—that's another case," and recessed the proceedings as Plaintiff began experiencing another flare-up of his disabling condition.

97. On December 5, 2022, Slone issued a decision finding Plaintiff responsible for computer sabotage. The decision did not cite forensic proof tying Plaintiff to any deletion and

SECOND AMENDED COMPLAINT - 26

relied instead on summaries of the UCPD investigation and Ajoy's accusations.

98. The degree hold, Slone's conduct finding, and the recommendation of dismissal were based on the UCPD narrative and Ajoy's accusations rather than on independently tested forensic evidence produced in the conduct process. Gross's report and warrant application became central to the University's theory of the case, but the underlying warrant materials and any purported digital records were not produced to Plaintiff and were not filed in the court record beyond a generic return. The University nonetheless relied on the UCPD narrative—including statements about what the warrant purportedly showed—in CSC proceedings and degree-hold decisions, making the UCPD investigation and Ajoy's accusations inseparable from the disciplinary outcome described herein.

H. 2023: OPHD Investigation, Sanctions Proceedings, and Administrative Appeal

99. In January 2023, a former Ajoy lab member and then-Ph.D. candidate—who had left the lab in June 2021—emailed Plaintiff's berkeley.edu account after being contacted by Rau during the OPHD process. In that email, the former lab member described "secret, ultra negative experiences" with Ajoy.

100.     In February 2023, Plaintiff reported the October 7, 2021 sexual battery and retaliatory "computer sabotage" narrative to CRD. CRD's intake process did not result in an interview with Plaintiff until May 2023.

101.     In early May 2023, OPHD investigator Rau issued his investigative report finding in Ajoy's favor. The report adopted and repeated Slone's conduct findings and Ajoy's

SECOND AMENDED COMPLAINT - 27

"computer sabotage" narrative. The report also included hearsay allegations about Plaintiff's purported conduct toward female lab members, including an implausible and unsupported claim that Plaintiff "chased" or "followed" a female lab member across campus in broad daylight—an allegation that, if true, would have concerned visible conduct in a public campus setting but was never disclosed to Plaintiff during his employment and never resulted in an SVSH case, police report, campus safety report, employment discipline, or personnel-file notation. Rau acknowledged that such hearsay allegations were outside the scope of the investigation but included them as "context" bearing on credibility, and relied on them to discredit Plaintiff while exonerating Ajoy.

102.    Rau's report was especially troubling because OPHD is the UC Berkeley office designated to investigate SVSH matters in both educational and employment contexts. Plaintiff has never been a respondent in any SVSH case, has never been terminated or disciplined as an employee, and separated from UC Berkeley employment through ordinary contract expiration, not termination for cause or discipline reflected in his personnel file.

103.    On May 25, 2023, Slone, Navab, and Michael Mann ("Mann"), the CSC representative who acted on the University's behalf during the October and December 2022 conduct hearing, conducted a sanctions hearing in Plaintiff's absence and imposed sanctions based on Slone's conduct finding.

104.    On June 9, 2023, Slone submitted a hearing report to the Dean of Students that:

   a.    asserted, without technical foundation or expert support, that Plaintiff had acquired the ability to erase complex Linux systems and hard drives merely from being present in the lab long enough;

SECOND AMENDED COMPLAINT - 28

b.  misidentified Plaintiff as a graduate student; and

c.  referenced the phone-records search warrant described in Gross's report, without any corresponding production of warrant-derived data to Plaintiff or in the conduct process.

105.    On June 18, 2023, Plaintiff filed a charge with CRD for sexual harassment, retaliation, and discrimination based on the October 7, 2021 assault and the retaliatory computer-sabotage narrative.

106.    In July 2023, Plaintiff appealed the conduct finding and degree hold. The appeal was assigned to outside attorney-adjudicator Amy Oppenheimer ("Oppenheimer"), principal of Oppenheimer Investigations Group LLP.

107.    Plaintiff shared the CRD charge and cited:

a.  anomalies in evidence;

b.  denial of access to "evidence" referenced only in the UCPD report;

c.  Slone's limitations on Plaintiff's ability to question Ajoy *only* after the SVSH investigation into Ajoy opened;

d.  the retaliatory motive of the entire process arising from Plaintiff's protected reports of Ajoy's October 7, 2021 sexual battery and related misconduct; and

e.  Ajoy's definitive knowledge that Plaintiff planned to report the October 7, 2021 assault as early as December 7, 2021, when Plaintiff verbally informed Ajoy that he would do so.

108.    On or about August 16, 2023, Oppenheimer upheld the University's findings and degree hold and found "no evidence" that the student-conduct process and the Title IX/SVSH process were related, leaving Chancellor review as the remaining internal

SECOND AMENDED COMPLAINT - 29

avenue for reversal.

109.    Oppenheimer Investigations Group later provided Alezah Trigueros ("Trigueros") as the Title IX/SVSH hearing officer for Plaintiff's SVSH case against Ajoy. By January 19, 2024, the same private firm that had upheld the sabotage finding and degree hold was also serving in a decision-making role in the SVSH hearing process for Plaintiff's complaint against Ajoy.

110.    Slone's decision and Oppenheimer's appeal decision accepted and reinforced the same "computer sabotage" narrative that originated with Ajoy and was advanced through UCPD materials, despite the conflict with University records and other undisputed facts, including Plaintiff's unblemished employment status, Ajoy's submission of a letter of recommendation on Plaintiff's behalf in early December 2021, Plaintiff's lack of employment discipline, and A-grades awarded by Ajoy while Plaintiff was employed in the lab. Those decisions entrenched the narrative that continues to be relied upon to justify the degree hold.

I. January 19, 2024: SVSH Hearing on Plaintiff's Complaint and Plaintiff's Exclusion

111.    On January 19, 2024, the University convened an SVSH hearing on Plaintiff's Title IX/SVSH complaint against Ajoy. Trigueros of Oppenheimer Investigations Group served as hearing officer, and out-of-state hearing coordinator Reese Havlatka ("Havlatka") controlled the Zoom session.

112.    Before the evidentiary hearing began, Havlatka admitted Plaintiff from the Zoom waiting room into a session where Trigueros, Havlatka, Ajoy, and Ajoy's counsel were

SECOND AMENDED COMPLAINT - 30

already present. Trigueros then informed Plaintiff that he would be removed from the live hearing and could listen to the recording after the hearing concluded. Havlatka then removed Plaintiff from the Zoom session. The University proceeded with the hearing from approximately 9:12 a.m. to 2:18 p.m., with Ajoy and his counsel present and Plaintiff excluded.

113.    As a result, Plaintiff could not observe the proceedings in real time, hear Ajoy's testimony, respond to allegations as they were presented, present his account in the manner afforded at the hearing, or meaningfully consult and participate during the evidentiary presentation.

114.    During Plaintiff's forced absence, Ajoy presented the "computer sabotage" narrative and hearsay accusations that Plaintiff had sexually harassed lab members, notwithstanding that Plaintiff had never been a respondent in any SVSH matter and had no workplace discipline, adverse HR findings, suspension, termination, or personnel-file notation.

115.    Rau's biased report was entered into evidence, and its misrepresentations of Plaintiff could not be challenged in Plaintiff's forced absence.

116.    OPHD Director Kellie Brennan ("Brennan") and Trigueros later provided written explanations for Plaintiff's exclusion that conflicted with each other. After Plaintiff objected by email in real time to being excluded from the live hearing while it was still underway, stating, in part, that he viewed the exclusion as retaliatory for asserting his Title IX rights, Brennan responded in a 10:09 a.m. email to Plaintiff that Plaintiff had been removed for allegedly violating hearing participation rules by interrupting the proceeding. Brennan's explanation did not accurately reflect the circumstances of

SECOND AMENDED COMPLAINT - 31

Plaintiff's exclusion because the proceeding she claimed Plaintiff had interrupted had not begun in Plaintiff's presence, and Plaintiff had not been permitted to observe any testimony or participate in any evidentiary portion of the hearing. Trigueros later provided a different written explanation in her hearing report, which did not adopt Brennan's real-time explanation and instead characterized Plaintiff's exclusion as arising from logistical and privacy concerns surrounding participation conditions. Neither explanation accurately reflected the circumstances of Plaintiff's exclusion, and the two institutional explanations were materially inconsistent with each other.

117.    Brennan's real-time explanation also conflicted with the practical realities of a Zoom hearing. If OPHD or Trigueros believed Plaintiff was interrupting, Trigueros could have muted Plaintiff, restricted Plaintiff's microphone access, placed Plaintiff in observer status, used a waiting room during breaks, or otherwise controlled participation without excluding the complainant entirely from the proceeding on his own sexual-battery complaint. Plaintiff also had DSP accommodations in place for the January 19, 2024 SVSH hearing allowing disability-related breaks as needed, further undermining any later suggestion that break-related participation logistics justified excluding Plaintiff from the live hearing.

118.    The hearing then proceeded for hours in Plaintiff's absence while Ajoy, counsel, and witnesses presented testimony bearing directly on Plaintiff's credibility, motives, and character, which Plaintiff could not hear, contextualize, or rebut in real time. The shifting explanations and disproportionate exclusion support an inference that Plaintiff's removal was not a neutral procedural necessity, but part of the retaliatory and complainant-inverting treatment alleged herein.

SECOND AMENDED COMPLAINT - 32

119.     A former Ajoy lab member and then-PhD candidate participated in the hearing as a character witness for Plaintiff.

120.     In or around March 2024, following Plaintiff's exclusion from the hearing, Trigueros issued a finding in favor of Ajoy and rescinded the no-contact directive OPHD had imposed in September 2022. Trigueros's Final Fact-Finding Hearing Report repeated Rau's investigative narrative, referenced the "computer sabotage" allegations, and adopted Ajoy's account without Plaintiff having been present to hear and respond to the testimony presented at the hearing.

121.     By excluding Plaintiff from the SVSH hearing while allowing Ajoy and his counsel to present the "computer sabotage" narrative and Rau's report without Plaintiff's real-time participation, the University used the same narrative that underlies the degree hold to defeat Plaintiff's Title IX/SVSH complaint and to further entrench the basis for the ongoing degree hold.

J. CRD / FEHA Proceedings and Bianca Bowman-Waugh's CRD Position Statement

122.     On June 6, 2024—nearly a year after Plaintiff's June 18, 2023 CRD charge and almost five months after Plaintiff's exclusion from the January 19, 2024 SVSH hearing—ELR consultant Bianca Bowman-Waugh ("Bowman-Waugh"), on behalf of People & Culture (UC Berkeley's HR department), submitted a nine-page position statement to CRD in response to Plaintiff's charge.

123.     Plaintiff did not receive access to this submission until October 3, 2025, after a protracted CRD appeal and CPRA process with CRD's PRA Unit.

124.     Bowman-Waugh's submission to CRD:

SECOND AMENDED COMPLAINT - 33

a. omitted the January 19, 2024 SVSH hearing, Plaintiff's exclusion from that hearing, and the ex parte nature of the proceeding, and did not disclose that an Oppenheimer Investigations Group hearing officer presided over the SVSH hearing after Oppenheimer had already upheld the sabotage finding and degree hold in August 2023;

b. presented Rau's May 2023 report as the dispositive resolution of Plaintiff's SVSH complaint, without disclosing that Rau's report adopted the sabotage narrative and included hearsay allegations about Plaintiff that were outside the scope of the SVSH investigation and inconsistent with University records showing ordinary contract expiration and no employment discipline;

c. repeated Ajoy's "computer sabotage" narrative in substance;

d. included dismissed, non-probative, and non-disciplinary HR material that had not been shared with Plaintiff during his employment, did not appear in the personnel file later provided to Plaintiff by UC Berkeley HR, did not result in employment discipline, suspension, termination, or any rehire restriction, and that Plaintiff first saw through CRD's disclosure on October 3, 2025; and

e. disclosed that Plaintiff's degree was being withheld and framed that withholding as "context," without acknowledging that the withholding itself was disputed and was part of the retaliatory course of conduct at issue.

125. Despite otherwise portraying Plaintiff negatively, the June 6, 2024 CRD position statement represented that Plaintiff was not suspended under employment policies, was not terminated from any appointment, and that both his Ajoy lab appointment and RSSP appointment ended on their scheduled end dates. Those institutional admissions

SECOND AMENDED COMPLAINT - 34

materially conflicted with earlier UCPD reports and warrant representations asserting that Plaintiff's employment had effectively been ended because of misconduct findings, even though Plaintiff was actively employed by The Regents in RSSP when those 2022 representations were made.

126. On December 17, 2024, CRD closed the case for "insufficient evidence" and issued a FEHA Right-to-Sue notice. Plaintiff timely filed the original complaint in this action on December 17, 2025, within one year of that notice.

127. On or about January 2025, the EEOC commenced a substantial weight review of CRD's case file, which included Bowman-Waugh's June 6, 2024 submission and other University materials that Plaintiff had not yet been able to review.

128. In February 2025, the EEOC closed the charge and issued a Right-to-Sue letter.

129. On October 3, 2025, Plaintiff's request for the CRD case file was granted after a lengthy appeal and months-long disclosure process. This was the first time Plaintiff was able to review the full contents of the University's June 6, 2024 submission and the HR materials the University included.

130. On October 22, 2025, CRD Attorney Rebecca Pinger of the PRA Unit confirmed on CRD letterhead that the University's June 6, 2024 submission contained no reference to the January 19, 2024 SVSH hearing from which the University excluded Plaintiff.

131. On November 11, 2025, Plaintiff filed an inquiry with the EEOC based on newly discovered post-charge retaliation reflected in Bowman-Waugh's submission to CRD, including:

   a. omission of Plaintiff's exclusion from the January 19, 2024 SVSH hearing;

   b. omission and distortion of the SVSH procedural history and the role of the

SECOND AMENDED COMPLAINT - 35

hearing;

c.  inclusion of dismissed, non-probative, and non-disciplinary HR material that had not been shared with Plaintiff during his employment, did not appear in Plaintiff's personnel file, and was first seen by Plaintiff through CRD's disclosure; and

d.  framing Plaintiff as a harasser notwithstanding that Plaintiff was never terminated or disciplined as an employee, had no adverse HR findings or investigations, and was never a respondent in any SVSH case.

132.    Following the November 11, 2025 inquiry, Plaintiff filed a formal EEOC Charge of Discrimination on February 18, 2026. The United States Department of Justice thereafter issued a Title VII Notice of Right to Sue on March 5, 2026.

K. Chancellor Lyons, Becca Lopez, and the Continued Withholding of Plaintiff's Degree

133.    On or about July 1, 2024, Lyons became Chancellor of UC Berkeley. By virtue of his office, Lyons has final authority over degree conferral and the authority to direct correction of student records and disciplinary outcomes maintained by UC Berkeley.

134.    In October 2024, Plaintiff emailed Lyons from his berkeley.edu address describing the degree hold, the lack of technical knowledge and forensic support of the "computer sabotage" accusation, the parallel Title IX/SVSH matter concerning Ajoy's sexual battery, Plaintiff's exclusion from the January 19, 2024 SVSH hearing, and the harm caused by withholding a completed degree. Plaintiff also described his longstanding relationship with UC Berkeley, including his 2010 degree and the book he authored that is held in UC Berkeley's Doe Library collection.

SECOND AMENDED COMPLAINT - 36

135.    Approximately three days later, Lyons's office responded by denying relief without substantive explanation and stated that the "administrative process…for violations of the code of student conduct is complete and the sanctions are final."

136.    In February 2025, Plaintiff attended a UC Berkeley gala as an invited alumnus. Lyons attended and posed for photographs with Plaintiff. At check-in, the University provided Plaintiff, like other attendees, a preprinted name tag, underscoring that UC Berkeley continued to treat Plaintiff as an alumnus while continuing to withhold his completed second degree.

137.    On March 21, 2025, Plaintiff again notified Lyons about the degree hold from his berkeley.edu account. Lyons's office again delegated the matter to staff, who again refused to reconsider the hold and provided no meaningful explanation.

138.    Plaintiff continued serving UC Berkeley in alumni roles in 2025, including grading essays and phone-banking for scholarship programs administered by the University.

139.    On May 8, 2025, Becca Lopez ("Lopez"), then the Director of CSC, informed Plaintiff by email that the Chancellor's office had contacted her regarding Plaintiff's degree. Lopez then stated, without further explanation, that Plaintiff's completed "degree is not eligible to be conferred," that "the case has been fully resolved," and that "all administrative procedures have been exhausted."

140.    Lopez maintained the degree hold even after Plaintiff provided information and records showing that:

    a.    the District Attorney declined to file criminal charges arising from UCPD's investigation;

SECOND AMENDED COMPLAINT - 37

   b.  neither Ajoy nor the University filed a civil action for damages relating to the alleged "computer sabotage," despite asserting that the incident caused massive losses;

   c.  HR and UCPath records reflected that Plaintiff was not terminated and had no employment discipline; and

   d.  the "computer sabotage" accusation remained unproven and no underlying forensic evidence was produced to Plaintiff in the process.

141. On July 1, 2025, Lopez again wrote that the matter was "complete" and confirmed that no degree would be awarded. Plaintiff again advised that:

   a.  he had never been criminally charged;

   b.  he had never been provided the underlying materials referenced in the UCPD narrative;

   c.  no civil action had been filed despite assertions of massive losses; and

   d.  the University had never provided a coherent technical explanation for how the alleged erasure purportedly occurred.

142. On July 21, 2025, HR partner White confirmed by email that Plaintiff's contracts had ended by ordinary expiration, that he had not been terminated, and that nothing barred him from applying for employment with UC Berkeley—directly contradicting the "terminated disgruntled saboteur" narrative relied on in the student conduct, OPHD, and CRD processes.

143. As of the filing of the original Complaint and this Second Amended Complaint, Plaintiff retains an active CalNet account, a working berkeley.edu email address, a University library account, and alumni access to—and attendance at—campus events,

SECOND AMENDED COMPLAINT - 38

including Golden Bear Orientation and Homecoming. UC Berkeley nonetheless continues to withhold conferral of Plaintiff's second undergraduate degree, for which Plaintiff completed all academic requirements in 2022.

L. CPRA Requests for Warrant Materials and Continuing Nonproduction

144.    On April 23, 2025, Plaintiff submitted a CPRA request to UCPD Records from his berkeley.edu account seeking warrant materials and any digital evidence obtained through Gross's May 5, 2022 warrant that were never filed with the issuing court and remained solely in UCPD's custody. UCPD did not respond with a determination or production timeline and did not identify any active investigation as a basis for withholding.

145.    On May 1, 2025, Plaintiff visited UCPD at 1 Sproul Hall and submitted requests on UCPD's CPRA forms seeking:

a.    the UCPD report concerning Ajoy's October 7, 2021 sexual battery; and

b.    the warrant materials referenced in Gross's UCPD report on "computer sabotage" and in CSC's hearing packet. UCPD did not provide a determination or production timeline in response.

146.    On May 27, 2025, Plaintiff sent UCPD Records a CPRA request by certified mail duplicating the May 1 in-person submissions. On May 30, 2025, Public Records Coordinator Janesa Shearer ("Shearer") of the University's PRA Office acknowledged receipt by email but did not provide a statutory determination or a firm production date, stating only that records might exist and referencing a tentative August 11, 2025 date.

147.    On July 22, 2025, Shearer sent a vague update confirming the existence of

SECOND AMENDED COMPLAINT - 39

responsive records, invoking unspecified CPRA exemptions that "may apply," and stating that some records might be produced before the proposed production date.

148.    On August 11, 2025, the proposed production date passed without production or a meaningful update. No further updates were ever received from Shearer or the University PRA Office.

149.    On October 8, 2025, Jennifer Woods ("Woods") of UCPD Records released the sexual-battery police report after approximately six months of delay via a Virtru-encrypted link sent to Plaintiff's berkeley.edu address. The report reflects that, when interviewed by UCPD in the same office where the October 7, 2021 sexual battery occurred, Ajoy invoked the "computer sabotage" narrative and asserted that HR had issued warnings to Plaintiff during his employment, again portraying Plaintiff as a disgruntled employee. Those assertions conflicted with University records reflecting ordinary contract expiration and no employment discipline or termination. In the same email thread, Woods stated that UCPD was "reviewing" Plaintiff's request for warrant materials, but no further response followed.

150.    On October 24, 2025, Plaintiff submitted an email request in the same thread for Gross's separation records pursuant to Penal Code § 832.7(b)(1)(C)–(E).

151.    On November 8, 2025, UCPD Lieutenant Nicole Miller ("Miller") responded in the same email thread that Gross had separated "in good standing," but did not address Plaintiff's outstanding CPRA requests for warrant materials and separation records. Miller also stated that UCPD did not have custody of the warrant records and directed Plaintiff to the Alameda County Superior Court, despite the Criminal Division's

indication that UCPD was the custodian of any records not contained in the court file.

152.    On November 21, 2025, Plaintiff responded and reiterated the Alameda County Superior Court's position that any warrant materials not contained in the court file would be maintained by the requesting agency. Miller provided no further response. As of the date of filing, the University has not issued a written CPRA determination concerning the outstanding requests for warrant materials and disclosable separation records.

153.    On December 2, 2025, Plaintiff emailed Miller a follow-up—with Lyons, Woods, UCPD Records, and the University's PRA Office copied—again requesting Gross's separation records and the May 2022 warrant materials. Plaintiff also identified material false statements and omissions in Gross's May 5, 2022 probable-cause affidavit, including:

   a.    a false statement that Plaintiff had been subjected to adverse findings of a Human Resources investigation, implying employment discipline or termination;

   b.    the omission that Gross's custodial-style interview of Plaintiff occurred at Plaintiff's home in Solano County, several counties from UC Berkeley, without any local law-enforcement presence; and

   c.    the omission that Gross recorded the interview inside Plaintiff's residence on an Axon body-worn camera without informing Plaintiff during the encounter.

154.    In the same email, Plaintiff submitted a new CPRA request for:

   a.    the body-worn camera footage from Gross's April 29, 2022 visit and interview at Plaintiff's home in Solano County;

   b.    any interagency communications with city police or the Solano County Sheriff's

SECOND AMENDED COMPLAINT - 41

Office regarding Gross's visit and interview; and

    c.   any UCPD records reflecting authorization, planning, or supervision of Gross's April 29, 2022 interview at Plaintiff's home.

155.    Plaintiff also posed specific questions to Miller, including:

    a.   whether Miller supervised or had knowledge of Gross's April 29, 2022 interview at Plaintiff's home;

    b.   whether Miller reviewed or approved Gross's May 5, 2022 warrant packet;

    c.   whether UCPD notified or coordinated with any local law enforcement regarding Gross's April 29, 2022 visit and interview;

    d.   who authorized Gross's use of an Axon body-worn camera inside Plaintiff's home; and

    e.   confirmation of which agency maintains custody of the warrant materials and any resulting records.

156.    Neither Miller nor anyone within the University responded.

157.    On December 15, 2025, in response to Plaintiff's follow-up inquiry, an Alameda County Superior Court administrator, Adam Byer, advised that "whatever is returned would be in the search warrant file" and that the proper venue for raising "any alleged injustice" was "through legal action," with "no administrative remedy." Based on that representation and Plaintiff's review of the court file, Plaintiff understands that any seized digital evidence not contained in the court's file has been retained solely by UCPD and was never made part of the court record.

158.    As of the filing of this Complaint, UCPD continues to withhold the warrant

SECOND AMENDED COMPLAINT - 42

materials and to maintain custody of any digital records obtained through the May 5, 2022 warrant, while refusing to provide those materials to Plaintiff or allow inspection. UCPD has not provided an itemized inventory or chain-of-custody documentation beyond a generic return. The University has continued to rely on Gross's narrative regarding purported warrant "fruits"—without producing the underlying records—in CSC proceedings and degree-hold decisions. This ongoing withholding and reliance continues to cause reputational and constitutional injury.

M. Ongoing Injury

159.    Plaintiff's completed second degree remains withheld. Plaintiff's transcript and academic record reflect an adverse status, including "administrative dismissal," based on the computer-sabotage finding. The University continues to rely on UCPD materials and alleged evidence referenced in reports but not produced to Plaintiff.

160.    The student-conduct findings, the SVSH outcome in Plaintiff's case against Ajoy, and the University's submissions to CRD rely on the same "computer sabotage" narrative that arose after Ajoy's sexual battery and Plaintiff's report. The University continues to rely on that narrative in maintaining the degree hold and related adverse student-record consequences.

161.    Defendant Gross's May 5, 2022 probable-cause affidavit contains false and highly prejudicial statements about Plaintiff's employment and remains publicly accessible through the Clerk's Office of the Criminal Division of the Alameda County Superior Court. Plaintiff has never been arrested, prosecuted, or convicted in connection with the warrant. Nonetheless, the public availability of the affidavit and the University's

SECOND AMENDED COMPLAINT - 43

continued reliance on the narrative it advances have caused and continue to cause reputational and economic harm to Plaintiff.

162.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer:

a.  the continued withholding of the second degree for which he completed all academic requirements in 2022, and the professional, academic, and economic opportunities that degree would provide;

b.  economic injury, including diminished earning capacity, lost educational and employment opportunities, and costs incurred in attempting to obtain records and pursue administrative remedies;

c.  emotional distress, including anxiety, humiliation, and trauma related to the sexual battery, the retaliatory process, exclusion from proceedings, and the ongoing refusal to confer his completed degree;

d.  reputational harm from being labeled a saboteur based on allegations the University has not substantiated with produced forensic evidence;

e.  harm from the search-warrant process and the continued retention and non-production of records obtained through the May 5, 2022 warrant, including loss of control over his personal data and the continuing consequences of the University's reliance on undisclosed "warrant fruits"; and

f.  a chilling effect on Plaintiff's willingness and ability to participate fully in UC Berkeley educational and employment opportunities and related professional pursuits.

SECOND AMENDED COMPLAINT - 44

N. Continuing Conduct and Timeliness

163.     The conduct described in this action reflects an ongoing course of adverse actions that began after Plaintiff reported the October 7, 2021 sexual battery and has continued through the filing of this action. UC Berkeley continues to withhold conferral of Plaintiff's completed second degree and continues to rely on the same "computer sabotage" narrative and warrant-related materials described above in maintaining that outcome.

164.     Key adverse acts occurred within two years before Plaintiff filed this action on December 17, 2025, and continued thereafter, including:

a.   Plaintiff's exclusion from the January 19, 2024 Title IX/SVSH hearing in which Plaintiff was the complainant;

b.   the June 6, 2024 CRD position statement submitted by Bowman-Waugh, which Plaintiff did not obtain until October 3, 2025;

c.   Chancellor Lyons's denials of relief and continued ratification of the degree hold through his office beginning in October 2024 and again in March 2025;

d.   Lopez's reaffirmations on May 8, 2025 and July 1, 2025 that Plaintiff's completed degree would not be conferred; and

e.   UCPD's refusal in 2025 to produce warrant materials and related chain-of-custody documentation requested under CPRA, including materials not contained in the Alameda County Superior Court file as described above.

165.     Each reaffirmation of the degree hold and each refusal to correct Plaintiff's student record and confer his completed degree is a new adverse action that continues to

SECOND AMENDED COMPLAINT - 45

cause harm. The continuing degree hold, the SVSH handling of Plaintiff's complaint against Ajoy, and the warrant-related narrative described above remain linked to the same underlying course of events.

166.    To the extent any discrete act is argued to fall outside a particular limitations period, Plaintiff pleads that:

   a. the challenged actions form a continuing course of conduct that includes acts within the limitations period; and

   b. accrual of claims based on concealed material facts was delayed until Plaintiff could reasonably discover them, including the contents of the University's June 6, 2024 CRD submission, which Plaintiff first obtained on October 3, 2025.

167.    Plaintiff's claims arise from an interlocking sequence of events: after Plaintiff informed Ajoy of his intent to report the October 7, 2021 sexual battery and then reported it, University personnel and agents advanced and maintained a "computer sabotage" narrative that became the basis for student-conduct proceedings, SVSH outcomes, external agency submissions, and the ongoing degree hold.

168.    Gross's investigation included a custodial-style home interview on April 29, 2022, a May 5, 2022 warrant application supported by a publicly filed probable-cause affidavit containing material false statements and omissions, and a UCPD report transmitted to CSC that relied on those same false premises, including nonexistent HR "findings" and claims of sexual harassment. After the warrant was executed, UCPD mailed Plaintiff warrant paperwork on June 1, 2022 that did not include the warrant number or the probable-cause affidavit and included only a generic return sheet. The absence of a warrant number made it difficult for Plaintiff to locate the warrant file

through the Alameda County Superior Court based on name alone. Compounding that problem, there was no criminal case number because the District Attorney rejected UCPD's case referral. Plaintiff ultimately located the warrant file only by using the UCPD police report number as a reference point—an indirect method not apparent from the materials UCPD provided. When Plaintiff obtained the warrant file from the issuing court in November 2025, it contained the probable-cause affidavit but did not contain a warrant return, itemized inventory, or any records showing what was obtained through the warrant. On December 8, 2022, when Plaintiff requested additional warrant materials, UCPD Detective Thomsen responded that the copies mailed on June 1, 2022 were "what we are required to provide," and he did not provide the affidavit or any underlying call-detail records. Plaintiff continued seeking the warrant materials through UCPD and the University's public records channels in 2025; Thomsen stated he could not release police records and directed Plaintiff to UCPD Records. After a protracted CPRA process and delayed production timeline, UCPD ultimately released the sexual-battery police report after approximately six months (October 8, 2025), but UCPD did not produce the requested warrant file or the underlying materials from the "computer sabotage" case. Plaintiff did not obtain the complete warrant file, including the affidavit, from the issuing court until November 2025.

169.    CSC, OPHD, and later decisionmakers relied on the UCPD narrative and Ajoy's accusations in imposing and maintaining the degree hold, in the conduct process, in the SVSH process, and in submissions to CRD and the EEOC, notwithstanding the absence of produced forensic proof tying Plaintiff to any alleged sabotage and notwithstanding University records described above.

SECOND AMENDED COMPLAINT - 47

170.    The continuing degree hold, the related adverse student-record consequences, and the ongoing public availability of the May 5, 2022 probable-cause affidavit are present harms that continue through the filing of this Second Amended Complaint. These harms arise from and remain tied to the same sequence of events and materials described above, including the "computer sabotage" narrative advanced after Plaintiff reported Ajoy's sexual battery, the warrant process and related UCPD materials, the student-conduct and SVSH proceedings, and the University's continuing refusals to correct Plaintiff's record and confer his completed degree.

## FIRST CAUSE OF ACTION

**Title IX: Sex Discrimination, Sexual Harassment, and Retaliation (20 U.S.C. § 1681 et seq.)**

Against The Regents

171.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

172.    At all relevant times, The Regents operated UC Berkeley and its education programs and activities, including the academic program in which Plaintiff was enrolled and the offices and processes used to receive, investigate, and adjudicate SVSH complaints and student discipline, including OPHD, CSC, and UCPD. The Regents receive federal financial assistance and are therefore subject to Title IX.

173.    Plaintiff was a student at UC Berkeley and participant in University educational programs and activities, and also a student-employee, when Ajoy sexually battered him on October 7, 2021.

174.    During Plaintiff's employment in Ajoy's lab, Plaintiff was also enrolled in Honors

SECOND AMENDED COMPLAINT - 48

Research (Chem H194) under Ajoy and received grades assigned by Ajoy. Ajoy thus exercised grading authority and supervisory academic authority over Plaintiff during the relevant period.

175.     Ajoy's sexual battery of Plaintiff and Ajoy's subsequent threat of academic and professional ruin if Plaintiff reported the assault constituted sex-based harassment and violence. The assault occurred in the context of Ajoy's supervisory and academic authority over Plaintiff and within UC Berkeley's education program and activity.

176.     Plaintiff engaged in protected activity under Title IX when, among other things, he:

    a.   informed Ajoy on December 7, 2021, that he intended to report the sexual battery;

    b.   reported Ajoy's misconduct to OPHD in early February 2022;

    c.   reported the sexual battery again to Wallace of CSC in May 2022;

    d.   reported the sexual battery to UCPD and again to OPHD in September 2022; and

    e.   pursued a Title IX/SVSH complaint leading to the January 19, 2024 hearing.

177.     After Plaintiff reported Ajoy's sexual battery, The Regents, through OPHD, CSC, UCPD, and other agents, responded in a manner that was clearly unreasonable in light of the known circumstances. Among other things, the University delayed opening an SVSH investigation; permitted the "computer sabotage" narrative to be used against Plaintiff in parallel proceedings; relied on UCPD materials and the sabotage narrative in the student-conduct process and degree-hold decisions; and allowed the sabotage narrative to be imported into the SVSH process rather than ensuring a fair evaluation of Plaintiff's complaint.

SECOND AMENDED COMPLAINT - 49

178.     When Plaintiff reported Ajoy's misconduct to OPHD in 2022, the University had actual notice that a faculty supervisor had sexually assaulted a student participating in the University's education program and activity, and OPHD had authority to take corrective action and institute supportive measures and an SVSH investigation.

179.     On or around May 31, 2022, during a meeting regarding the hold on Plaintiff's completed degree, Plaintiff again reported Ajoy's sexual battery to CSC Senior Conduct Coordinator Becca Wallace and explained Plaintiff's belief that the degree hold and sabotage accusation were retaliatory. Wallace did not make an SVSH referral or otherwise initiate any corrective action in response to Plaintiff's report. Instead, Wallace advanced the sabotage narrative by asserting—without evidence—her belief that Plaintiff drove from a residence outside Alameda County to the Berkeley campus to sabotage computers in Ajoy's lab, despite Plaintiff then also maintaining a University Village apartment in Albany, approximately one mile from campus.

180.     OPHD's handling of Plaintiff's SVSH complaint incorporated the sabotage narrative and student-conduct findings rather than independently evaluating Plaintiff's report of sexual battery. Rau's May 2023 report repeated the sabotage narrative and included uninvestigated hearsay allegations about Plaintiff's purported conduct toward female lab members as "context" bearing on credibility, even though Rau acknowledged those allegations were outside the scope of the SVSH investigation and never the subject of any investigation.

181.     On January 19, 2024, the University convened an SVSH hearing on Plaintiff's complaint against Ajoy. Trigueros served as hearing officer and Havlatka controlled the Zoom session. Before the evidentiary hearing began, Plaintiff—the complainant—was

SECOND AMENDED COMPLAINT - 50

removed from the Zoom session, and the University proceeded for approximately five hours with Ajoy and his counsel present while Plaintiff was excluded.

182.    As alleged above, Brennan and Trigueros gave materially inconsistent explanations for Plaintiff's exclusion from the January 19, 2024 hearing. Brennan stated in real time that Plaintiff had been removed for alleged participation-rule violations, while Trigueros's later report recast the exclusion as arising from logistical and privacy concerns. The University did not use available less-exclusionary Zoom controls, such as muting, restricted microphone access, observer status, or waiting-room procedures, and instead excluded Plaintiff entirely from live participation in the hearing on his own SVSH complaint.

183.    That exclusion denied Plaintiff an equal opportunity to participate in the Title IX process for his complaint against Ajoy, prevented Plaintiff from hearing and responding to testimony presented at the hearing, and enabled Ajoy to present the "computer sabotage" narrative and Rau's report without Plaintiff's real-time participation. The subsequent finding in Ajoy's favor and rescission of the no-contact directive further deprived Plaintiff of Title IX remedies and supportive measures.

184.    On June 6, 2024, The Regents, through ELR consultant Bowman-Waugh, submitted a position statement to CRD that omitted Plaintiff's exclusion from the January 19, 2024 SVSH hearing and presented the University's internal outcomes as complete. The submission included HR material that had never been shared with Plaintiff during his employment and portrayed Plaintiff as a wrongdoer rather than a complainant. Plaintiff did not obtain the position statement until October 3, 2025 through CRD's records-production process.

SECOND AMENDED COMPLAINT - 51

185.    The Regents further retaliated against Plaintiff for engaging in protected Title IX activity by maintaining and enforcing the degree hold and "administrative dismissal" based on the sabotage narrative; allowing the sabotage narrative to be used to discredit Plaintiff's SVSH complaint; and failing to remedy Plaintiff's exclusion from the January 19, 2024 hearing.

186.    Key Title IX violations occurred within two years of the filing of this Complaint, including Plaintiff's January 19, 2024 exclusion from the SVSH hearing (in which Plaintiff was the complainant), Trigueros's subsequent findings and removal of the no-contact directive, the June 6, 2024 CRD submission omitting the hearing exclusion, and the Regents' continued reliance on those outcomes to refuse to release the degree hold as recently as July 1, 2025.

187.    These acts are part of a continuing course of discrimination and retaliation tied to the same nucleus of facts: the sexual battery, Plaintiff's reports, the retaliatory sabotage narrative, and the ongoing degree hold and reputational harm.

188.    The Regents' response to Plaintiff's report of sexual battery—including the delayed and compromised SVSH process, the exclusion of Plaintiff from the January 19, 2024 hearing, and the continued reliance on the sabotage narrative to deny relief—was clearly unreasonable in light of the known circumstances and constituted deliberate indifference to sex-based harassment. The response would deter a reasonable complainant from reporting sexual misconduct and pursuing Title IX remedies.

189.    As a direct and proximate result of The Regents' conduct, Plaintiff has suffered and continues to suffer damages, including the continuing withholding of his completed degree, adverse student-record consequences, loss of educational and professional

SECOND AMENDED COMPLAINT - 52

opportunities, emotional distress, and reputational harm.

## SECOND CAUSE OF ACTION

### Title VII Retaliation (42 U.S.C. § 2000e-3(a))

Against the Regents

190.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

191.    At all relevant times, Plaintiff was employed by The Regents at UC Berkeley, including in Ajoy's lab from February 2021 through December 31, 2021 and in RSSP from February 2, 2022 through August 31, 2022. Plaintiff's employment ended by ordinary contract expiration, not termination for cause or discipline, and University records reflected no employment discipline and no bar to rehire.

192.    In a later CRD position statement dated June 6, 2024, The Regents represented that Plaintiff was not suspended under employment policies, was not terminated from any appointment, and that both appointments ended on their scheduled end dates.

193.    Those 2024 institutional admissions materially conflicted with earlier 2022 UCPD reports and warrant representations asserting that Plaintiff's employment had effectively been ended due to misconduct findings, even though Plaintiff was actively employed by The Regents in another UC Berkeley unit when those representations were made.

194.    Plaintiff engaged in protected activity under Title VII when, among other things, he:

   a.    reported sex-based misconduct and retaliation to University offices;

SECOND AMENDED COMPLAINT - 53

b. reported the October 7, 2021 sexual battery and retaliatory "computer sabotage" narrative to CRD in February 2023;

c. met with CRD regarding those issues in May 2023;

d. filed a dual-filed CRD/EEOC charge in June 2023 arising from the October 7, 2021 sexual battery and retaliatory "computer sabotage" narrative;

e. pursued the related CRD proceedings;

f. notified the EEOC on November 11, 2025 regarding newly discovered post-charge retaliation; and

g. filed a formal EEOC Charge of Discrimination on February 18, 2026 challenging that post-charge retaliation.

195.    On June 6, 2024, while Plaintiff's civil-rights charge was pending, The Regents, through People & Culture / ELR consultant Bowman-Waugh, submitted a position statement to CRD in response to Plaintiff's charge. As alleged above, that submission omitted the January 19, 2024 SVSH hearing convened on Plaintiff's complaint, omitted Plaintiff's exclusion from that hearing, omitted that the hearing proceeded for hours in Plaintiff's absence while Ajoy and witnesses presented testimony bearing on Plaintiff's credibility and character, misleadingly presented Rau's May 2023 report as the effective final outcome of Plaintiff's complaint, included dismissed and non-probative HR material that had never been shared with Plaintiff during his employment, and continued to present the "computer sabotage" theory without disclosing exculpatory context, including that the District Attorney had declined to file charges, that no civil action for damages had been filed despite assertions of massive losses, and that the University's own submission elsewhere admitted Plaintiff was not suspended, was not terminated, and

SECOND AMENDED COMPLAINT - 54

completed both appointments on their scheduled end dates.

196.    Plaintiff did not and could not review that June 6, 2024 submission while the CRD matter and EEOC substantial-weight review were pending. He first obtained it on October 3, 2025 through the PRA release, and on October 22, 2025 CRD attorney Rebecca Pinger confirmed that UC Berkeley's June 6, 2024 submission omitted all documents and any reference to the January 19, 2024 hearing from which Plaintiff had been excluded.

197.    The Regents' June 6, 2024 submission and related concealment of the January 19, 2024 hearing constituted a materially adverse action under Title VII. The submission was made in direct response to Plaintiff's protected charge activity, tainted the administrative record on which EEOC relied in its substantial-weight review, portrayed Plaintiff as a wrongdoer rather than as a complainant, and would dissuade a reasonable employee or former employee from making or supporting a charge of discrimination or retaliation.

198.    The materially adverse action was causally connected to Plaintiff's protected activity. The Regents' June 6, 2024 submission was prepared because Plaintiff had filed and was pursuing a civil-rights charge, addressed the very subject matter of that protected activity, and used misleading omissions and prejudicial material to blunt, defeat, and discredit Plaintiff's Title VII complaint.

199.    The Regents' retaliation did not end with the June 6, 2024 submission. As alleged above, the University continued to rely on the same corrupted record and retaliatory narrative to justify ongoing adverse consequences against Plaintiff, including withholding his completed 2022 degree on pretextual grounds, maintaining a retaliatory disciplinary

SECOND AMENDED COMPLAINT - 55

notation on his transcript, and relying on baseless and rejected allegations to discredit him as a Title VII complainant.

200.    As a direct and proximate result of The Regents' retaliatory conduct, Plaintiff has suffered and continues to suffer damages, including economic loss, loss of educational and professional opportunities, emotional distress, reputational harm, and other damages according to proof.

201.    Plaintiff exhausted his administrative remedies as to this Title VII retaliation claim. After discovering the June 6, 2024 submission through the PRA release and obtaining CRD's written confirmation of the omission of the January 19, 2024 hearing, Plaintiff notified the EEOC in November 2025 and then filed a formal EEOC Charge of Discrimination on February 18, 2026 alleging post-charge retaliation under Title VII. The United States Department of Justice issued a Notice of Right to Sue dated March 5, 2026 authorizing a civil action under Title VII within 90 days.

202.    Plaintiff therefore seeks all relief available under Title VII, including declaratory relief, injunctive and equitable relief, compensatory damages as permitted by law, costs, and attorneys' fees to the extent permitted by 42 U.S.C. § 2000e-5(k).

## THIRD CAUSE OF ACTION

### FEHA: Sexual Harassment, Hostile Work Environment, and Retaliation

(Cal. Gov't Code § 12940 et seq.)

Against The Regents and Ajoy (Individual Capacity for Sexual Harassment)

203.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

SECOND AMENDED COMPLAINT - 56

204.    At all relevant times, The Regents employed Plaintiff at UC Berkeley, including in Ajoy's lab from February 2021 through December 31, 2021 and in RSSP from February 2022 through August 31, 2022.

205.    As detailed in Section C, on October 7, 2021, Ajoy—acting as Plaintiff's laboratory supervisor and as a faculty member with grading authority over Plaintiff— subjected Plaintiff to unwelcome sexual conduct and threatened adverse academic consequences if Plaintiff reported the assault. Ajoy's conduct was severe and created a hostile work environment. The Regents are liable under FEHA for supervisor harassment and for the hostile work environment and retaliatory acts described below.

206.    Ajoy's sexual battery, lewd physical contact, and threat to destroy Plaintiff's academic career if he disclosed the assault constitute harassment "because of sex" under FEHA.

207.    After Plaintiff engaged in protected activity by informing Ajoy of his intent to report the assault and by reporting Ajoy's misconduct to OPHD and other University personnel, The Regents, through their agents and offices including HR/ELR/People and Culture, CSC, UCPD, and OPHD, retaliated against Plaintiff. Retaliatory acts included rescinding the December 1, 2021 recommendation letter in or around February 2022; advancing the "computer sabotage" narrative; placing Plaintiff on paid investigatory leave from his RSSP position; initiating and relying upon UCPD investigative materials and the May 5, 2022 warrant process; and using the sabotage narrative to support adverse actions affecting Plaintiff's status and opportunities, including the ongoing degree hold and related adverse record consequences.

208.    On June 18, 2023, Plaintiff filed a charge with CRD alleging sexual harassment

SECOND AMENDED COMPLAINT - 57

and retaliation arising from the October 7, 2021 assault and the retaliatory course of conduct described herein.

209.    On June 6, 2024, Bowman-Waugh submitted a position statement to CRD on the University's behalf that omitted Plaintiff's exclusion from the January 19, 2024 SVSH hearing, presented Rau's May 2023 report as dispositive, and included HR material that had not been shared with Plaintiff during his employment and was not part of Plaintiff's personnel file. Plaintiff did not obtain this submission until CRD's records production on October 3, 2025. The submission portrayed Plaintiff as a wrongdoer rather than as a complainant and was materially adverse to Plaintiff's protected civil-rights activity.

210.    Ajoy is individually liable under FEHA for harassment as a supervisor, and The Regents are liable as employer for his harassment and for retaliation and hostile-environment acts by Ajoy and other agents.

211.    When the "computer sabotage" allegations were advanced and used in employment-related actions, Plaintiff remained an employee in good standing. Plaintiff's lab appointment ended by ordinary contract expiration on December 31, 2021, and Plaintiff's RSSP appointment ended by ordinary contract expiration on August 31, 2022. University employment records reflect no termination for cause and no employment discipline.

212.    The University has continued to maintain and rely on the same false employment-related premises used to advance the sabotage narrative, including statements implying HR "findings" and termination that are contradicted by University records. The continued degree hold and the continued dissemination and reliance on those premises have

SECOND AMENDED COMPLAINT - 58

interfered with Plaintiff's employment-related opportunities and caused ongoing economic and reputational harm.

213.    CRD issued a Right-to-Sue notice dated December 17, 2024, and Plaintiff commenced this action within one year of that notice.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth Amendment (Unlawful Search and Seizure;**

**Ongoing Retention and Use of Unlawfully Obtained Information)**

Against Gross (Individual Capacity) and Lyons (Official Capacity)

214.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

215.    At all relevant times, Defendant Gross was a UCPD detective acting under color of state law as an employee of The Regents.

216.    On or about April 29, 2022, Gross traveled to Plaintiff's home in Solano County—several counties away from UC Berkeley and outside any campus or UC-property setting—to question Plaintiff about alleged "computer sabotage" in Ajoy's lab. Gross recorded the encounter using an Axon body-worn camera without informing Plaintiff during the encounter that he was being recorded.

217.    On May 5, 2022, Gross applied for a search warrant for Plaintiff's cellphone records for December 23–25, 2021. In the supporting probable-cause affidavit, Gross asserted that Plaintiff had been subjected to adverse HR "findings" for inappropriate contact with others in the lab and, based on those purported "findings," suggested that the University determined Plaintiff's lab appointment should not be renewed. Those

SECOND AMENDED COMPLAINT - 59

assertions were false and contradicted by University employment records showing that Plaintiff's lab appointment ended by ordinary contract expiration, without termination or discipline, that Plaintiff was a current employee of The Regents at UC Berkeley through his RSSP position at the time, and that Plaintiff had no SVSH respondent status or SVSH disciplinary notation in his personnel file. The affidavit also omitted that Gross questioned Plaintiff inside Plaintiff's home in Solano County and recorded the encounter on an Axon body-worn camera, and it referenced purported co-conspirators and an elaborate sabotage scheme. The warrant was issued and executed.

218.    In a UCPD police report that Gross prepared and that was later transmitted to CSC as part of the student conduct packet, Gross acknowledged that she traveled to Plaintiff's home in Solano County and recorded the interview using her Axon body-worn camera inside Plaintiff's residence. Gross did not disclose those facts in her probable cause affidavit.

219.    Gross's probable-cause affidavit omitted the Solano County home-interview location and the Axon recording, and it included false statements about HR "findings" and implied termination or non-renewal for cause. These omissions and misstatements were material to probable cause because they supplied the affidavit's motive theory and credibility framing for the alleged sabotage and supported the need for the requested records.

220.    The warrant was executed on Plaintiff's cellphone data. The court file did not contain an itemized inventory, chain-of-custody documentation, or any records showing what data was obtained through the warrant beyond a generic return sheet. Neither the issuing court nor Plaintiff has been provided the underlying warrant-derived records, yet

SECOND AMENDED COMPLAINT - 60

UCPD has retained custody of any such records and the University has continued to rely on Gross's narrative regarding what the warrant purportedly showed.

221. Gross violated Plaintiff's Fourth Amendment rights by securing a search warrant through material false statements and omissions, resulting in an unreasonable search and seizure of Plaintiff's cellphone records, and by causing the continuing retention and use of warrant-derived information without meaningful disclosure, inventory, or an opportunity for Plaintiff to inspect the materials that are being relied upon.

222. Gross's UCPD report, and the warrant process described above, were transmitted internally to CSC and used to support the "computer sabotage" narrative in Plaintiff's student conduct case and degree-hold decisions. At the same time, Gross's probable-cause affidavit presented to the Alameda County Superior Court omitted the Solano County home interview and Axon recording and relied on the same false HR/termination premise, thereby tainting both the warrant process and the parallel administrative processes that continue to affect Plaintiff's student record and degree status.

223. The University has continued to maintain the degree hold and related adverse student-record consequences while continuing to rely on Gross's investigative narrative and purported warrant-derived information that has not been produced to Plaintiff, including after UCPD declined to provide the underlying materials through CPRA.

224. Lyons, in his official capacity, is the University officer with authority to implement prospective relief concerning the University's continuing retention, use, and reliance on the warrant-related materials described herein and the continuing adverse student-record and degree consequences tied to those materials. Lyons is sued in his official capacity solely for prospective injunctive and declaratory relief.

SECOND AMENDED COMPLAINT - 61

225.     Although the warrant was sought and executed in 2022, this claim is timely because the probable-cause affidavit supporting the May 5, 2022 warrant was not reasonably available to Plaintiff until November 26, 2025. Plaintiff did not know, and could not reasonably have known, the contents of Gross's probable-cause affidavit—including its false HR/nonrenewal premise and its omissions concerning the Solano County home interview and Axon recording—until he obtained the warrant file in November 2025. UCPD mailed Plaintiff warrant paperwork on June 1, 2022 without the warrant number or the affidavit and provided only a generic return sheet. The absence of a warrant number made it difficult to locate the warrant file through the Alameda County Superior Court based on name alone, and there was no criminal case number because the District Attorney declined to file charges. Plaintiff diligently pursued the affidavit and related warrant materials for years, including: requesting additional warrant materials from UCPD Detective Thomsen by email in December 2022; seeking advice from attorneys in 2023 and 2024 regarding how to locate the affidavit; requesting materials again from Thomsen in March 2025; submitting CPRA requests to UCPD Records in April 2025 and in person on May 1, 2025; and submitting a duplicative CPRA request by certified mail on May 27, 2025, which generated only acknowledgments and delay without production. UCPD ultimately produced the sexual-battery report after months of delay in October 2025 but still did not produce the "computer sabotage" warrant materials. Plaintiff finally located the warrant file by using the UCPD report number as a reference point, and the court file contained the probable-cause affidavit but not a warrant return, inventory, or warrant-derived records. Plaintiff filed the original Complaint on December 17, 2025, shortly after obtaining the affidavit.

SECOND AMENDED COMPLAINT - 62

226.     Gross acted knowingly or with reckless disregard for the truth in making the false statements and omissions described above, and those actions caused the search and seizure of Plaintiff's cellphone records and contributed to the continuing use of undisclosed warrant-related information in University decision-making.

227.     As a direct and proximate result, Plaintiff has suffered and continues to suffer harm, including ongoing reputational injury from the public affidavit and continuing injury from the retention and use of undisclosed warrant-related materials to support adverse student-record consequences and the continuing degree hold.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process

Against Lyons (Official Capacity), and Gross and Ajoy (Individual Capacities)

228.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

229.     Plaintiff has a constitutionally protected property interest in the conferral of his second undergraduate degree because he completed all academic requirements for that degree in 2022 and therefore had a legitimate claim of entitlement to conferral absent lawful grounds to withhold it. Plaintiff also has a protected liberty interest in his good name and reputation and in pursuing educational and professional opportunities without false, stigmatizing accusations. The "plus" deprivation includes the continuing non-conferral of Plaintiff's completed degree and the ongoing maintenance of adverse disciplinary and academic status on Plaintiff's official student record.

230.     Defendants, acting under color of state law through UCPD, CSC, OPHD, and the

SECOND AMENDED COMPLAINT - 63

Chancellor's Office, deprived Plaintiff of these interests without constitutionally adequate notice and a meaningful opportunity to be heard. The deprivation included, among other things:

    a.   imposing and maintaining a degree hold and adverse student-record consequences while treating UCPD narratives and alleged warrant-derived "evidence" as operative without producing the underlying materials to Plaintiff or allowing meaningful testing of the asserted technical basis;

    b.   restricting Plaintiff's ability to question Ajoy concerning Ajoy's motive and knowledge of Plaintiff's SVSH report, including by changing the questioning format after Plaintiff raised his OPHD report and the incipient SVSH investigation during the October 14, 2022 student conduct hearing;

    c.   conditioning Plaintiff's questioning of Ajoy on Plaintiff keeping his camera off and microphone muted and submitting questions only in writing once a Title IX/SVSH investigation into Ajoy was opened;

    d.   skipping substantial portions of Plaintiff's written questions and allowing Ajoy to leave before questioning concluded;

    e.   relying on hearsay summaries in UCPD and University narratives in lieu of production of forensic proof;

    f.   proceeding with sanctions and degree-related decisions based on the conduct finding while continuing to withhold the degree without producing the alleged technical evidence;

    g.   excluding Plaintiff from the January 19, 2024 SVSH hearing on Plaintiff's

SECOND AMENDED COMPLAINT - 64

complaint against Ajoy while permitting Ajoy and his counsel to present the sabotage narrative and Rau's report;

h. presenting incomplete and misleading procedural history to CRD, including omitting Plaintiff's exclusion from the January 19, 2024 hearing and including non-probative HR material not shared with Plaintiff during employment; and

i. refusing to revisit or correct the degree hold and "administrative dismissal" despite repeated requests and despite the absence of any criminal case, civil action, or employment discipline supporting the sabotage narrative.

231. Ajoy's retaliatory accusations and false statements, together with Gross's UCPD report and warrant representations, were used as the basis for University action and were incorporated into UCPD materials, CSC proceedings, OPHD outcomes, and later decision-making, further undermining the fairness of the process afforded to Plaintiff.

232. Lyons, acting through his office and designees—including Becca Lopez while she served as CSC Director—ratified and prolonged the deprivation by refusing to correct the degree hold and adverse student-record consequences after Plaintiff's documented requests in October 2024, March 2025, May 8, 2025, and July 1, 2025.

233. Significant procedural due process violations occurred within two years before Plaintiff filed this action, including the January 19, 2024 SVSH hearing exclusion and the Regents' continued refusals in 2024–2025 to correct Plaintiff's record and confer his completed degree. The deprivation is continuing so long as the degree hold and adverse student-record consequences remain in place.

234. Certain material facts supporting Plaintiff's procedural due process claim were

SECOND AMENDED COMPLAINT - 65

concealed and were not reasonably available to Plaintiff until late 2025 despite Plaintiff's diligence. UCPD did not provide the warrant number or the probable-cause affidavit when it mailed warrant paperwork in June 2022, and there was no criminal case number because the District Attorney declined to file charges. Plaintiff sought the affidavit and warrant materials from UCPD beginning in 2022 and again in 2025, including through CPRA requests and follow-ups, without meaningful production. Plaintiff did not obtain the University's June 6, 2024 CRD position statement—which omitted Plaintiff's exclusion from the January 19, 2024 SVSH hearing and presented the University's internal outcomes as complete—until CRD produced the file on October 3, 2025. Plaintiff did not obtain the warrant file and probable-cause affidavit from the issuing court until November 2025, after locating the file through an indirect reference method tied to the UCPD report number. Plaintiff filed the original Complaint on December 17, 2025, shortly after obtaining these materials.

235.    As a proximate result, Plaintiff has suffered the injuries described in Sections M and N of the Statement of Facts, including loss of his degree, economic harm, reputational injury, and severe emotional distress.

236.    The use of alleged digital "evidence" purportedly obtained through Gross's warrant process—without producing the underlying warrant-derived records to Plaintiff—and the denial of meaningful procedural safeguards in the student-conduct and SVSH processes, including restrictions on Plaintiff's participation and questioning and Plaintiff's exclusion from the January 19, 2024 hearing on his own complaint, violated Plaintiff's Fourteenth Amendment right to procedural due process.

237.     The resulting sanctions, adverse student-record consequences, and continuing degree hold lack a rational basis on the record and materials made available to Plaintiff. The University has never produced warrant-derived records, an itemized inventory, or a coherent forensic explanation tying Plaintiff to any alleged sabotage, and the narrative relied upon conflicts with University employment and academic records, including Ajoy's December 1, 2021 recommendation letter and the A-level grades Ajoy awarded Plaintiff in Honors Research (Chem H194) while Plaintiff was employed in the lab.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 — Fourteenth Amendment Equal Protection /

### Retaliation for Complaints of Sex Discrimination

Against Lyons (Official Capacity), and Ajoy and Gross (Individual Capacities)

238.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

239.     Plaintiff engaged in protected activity when he informed Ajoy of his intent to report and then reported sexual battery and sex discrimination by Ajoy under Title IX and FEHA to OPHD, CSC, UCPD, and other University officials, and when he pursued related complaints with state and federal civil-rights agencies.

240.     Defendants, acting under color of state law, subjected Plaintiff to adverse and unequal treatment in substantial part because Plaintiff reported sex-based misconduct and pursued protected complaints, including by:

    a.   crediting Ajoy's effort to reframe Plaintiff's sexual-battery complaint into a narrative that Plaintiff was a disgruntled former employee who had sexually

SECOND AMENDED COMPLAINT - 67

harassed lab colleagues and sabotaged lab computers, despite the absence of any SVSH case in which Plaintiff was a respondent and the absence of any HR discipline or termination in Plaintiff's employment records;

b.   using Gross's warrant application and UCPD materials—obtained through material false statements and omissions—and purported warrant-derived "fruits" that were never produced to Plaintiff as part of the foundation for the Penal Code § 502(c)(4) "computer sabotage" accusation;

c.   imposing and maintaining a degree hold and pursuing a student conduct case based on that same narrative after Plaintiff reported Ajoy's sexual battery, and treating Plaintiff in practice as a person to be discredited and punished rather than as a complainant of SVSH by a faculty supervisor;

d.   limiting Plaintiff's ability to confront Ajoy during the student conduct proceedings by recalling Ajoy on December 2, 2022 only under restrictive conditions requiring Plaintiff to keep his camera off and microphone muted "so as not to make Ajoy uncomfortable" and to submit all questions in writing, at least thirty of which Slone skipped; these restrictions were imposed only after Plaintiff attempted on October 14, 2022 to probe Ajoy's motive and his knowledge of Plaintiff's SVSH report to OPHD and the incipient SVSH investigation, and after OPHD opened a Title IX/SVSH investigation on November 3, 2022;

e.   excluding Plaintiff from the January 19, 2024 SVSH hearing on Plaintiff's complaint while allowing Ajoy, his counsel, and witnesses to present and defend the sabotage narrative and Rau's report in Plaintiff's absence and to portray Plaintiff as a wrongdoer;

SECOND AMENDED COMPLAINT - 68

f.  permitting OPHD and People & Culture/ELR to mischaracterize Plaintiff in internal materials and in the June 6, 2024 CRD submission by omitting Plaintiff's exclusion from the January 19, 2024 hearing and including dismissed, non-probative HR material never shared with Plaintiff, thereby portraying Plaintiff as a dishonest or dangerous complainant; and

g.  through Lyons and other University decisionmakers and agents, including Becca Lopez while she served as CSC Director, repeatedly refusing in 2024 and 2025 to lift the degree hold or correct Plaintiff's record, even after the District Attorney declined to file charges, no civil action was filed, and HR and UCPath records confirmed no termination, discipline, or bar to rehire, and while Plaintiff continued to be treated as an active alumnus for all purposes except conferral of his completed degree.

241.    Rather than treating Plaintiff as a complainant reporting SVSH by a faculty supervisor, Defendants treated Plaintiff as a quasi-respondent and relied on the sabotage narrative to justify severe educational and reputational consequences, including exclusion from key proceedings and the continuing withholding of Plaintiff's completed degree.

242.    Plaintiff is a male complainant who reported sexual battery by a male supervisor. Plaintiff was excluded from his own SVSH hearing, was treated as a quasi-respondent, and was portrayed as a dangerous saboteur. On information and belief, credibility judgments and adverse procedural choices affecting Plaintiff were influenced, at least in part, by sex-based stereotypes and discriminatory assumptions about male complainants—particularly in male-on-male SVSH allegations.

243.    These stereotypes compounded retaliation against Plaintiff for reporting SVSH

SECOND AMENDED COMPLAINT - 69

and contributed to decisions to deny Plaintiff meaningful participation and to deny Plaintiff relief that would ordinarily be afforded to complainants in the SVSH process.

244.    The unequal treatment and retaliation continued into 2024 and 2025, including:

a.    Plaintiff's January 19, 2024 exclusion from the SVSH hearing;

b.    the adverse SVSH disposition and rescission of the no-contact directive;

c.    the University's June 6, 2024 CRD position statement omitting Plaintiff's hearing exclusion; and

d.    continued refusals in 2024 and 2025 by Lyons's office and CSC leadership to lift the degree hold and correct Plaintiff's record, including communications dated May 8, 2025 and July 1, 2025.

245.    Plaintiff did not obtain the University's June 6, 2024 CRD position statement until October 3, 2025 through CRD's records production process, and Plaintiff did not obtain the May 5, 2022 probable-cause affidavit supporting the warrant until November 2025 despite diligent efforts described above. Plaintiff has suffered the harms described in Sections M and N of the Statement of Facts as a direct and foreseeable result, including loss of his degree, diminished employment prospects, reputational injury, and severe emotional distress.

## SEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Official-Capacity Claim

### for Prospective Injunctive and Declaratory Relief (Ex parte Young)

Against Lyons (Official Capacity)

246.    Plaintiff realleges and incorporates by reference the allegations set forth in the

preceding paragraphs.

247.     Plaintiff seeks prospective injunctive and declaratory relief against Lyons in his

official capacity. Plaintiff seeks damages against individual-capacity defendants only as

separately pleaded in the individual-capacity causes of action.

248.     Plaintiff challenges ongoing practices and continuing effects of University action

described above—maintaining the degree hold, adverse student-record consequences, and

continued reliance on the warrant-related narrative and undisclosed materials—that

continue to deprive Plaintiff of federal constitutional rights. Plaintiff seeks prospective

relief to end these ongoing violations.

249.     Defendant Lyons, in his official capacity as Chancellor of UC Berkeley, is

presently charged with authority to implement prospective relief concerning those

policies and practices.

250.     Plaintiff seeks prospective relief to stop ongoing constitutional violations and

their continuing effects, including the continuing degree hold and adverse student-record

consequences and the University's continuing reliance on the warrant-related narrative

and undisclosed warrant-related materials described above. These are ongoing actions

and continuing effects maintained through University offices and decisionmakers, not

merely past events.

A. CSC and UCPD – Practices Applied to Plaintiff in the 'Computer Sabotage' Matter

251.     There is nothing inherently improper about a faculty supervisor reporting

genuinely serious misconduct both to campus police and to student conduct authorities, or about UCPD and CSC proceeding in parallel where there is actual evidence of criminal behavior and, at minimum, an arrest or charging decision.

252.    In Plaintiff's case, The Regents' policies, customs, and practices allowed CSC to treat Ajoy's allegations and UCPD's incomplete investigation as if they established felony-level misconduct, even though no arrest was made; the District Attorney declined to file charges; no civil action was initiated despite assertions of massive losses; University employment records reflect no HR discipline of Plaintiff; and no coherent forensic explanation or produced technical evidence substantiating the alleged sabotage ever materialized.

253.    Under The Regents' policies and practices, when Ajoy alleged "computer sabotage," the matter was routed simultaneously to UCPD's Threat Management Unit and CSC, and both tracks proceeded largely on the basis of Ajoy's false narrative. UCPD opened a Penal Code § 502(c)(4) investigation, obtained a warrant based on a materially misleading affidavit, and generated a narrative report. CSC opened a matching student conduct case predicated on the same alleged incident.

254.    In the course of that process, UCPD did not arrest Plaintiff, the District Attorney ultimately rejected any criminal case, and no court ever made any finding that Plaintiff had committed any offense.

255.    The alleged "fruits" of the warrant—referenced in Gross's report without disclosure of the underlying records—were never provided to Plaintiff or to CSC. Neither CSC nor any campus body reviewed underlying warrant-derived data or other technical

SECOND AMENDED COMPLAINT - 72

evidence capable of proving or disproving the alleged sabotage.

256.    At the time of the late-December 2021 dates alleged by Ajoy, Gross, and CSC, Plaintiff maintained a residence at University Village in Albany, another residence outside Alameda County, and a third residence in Solano County through February 28, 2022. Plaintiff's University Village apartment was University property, yet Gross did not attempt to contact Plaintiff there or through ordinary campus channels. Instead, Gross first contacted Plaintiff in late April 2022 by traveling to Plaintiff's home in Solano County to conduct an in-home interview during the closing weeks of the Spring 2022 semester, shortly before Plaintiff completed his degree requirements.

257.    Nonetheless, under the Regents' customs and practices, CSC treated the existence of a UCPD report and Gross's narrative references to a warrant as sufficient confirmation of felony-level misconduct and as a basis for severe administrative sanctions, even though the underlying warrant-derived records were not produced in the process.

258.    CSC proceeded to impose and maintain a degree hold and "administrative dismissal" against Plaintiff on the theory that he had committed a felony-level act of computer sabotage, despite the absence of any arrest, criminal charges, conviction, or independent technical proof.

259.    In effect, the Regents' policies and practices allowed CSC to impose and maintain severe, lasting educational sanctions based on penal-code framing and police narratives without the underlying technical evidence being produced and subjected to meaningful adversarial testing in the administrative process.

260.    Rather than limiting such severe administrative action to situations supported by

produced technical evidence or adjudicated criminal findings, the Regents permitted CSC to treat a declined and unsupported penal investigation as sufficient to justify lasting educational sanctions, including non-conferral of a completed degree.

B. People & Culture / HR Practices Applied to Plaintiff in the CRD Matter

261.    The Regents also maintain policies and practices within its People & Culture/HR apparatus for responding to external civil-rights agencies such as CRD, including in cases that involve SVSH and Title VII/IX overlap.

262.    In Plaintiff's case, even though OPHD was the campus body that actually conducted the SVSH investigation and oversaw the January 19, 2024 hearing, The Regents allowed People & Culture's ELR unit—through Bowman-Waugh—to speak for the institution in the June 6, 2024 response to CRD.

263.    In that submission, People & Culture:

a.    omitted any mention of Plaintiff's exclusion from the January 19, 2024 SVSH hearing or the very existence of such a hearing;

b.    framed Rau's flawed and disputed investigation as a neutral, final disposition of Plaintiff's sexual-battery complaint;

c.    revived and attached dismissed, non-probative, and non-disciplinary HR material that had never been shared with Plaintiff while he was employed, did not result in discipline, and does not appear in his personnel file; and

d.    portrayed Plaintiff as a "problem employee" whom the University could not easily remove, despite UCPath and HR records—and the June 6, 2024 CRD position statement itself—showing only scheduled contract expirations, no

SECOND AMENDED COMPLAINT - 74

suspension, no termination, no employment discipline, and no bar to rehire.

264.    These facts reflect a practice of routing responses to external civil-rights agencies through People & Culture/ELR and presenting the University's internal outcomes as complete while omitting material procedural facts about the SVSH process—particularly the January 19, 2024 hearing and Plaintiff's exclusion—and while including employment-related material not shared with Plaintiff during employment and not contained in his personnel file.

265.    In Plaintiff's case, the June 6, 2024 submission did not disclose that OPHD—not People & Culture—conducted the SVSH investigation, did not disclose the January 19, 2024 hearing or Plaintiff's exclusion, and did not identify those facts as relevant to CRD's evaluation of Plaintiff's FEHA charge. The University nonetheless relied on the submission in the CRD process and subsequent agency review described above.

C. Additional Policies, Customs, and Ratification

266.    Across these two tracks, the University's actions toward Plaintiff reflect broader practices that contributed to the violations at issue, including:

   a.    a practice of retaining outside attorney adjudicators—such as Slone, Oppenheimer, and Trigueros—in high-stakes student conduct and SVSH matters, including matters where the University is the complainant (e.g., the Penal Code § 502(c)(4) student-conduct case) or where University personnel and processes are at issue (e.g., the SVSH matter). In Plaintiff's case, outside adjudicators made key credibility and procedural rulings and upheld outcomes central to the continuing

degree hold;

b.  a policy and practice of permitting UCPD to seek and execute warrants on student and employee data based on materially incomplete or misleading affidavits, and then to withhold those affidavits and any underlying digital data from the affected student and from campus adjudicators; instead, CSC relied on narrative summaries in a UCPD report. In Plaintiff's case, Gross's UCPD report—entered into evidence in the student conduct process—openly acknowledged that she traveled to Plaintiff's home in Solano County and activated her Axon body camera, yet repeated false assertions about adverse HR "findings" for sexual harassment and termination and referred vaguely to supposed fruits of the warrant. The actual warrant affidavit and any seized data were never disclosed to Plaintiff or presented as evidence in his student conduct case, yet the University treated these narrative descriptions as sufficient "evidence" to support a felony-level computer sabotage theory and severe educational sanctions;

c.  a practice of restricting complainant participation in SVSH proceedings in ways that can materially impair meaningful participation and real-time response to testimony, including—in Plaintiff's case—excluding Plaintiff entirely from the January 19, 2024 SVSH hearing on his complaint while permitting the respondent, counsel, and witnesses to appear and present testimony in Plaintiff's absence;

d.  a policy and practice of using Family Educational Rights and Privacy Act ("FERPA")-related and privacy-related justifications selectively: allowing

SECOND AMENDED COMPLAINT - 76

stigmatizing accusations and misleading narratives (such as allegations of sabotage or implications of "adverse findings") to be shared with internal decision-makers and external agencies like CRD, while denying Plaintiff reciprocal access to the underlying "evidence," HR materials, and warrant fruits needed to clear his name; and

e.  a policy and practice of ratifying and maintaining flawed disciplinary outcomes and degree holds—rather than correcting them—when they arise from these processes, including by empowering the Chancellor's Office and CSC leadership to summarily deny reconsideration requests without explanation, even where there is no criminal case, no civil case, no HR discipline, no termination, and no bar to rehire.

267.    While Lopez served as CSC Director, she repeatedly reaffirmed the degree hold, and Lyons, through his office, repeatedly declined to intervene or direct correction of Plaintiff's record in 2024 and 2025. Lyons's denials and refusals through his designees in October 2024 and March 2025, together with continued reaffirmations communicated through CSC leadership including July 1, 2025, constitute ongoing ratification or deliberate indifference to the continuing deprivation described above.

268.    As a direct and proximate result of these policies, customs, and ratifications, Plaintiff suffered the federal constitutional injuries detailed in the Fourth, Fifth, and Sixth Causes of Action and the harms set forth in Sections M and N of the Statement of Facts, including loss of his completed degree, diminished employment prospects, reputational injury, and severe emotional distress.

269.    Prospective injunctive and declaratory relief against Lyons in his official capacity

SECOND AMENDED COMPLAINT - 77

is necessary to stop ongoing violations of federal law and to remedy their continuing effects, including the continuing degree hold, adverse student-record consequences, and the University's continuing reliance on the warrant-related narrative and undisclosed warrant-related materials.

## EIGHTH CAUSE OF ACTION

### Sexual Battery (Cal. Civ. Code § 1708.5 and Related Common Law)

Under California Law – Against Ajoy

270.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

271.   On October 7, 2021, while Plaintiff was working and studying in Ajoy's lab at UC Berkeley, Ajoy intentionally engaged in nonconsensual sexual contact with Plaintiff, as described in the Statement of Facts.

272.   Ajoy's acts constituted "sexual battery" under Cal. Civ. Code § 1708.5 because he did one or both of the following:

   a.   acted with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff, and a sexually offensive contact directly resulted; and/or

   b.   acted with the intent to cause a harmful or offensive contact with Plaintiff by use of Ajoy's intimate part, and a sexually offensive contact directly resulted.

273.   Plaintiff did not consent to this contact. The touching was harmful and offensive, occurred in the context of a faculty–student/employee power imbalance, and was accompanied by Ajoy's threats to destroy Plaintiff's academic career if he reported the assault.

SECOND AMENDED COMPLAINT - 78

274.    As a direct and proximate result of Ajoy's sexual battery, Plaintiff has suffered and continues to suffer physical and emotional pain, humiliation, anxiety, exacerbation of existing health conditions, and other damages as described in the Statement of Facts.

275.    This claim is timely under Code of Civil Procedure § 340.16 because the assault occurred after Plaintiff's 18th birthday and this action was commenced within ten years of the October 7, 2021 sexual assault.

276.    Plaintiff seeks compensatory and punitive damages against Ajoy for sexual battery.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant relief as follows:

**A. Declaratory Relief**

   a.    A declaration under 28 U.S.C. §§ 2201–2202 that Defendants' actions violated Plaintiff's rights under Title IX and Title VII; that Defendants' actions under color of state law violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution; and that Defendants violated FEHA to the extent the Court reaches Plaintiff's FEHA claims on the merits; and

   b.    A declaration that the retaliatory degree hold and dismissal are unlawful and void.

**B. Injunctive Relief**

   a.    An order directing Defendant Lyons, in his official capacity, and all officers, agents, employees, and persons acting in active concert with him on behalf of UC

SECOND AMENDED COMPLAINT - 79

Berkeley and The Regents, to confer upon Plaintiff his completed degree, with a conferral date reflecting his timely completion of degree requirements in 2022;

b.  An order directing Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, to remove all references to the "computer sabotage" finding, dismissal, and degree hold from Plaintiff's official student records, transcript, and internal student conduct files;

c.  An order directing Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, to correct and, where appropriate, retract, amend, or supplement any internal or external representations (including to CRD and EEOC) that falsely portray Plaintiff as a saboteur, harasser, or wrongdoer rather than a complainant;

d.  An order directing Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, including UCPD, to return, destroy, or, where destruction is not legally possible, sequester and remove from any academic or disciplinary use, any records or data obtained under the May 2022 warrant (and any related filings), to the extent such records or data are retained by the University;

e.  An order enjoining Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, from relying on the warrant or any warrant-derived materials in any further actions or representations regarding Plaintiff;

f.  An order directing Defendant Lyons, in his official capacity, to implement reasonable measures, training, and oversight necessary to ensure compliance with

SECOND AMENDED COMPLAINT - 80

Title IX, Title VII, and constitutional requirements in SVSH, employment, and student conduct proceedings, including to prevent retaliation through pretextual conduct charges, biased hearings, exclusion from SVSH proceedings, misleading agency submissions, or misuse of law-enforcement narratives;

g. An order directing Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, to take all reasonable steps, to the extent permitted by law, including appropriate applications in state court, to request sealing, redaction, or other appropriate relief regarding the May 5, 2022 warrant affidavit and related filings to the extent they contain materially false or misleading statements about Plaintiff's employment and alleged misconduct; and

h. An order directing Defendant Lyons, in his official capacity, and those acting in active concert with him on behalf of UC Berkeley and The Regents, to correct UCPD and University records to remove false statements that Plaintiff was terminated after adverse HR findings or found to have sexually harassed lab colleagues.

C. **Damages**

a. Compensatory damages for economic losses, including lost earning capacity and diminished educational and professional opportunities;

b. Compensatory damages for emotional distress, mental anguish, and loss of enjoyment of life;

c. Reputational damages;

SECOND AMENDED COMPLAINT - 81

d.   Punitive damages against individual Defendants where allowed by law;

e.   Other non-economic damages in an amount to be proven at trial; and

f.   All other damages, remedies, and relief authorized by applicable federal law;

g.   **Title VII remedies:** All equitable and monetary relief authorized by Title VII against The Regents, including compensatory damages and, to the extent supported by proof, any back pay, front pay, lost benefits, or other equitable relief; and

h.   **FEHA remedies**: To the extent the Court reaches Plaintiff's FEHA claim on the merits, all remedies authorized by FEHA, including any compensatory damages, punitive damages as to non-public-entity defendants where permitted, and such other relief as Cal. Gov't Code § 12965 makes available.

D.   **Attorneys' Fees and Costs**

a.   An award of reasonable attorneys' fees and costs to a prevailing Plaintiff represented by counsel, to the extent permitted by law, pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), Title IX, FEHA, and other applicable provisions; and

b.   An award of costs of suit and allowable litigation expenses to the extent permitted by law.

E.   **Pre- and Post-Judgment Interest**

a.   Awarding pre- and post-judgment interest as allowed by law.

F.   **Such Other Relief**

a.   Granting such other and further relief as the Court deems just and proper.

SECOND AMENDED COMPLAINT - 82

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 18, 2026

Respectfully submitted,

 /s/ **John Doe**

John Doe
Plaintiff, Pro Se
P.O. Box 483
Isleton, California 95641
Telephone: (415) 737-4225
Email: X92QT77@PROTON.ME

SECOND AMENDED COMPLAINT - 83