UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br>Plaintiff,<br>v.<br>REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.,<br>Defendants. | Case No. 25-cv-10779-EMC<br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br>Docket No. 45 |

Plaintiff John Doe ("JD"), proceeding pro se, has sued the following Defendants:

- the Regents of the University of California;
- Richard Kent Lyons, the Chancellor of the University of California, Berkeley ("UCB") (in his official capacity only);
- Prof. Ashok Ajoy, a professor at UCB (in his individual capacity only); and
- Samantha Gross, a former campus police officer (in her individual capacity only).

The gist of JD's suit is that, while JD was a UCB student and working for Prof. Ajoy in his laboratory, Prof. Ajoy sexually assaulted JD, and, after JD reported the misconduct to UCB, the university retaliated against him. The retaliation included, but was not limited to, accusing JD of sabotaging Prof. Ajoy's computers and refusing to release the undergraduate degree JD had earned because of the purported sabotage. Now pending before the Court is Defendants' motion to dismiss.

Having considered the parties' briefs and accompanying submissions, as well as their oral argument, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

United States District Court
Northern District of California

## I. FACTUAL & PROCEDURAL BACKGROUND

In the operative second amended complaint ("SAC"), JD alleges as follows.

A. October 2021 Sexual Assault by Prof. Ajoy

JD is a 2010 graduate of UCB. *See* SAC ¶¶ 1, 30. In August 2020, he re-enrolled at UCB to pursue a second undergraduate degree. *See* SAC ¶¶ 4, 32.

In the fall of 2020, JD took a chemistry class from Prof. Ajoy and received an A-. *See* SAC ¶ 33. Prof. Ajoy then recruited JD to work in his lab as a grant writer and hardware technician. *See* SAC ¶ 34.

From February 2021 to December 2021, JD worked at Prof. Ajoy's lab. *See* SAC ¶¶ 4, 36. In October 2021, while JD was working for Prof. Ajoy, Prof. Ajoy sexually assaulted JD.[1] The assault took place in Prof. Ajoy's office on campus. *See* SAC ¶ 42. Prof. Ajoy threatened JD that he would destroy JD's academic career if JD ever reported the sexual assault. *See* SAC ¶¶ 7, 27, 50.

On December 1, 2021, Prof. Ajoy gave UCB's Graduate Division a letter of recommendation for JD. JD "understood the letter as an effort by [Prof.] Ajoy to cultivate goodwill and discourage reporting of the assault." SAC ¶ 52.

B. Alleged Computer Sabotage by JD

In spite of the threat and letter of recommendation, JD decided to report Prof. Ajoy's misconduct. On December 7, 2021, he told Prof. Ajoy that he intended to do so. *See* SAC ¶ 53.

JD finished working for Prof. Ajoy in December 2021. *See* SAC ¶ 36 (emphasizing that the job with Prof. Ajoy "ended by ordinary contract expiration"). Subsequently, in early February 2022, JD formally reported Prof. Ajoy's misconduct, specifically, to the Office for the Prevention of Harassment and Discrimination ("OPHD"). *See* SAC ¶¶ 8, 57. "OPHD is the UC Berkeley office designated to receive and investigate sexual violence and sexual harassment ('SVSH') complaints." SAC ¶ 57.

[1] Prior to this incident, Prof. Ajoy made overtures to JD that made JD uncomfortable. *See* SAC ¶¶ 40-41.

United States District Court
Northern District of California

At about the same time, Prof. Ajoy rescinded the letter of recommendation for JD and told UCB counsel (David Robinson) that, in late December 2021, JD had sabotaged the computers in Prof. Ajoy's lab. *See* SAC ¶ 58.

UCB has never provided JD with "reliable forensic proof" that JD engaged in such sabotage. SAC ¶ 8. In fact, JD was not responsible. It appears UCB tried to link JD to the computer sabotage based on his student ID card which "also functioned as a swipe card for building access [to Prof. Ajoy's lab]." SAC ¶ 53; *see also* SAC ¶ 80 (alleging that "University personnel relied on access logs tied to the prior card number"). But JD had lost his student ID card sometime in early to mid-December 2021, which was *before* the sabotage took place (between December 23 and 24, 2021). *See* SAC ¶¶ 53, 64. Notably, JD reported that his card was missing on December 17, 2021, and, on the same date, he was issued a replacement card *without* access to the building where the lab was located. *See* SAC ¶ 54.

C. Search Warrant Related to Alleged Computer Sabotage

On or about April 27, 2022, JD was put on paid leave from a new campus job that he had started.[2] *See* SAC ¶ 61; *see also* SAC ¶¶ 4, 37-38 (alleging that, from February to August 2022, JD had a job in the Residential Student Services Program "supporting food-insecure students"). At the time, JD was not given a reason for being put on paid leave, but he later learned that the leave "was connected to the emerging 'computer sabotage' allegations." SAC ¶ 61.

Two days later, on or about April 29, 2022, Ms. Gross – at the time a campus police officer – went to JD's home, several counties away from UCB, and questioned him about the alleged computer sabotage. *See* SAC ¶ 62. JD characterizes the interview as a custodial interrogation. The interview was secretly recorded via a body-worn camera. *See* SAC ¶ 63.

/ / /

[2] Although JD was put on paid leave, it appears UCB has never barred JD from reemployment. *See* SAC ¶ 38 (adding that "his employment history contains no termination or disciplinary notation").

JD stayed on paid leave through August 2022, when "his appointment [at his new job] expired by its own terms, without termination, employment discipline, or a notation of cause." SAC ¶ 61.

In early May 2022, Ms. Gross sought and obtained a search warrant for JD's phone records from a state court. *See* SAC ¶¶ 9(a)-(b), 28, 68. In her supporting probable cause affidavit, Ms. Gross made false or misleading statements and/or omissions. For example, Ms. Gross stated that JD "had been subjected to adverse HR findings involving inappropriate contact with others in [Prof. Ajoy's] lab" (such that his contract with the lab would not be renewed) and suggested that JD was part of an elaborate computer sabotage scheme. SAC ¶ 69. In his opposition brief, JD suggests that Ms. Gross lied about JD having engaged in inappropriate conduct so that there would be a reason for his work contract not to be renewed, which then served as the purported motive for the alleged computer sabotage. *See, e.g.*, Opp'n at 10-11.

JD did not learn about the warrant until June 2022, after it was already executed.[3] *See* SAC ¶ 81.

D. Student Conduct Proceedings Against JD

In May 2022, JD finished the requirements for his second undergraduate degree. However, on May 18, 2022, UCB relied on the alleged computer sabotage to put a hold on the release of his degree. *See* SAC ¶¶ 6, 8, 77.

Subsequently, in late May 2022, JD had a meeting with the Center for Student Conduct about the degree hold. During the meeting, JD reported a second time Prof. Ajoy's sexual misconduct, but no action was taken. *See* SAC ¶ 78 (adding that, in fact, the Center for Student Conduct Coordinator later cast his disclosure as "threatened legal action for 'emotional distress'").

In September 2022, JD reported Prof. Ajoy's sexual misconduct yet again. This report was the second one made to OPHD (which, as noted above, is the UCB office designated to receive and investigate sexual violence and sexual harassment). In response, OPHD "issued a no contact directive between [JD] and [Prof.] Ajoy, with the explicit exception of [Prof.] Ajoy's participation in [JD's] student conduct proceeding." SAC ¶ 86. JD then reported the sexual assault by Prof. Ajoy to the campus police. *See* SAC ¶ 87.

[3] In spite of various efforts, JD did not get a copy of the actual probable cause affidavit until some three years later, in November 2025. *See* SAC ¶¶ 68, 168.

JD's student conduct hearing – addressing *JD's* alleged misconduct – was held on October 14 and December 2, 2022. *See* SAC ¶¶ 88-89. An outside independent hearing officer (Stephanie Slone) was selected to conduct the proceedings. *See* SAC ¶ 83 (alleging that Ms. Slone was an attorney from Ohio).

Meanwhile, in November 2022, OPHD finally began an investigation into JD's sexual misconduct complaint against Prof. Ajoy. *See* SAC ¶ 89.

During the student conduct hearing that took place in December 2022, the hearing officer did not allow JD to fully question Prof. Ajoy, including about the sexual assault. *See* SAC ¶¶ 90-92, 95; *see also* SAC ¶ 107(c) (emphasizing that Ms. Slone imposed "limitations on [JD's] ability to question [Prof.] Ajoy only after the [sexual misconduct] investigation into [Prof.] Ajoy opened"). Furthermore, the evidence presented regarding the alleged computer sabotage was lacking. For instance, there was no video evidence of the alleged computer sabotage, or even JD entering the building where the computers were located, because Prof. Ajoy had waited (deliberately) to report the sabotage. *See* SAC ¶ 94 ("[Prof.] Ajoy reported the alleged sabotage only after the 21-day Stanley Hall video retention period had expired, undermining any claim of diligent reporting or investigation and ensuring that no objective video evidence could be reviewed."). In addition, JD's ID card – which had given him access to Prof. Ajoy's lab – had been lost and replaced in early to mid-December 2021, *i.e.*, *before* the alleged computer sabotage in late December 2021. *See* SAC ¶ 95. UCB "did not adequately investigate whether the prior card had been stolen, cloned, improperly left active, or used by someone else." SAC ¶ 80. JD also lacked the technical ability to perform the alleged sabotage. *See* SAC ¶ 62 ("[J.D.'s] role in [Prof.] Ajoy's lab had been grant writing and hardware support, not systems administration, Linux administration, cybersecurity, or forensic data recovery. [J.D.'s] prior degree was a Bachelor of Arts, not a degree in computer science or a related technical field."); SAC ¶ 104(a) ("[Ms. Slone] asserted, without technical foundation or expert support, that [JD] had acquired the ability to erase complex Linux systems and hard drives merely from being present in the lab long enough.").

"On December 5, 2022, [Ms.] Slone issued a decision finding [JD] responsible for computer sabotage. The decision did not cite forensic proof tying [JD] to any deletion and relied

instead on summaries of the UCPD [*i.e.*, campus police] investigation and [Prof.] Ajoy's accusations." SAC ¶ 97.

In February 2023, JD filed a complaint with the California Civil Rights Division about both the sexual assault by Prof. Ajoy and the false accusation of computer sabotage. *See* SAC ¶ 100.

In May 2023, OPHD's investigator (Ashok Arjun Rau) concluded his investigation into JD's sexual assault complaint against Prof. Ajoy and issued a report in Prof. Ajoy's favor. *See* SAC ¶ 101. As alleged by JD,

> [t]he report adopted and repeated [Ms.] Slone's conduct findings and [Prof.] Ajoy's "computer sabotage" narrative. The report also included hearsay allegations about [JD's] purported conduct toward female lab members, including an implausible and unsupported claim that [he] "chased" or "followed" a female lab member across campus in broad daylight – an allegation that, if true, would have concerned visible conduct in a public campus setting but was never disclosed to [JD] during his employment and never resulted in [a sexual violence/sexual harassment] case, police report, campus safety report, employment discipline, or personnel-file notation. [The OPHD investigator] acknowledged that such hearsay allegations were outside the scope of the investigation but included them as "context" bearing on credibility, and relied on them to discredit [JD] while exonerating [Prof.] Ajoy.

SAC ¶ 101.

In late May 2023, Ms. Slone conducted a sanctions hearing for the alleged computer sabotage by JD – without JD being present – and issued sanctions against him. *See* SAC ¶ 103. In June 2023, she submitted a hearing report to the Dean of Students. *See* SAC ¶ 104.

Subsequently, on or about June 18, 2023, JD filed a charge with the California Civil Rights Division for "sexual harassment, retaliation, and discrimination based on the October 7, 2021 assault and the retaliatory computer-sabotage narrative." SAC ¶ 105.

Then, in July 2023, JD appealed the student conduct finding. The appeal was assigned to an outside adjudicator (also an attorney), Amy Oppenheimer. *See* SAC ¶ 106. In August 2023, Ms. Oppenheimer "upheld the University's findings and degree hold and found 'no evidence' that the student-conduct process and the Title IX/SVSH process were related, leaving Chancellor review as the remaining internal avenue for reversal." SAC ¶ 108.



United States District Court
Northern District of California

E. Sexual Misconduct Proceedings Against Prof. Ajoy

Subsequently, in January 2024, a hearing was held on JD's sexual assault complaint against Prof. Ajoy. The adjudicator for that hearing – Alezah Trigueros – was from the same firm as Ms. Oppenheimer. *See* SAC ¶¶ 13, 109, 111.

The hearing was conducted via Zoom. At the hearing, Ms. Trigueros "informed [JD] that he would be removed from the live hearing and could listen to the recording after the hearing concluded. . . . The University proceeded with the hearing from approximately 9:12 a.m. to 2:18 p.m., with [Prof.] Ajoy and his counsel present and [JD] excluded." SAC ¶ 112; *see also* SAC ¶ 9(d)-(f).

> OPHD Director Kellie Brennan ("Brennan") and [Ms.] Trigueros later provided written explanations for [JD's] exclusion that conflicted with each other. After [JD] objected by email in real time to being excluded from the live hearing while it was still underway, stating, in part, that he viewed the exclusion as retaliatory for asserting his Title IX rights, [Ms.] Brennan responded in a 10:09 a.m. email to [JD] that [he] had been removed for allegedly violating hearing participation rules by interrupting the proceeding. [Ms.] Brennan's explanation did not accurately reflect the circumstances of [JD's] exclusion because the proceeding she claimed [JD] had interrupted had not begun in [his] presence, and [JD] had not been permitted to observe any testimony or participate in any evidentiary portion of the hearing. [Ms.] Trigueros later provided a different written explanation in her hearing report, which did not adopt [Ms.] Brennan's real-time explanation and instead characterized [JD's] exclusion as arising from logistical and privacy concerns surrounding participation conditions. Neither explanation accurately reflected the circumstances of Plaintiff's exclusion, and the two institutional explanations were materially inconsistent with each other.

SAC ¶ 116.

In March 2024, Ms. Trigueros issued a ruling in favor of Prof. Ajoy and "rescinded the no-contact directive OPHD had imposed in September 2022." SAC ¶ 120. Ms. Trigueros's report referred to the alleged computer sabotage and "adopted [Prof.] Ajoy's account without [JD] having been present to hear and respond to the testimony presented at the hearing." SAC ¶ 120.

F. JD's Agency Complaints

In June 2024, UCB filed a response to the complaint that JD had made with the California Civil Rights Division. *See* SAC ¶ 122.



United States District Court
Northern District of California

In December 2024, the California Civil Rights Division closed JD's case based on insufficient evidence but issued him a right-to-sue letter. *See* SAC ¶ 126. In January 2025, the EEOC reviewed the California Civil Rights Division's case file and then, in February 2025, issued a right-to-sue letter to JD. *See* SAC ¶¶ 127-28.

In November 2025, JD initiated an inquiry with the EEOC because he learned that UCB's submission to the California Civil Rights Division had not included information such as his being excluded from the hearing on the sexual assault by Prof. Ajoy. *See* SAC ¶ 131. Then, in February 2026, JD filed a charge with the EEOC. A right-to-sue letter issued in March 2026. *See* SAC ¶ 132.

G. Causes of Action

Based on, *inter alia*, the above allegations, JD has asserted the following causes of action.

(1) Sex discrimination, sexual harassment, and retaliation in violation of Title IX (against the Regents). *See* 20 U.S.C. § 1681.

(2) Retaliation in violation of Title VII (against the Regents). *See* 42 U.S.C. § 2000e-3(a).

(3) Sexual harassment, hostile work environment, in violation of FEHA (against the Regents and Prof. Ajoy). *See* Cal. Gov't Code § 12940.

(4) Unlawful search and seizure and ongoing retention and use of unlawfully obtained information in violation of the Fourth Amendment (against Ms. Gross in her individual capacity and Mr. Lyons in his official capacity). *See* 28 U.S.C. § 1983.

(5) Violation of procedural due process in violation of the Fourteenth Amendment (against Mr. Lyons in his official capacity and Ms. Gross and Prof. Ajoy in their individual capacities). *See id.*

(6) Retaliation for complaints about sex discrimination in violation of the Equal Protection Clause (against Mr. Lyons in his official capacity and Ms. Gross and Prof. Ajoy in their individual capacities). *See id.*

(7) Prospective injunctive and declaratory relief (against Mr. Lyons in his official



United States District Court
Northern District of California

capacity). *See id.*[4]

(8) Sexual battery (against Prof. Ajoy).

Defendants have moved to dismiss only some of the above claims – specifically, the Title IX claim and the multiple § 1983 claims (based on the Fourth Amendment, the Due Process Clause, and the Equal Protection Clause).

## II. DISCUSSION

### A. Legal Standard

Defendants primarily move to dismiss for failure to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

In assessing whether a complaint pleads a plausible claim for relief, a court is typically confined to the allegations made in the complaint. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (stating that, "when the legal sufficiency of a complaint's allegations is tested

[4] Relief is not itself a cause of action. Since Count 7 does not state an independent claim, it is not addressed separately below.

by a motion under Rule 12(b)(6), 'review is limited to the complaint'"). However, "[a] court may . . . consider certain materials – documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice – without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (2003).

In the instant case, JD submitted, in conjunction with his opposition brief, a declaration. Attached to the declaration are various documents such as correspondence between JD and UCB, a position statement that UCB submitted to the California Civil Rights Division in June 2024, a document indicating that Prof. Ajoy gave JD a letter of recommendation, a UCPD report reflecting a statement made by Prof. Ajoy, and correspondence between JD and UCPD about JD getting records. Most of the documents are not judicially noticeable because they do not meet the requirements of Federal Rule of Evidence 201(b) (providing that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). At best, for a few documents, the Court could take limited judicial notice – *e.g.*, the Court could take judicial notice of the fact that UCB submitted a position statement to the California Civil Rights Division and that UCB made certain claims in the position statement; however, the Court could not accept as true the substantive content of the position statement for purposes of the pending motion to dismiss.

Ultimately, the Court need not resolve the matter because, even if the Court could not take judicial notice of *any* document, the excluded documents do not materially add to the complaint. Recognizing the possibility that these documents may not be subject to judicial notice, JD states: "If the Court concludes that any exhibit [attached to his declaration] is outside the Rule 12 record, Plaintiff requests that it disregard the exhibit rather than convert the motion [to one for summary judgment]." Opp'n at 8. Thus, the Court disregards JD's declaration and exhibits attached thereto and focuses solely on the allegations in JD's complaint.[5]

---

[5] In addition to his declaration, JD has filed a motion for leave to file a sur-reply. Defendants oppose the motion. Although the Court could well deny the motion because the proposed sur-reply does not add anything substantive to what JD has already argued in his opposition brief, the Court – out of an abundance of caution – grants the motion. JD is advised that sur-replies are not

B. Claims Against Mr. Lyons

As an initial matter, Defendants move to dismiss all claims against Mr. Lyons, the Chancellor of UCB. *See* SAC ¶ 26 (alleging that Mr. Lyons has been in this position since July 2024). JD has asserted three § 1983 claims against Mr. Lyons, all in his official (not individual) capacity: (1) unlawful search and seizure; (2) violation of procedural due process; and (3) retaliation in violation of the Equal Protection Clause. *See* 42 U.S.C. § 1983 (providing that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured"). Defendants argue that the claims against Mr. Lyons should be dismissed because official capacity claims are claims against the state, and the state is protected by sovereign immunity.[6]

Sovereign immunity is predicated on the Eleventh Amendment. "The Eleventh Amendment protects states and state instrumentalities, such as [t]he Regents [of the University of California], from suit in federal court." *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1141, 1153 (9th Cir. 2018). Where a state official is sued in his *official* capacity for a violation of § 1983, the Eleventh Amendment also provides for immunity from suit. *See Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (noting that "state officials sued in their official capacities . . . are not 'persons' within the meaning of § 1983 and are therefore generally entitled to Eleventh Amendment immunity").

> However, there is one exception to this general rule: When sued for *prospective injunctive relief*, a state official in his official capacity is

routine matters and, should he seek to file one in the future, the Court may reject it.

[6] Defendants' motion to dismiss here is technically based on Federal Rule of Civil Procedure 12(b)(1). *See Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2015) (noting that, "[a]lthough sovereign immunity is only quasi-jurisdictional in nature, Rule 12(b)(1) is still a proper vehicle for invoking sovereign immunity from suit"). "Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In the case at bar, Defendants make a facial attack. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (noting that, in a facial attack, a defendant accepts as true the plaintiff's allegations but asserts that they are not sufficient on their face to support jurisdiction). "A district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)." *Id.*

> considered a "person" for § 1983 purposes. In what has become known as part of the *Ex parte Young* doctrine, a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity.

*Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) (emphasis in original). That being said, "[t]he individual state official sued 'must have some connection with the enforcement of the [alleged unconstitutional] act,'" and "that connection 'must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'" *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).

In the instant case, there is no dispute that UCB is an arm of the state and that Mr. Lyons – as UCB's Chancellor – is a state official for purposes of sovereign immunity. The only disputes between the parties are: (1) whether JD is seeking prospective injunctive relief against Mr. Lyons and (2) whether Mr. Lyons has a sufficient connection with enforcement of the alleged unlawful acts.

1. <u>Prospective Injunctive Relief</u>

The injunctive relief that JD seeks against Mr. Lyons is essentially twofold: (1) a release of his undergraduate degree, which was put on hold as a result of the student conduct proceedings, and (2) a "takedown" or correction of any records putting forth the allegedly false narrative that he sexually harassed female members of Prof. Ajoy's lab and sabotaged the lab computers. (Such records include the probable cause affidavit that Ms. Gross prepared and submitted.) In their papers, Defendants argue that both forms of relief sought are retrospective, not prospective, in nature. However, that position is contrary to Ninth Circuit authority.

The Ninth Circuit has held that "expungement of [negative] information from school records is a form of prospective relief a student plaintiff can seek under the *Ex parte Young* doctrine." *Jensen v. Brown*, 131 F.4th 677, 697 (9th Cir. 2025); *see also Flint*, 488 F.3d at 824 (noting that, "[w]hen a student's record contains negative information derived from allegedly unconstitutional school regulations, . . . that information may jeopardize the student's future employment or college career"). Although the negative information may have arisen from *past* constitutional violations,



United States District Court
Northern District of California

> *Ex parte Young* does not demand that the relief sought be unrelated to past violations. Rather, a plaintiff may pursue relief that "would relate to [a] past violation," so long as it "would not amount to relief *solely for the past violation*. Expungement of negative . . . records does not amount solely to a relief for a past violation, because "[t]he goal of . . . the removal of damaging information . . . is not compensatory; rather, it is to compel the state official to cease her actions in violation of federal law and to comply with constitutional requirements."

*Id.* (emphasis in original).

2. Fairly Direct Connection

Defendants contend that, even if JD is seeking prospective injunctive relief, all claims against Mr. Lyons should still be dismissed because he does not have a sufficient connection to any of the alleged violations of JD's rights. As noted above, the state official sued must have a "fairly direct" connection with the enforcement of the alleged unconstitutional acts: "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged [act] will not subject an official to suit." *Coal. to Defend Affirmative Action*, 674 F.3d at 1134.

In *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992), the Ninth Circuit held that the defendants in the case were not being sued simply because of a generalized duty to enforce state law. The plaintiff in the case was the Los Angeles County Bar Association. It challenged the constitutionality of a California statute that "prescribe[d] the number of judges on the Superior Court for Los Angeles County." *Id.* at 699. The court explained that the plaintiff's suit was "not based on any asserted general duty to enforce state law" because the defendants – the secretary of state and the governor – had "a specific connection to the challenged statute. [The governor] has a duty to appoint judges to any newly-created judicial positions, and [the secretary of state] has a duty to certify subsequent elections for those positions." *Id.* at 704; *cf. Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022) (where plaintiffs challenged a state statute establishing the order in which candidates appear on the ballot in general elections, holding that the secretary of state was an appropriate defendant because county supervisors who print the ballots had no discretion to order candidate names but rather were bound by an Election Procedures Manual which was promulgated by the secretary as a matter of state law).

Similarly, in *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013), the Ninth Circuit held that one of the defendants sued – the attorney general of California – had a sufficient connection to enforcement of the challenged conduct. There, the plaintiffs were producers and sellers of foie gras. They challenged a California statute banning the sale of products that were the result of force feeding birds to enlarge their livers. The Ninth Circuit held that, while the governor was "entitled to Eleventh Amendment immunity because his only connection to [the state statute at issue] is his general duty to enforce California law," *id.* at 943, the attorney general was a proper defendant because (1) the statute being challenged "expressly authorizes enforcement of the statute by district attorneys and city attorneys," and (2) under a provision in the California Constitution, "the Attorney General not only has 'direct supervision over every district attorney,' but also has the duty 'to prosecute any violations of law . . . [and] shall have all the powers of a district attorney,' whenever she believes that the law is not being adequately enforced." *Id.*

Finally, in *Coalition to Defend Affirmative Action*, the Ninth Circuit rejected the defendant's contention that he did not have an adequate connection to enforcement of the challenged act. The plaintiffs in the case were students challenging § 31 of article I of the California Constitution. Section 31 (also known as Proposition 209) provided that the state shall not discriminate against or grant preferential treatment to any individual or group on the basis of, *e.g.*, race, ethnicity, or national origin. Plaintiffs argued that § 31 violated the Equal Protection Clause and caused the unfair exclusion of African American, Latino, and Native American students from higher education. They sought an injunction against the president of the University of California from enforcing § 31. The president argued that he was protected by Eleventh Amendment immunity because of a lack of a sufficient connection, but the Ninth Circuit disagreed: "As the head of the University of California, [the president] does more than just 'live with' section 31. He enforces it. He is duty-bound to ensure that his employees follow it and refrain from using race as a criterion in admission decisions. . . At the University of California, the buck stops with [the president]." *Coal. to Defend Affirmative Action*, 674 F.3d at 1134-35. Thus, the president was "correctly denied Eleventh Amendment immunity." *Id.* at 1134.

a. <u>Degree Hold</u>

Given the above authorities, the Court holds that JD has made sufficient allegations that Mr. Lyons has a fairly direct connection to enforcement of the degree hold. In the SAC, JD alleges that Mr. Lyons "has final authority over degree conferral." SAC ¶ 26. As JD clarifies in his opposition brief, the source of this allegation is Regents Bylaw 31, which states in relevant part that, "[o]n recommendation of the Academic Senate, the Chancellors [of the University of California campuses] are authorized to confer academic degrees on candidates successfully completing their courses of instruction." https://regents.universityofcalifornia.edu/governance/bylaws/bl31.html (last visited 8/26/2026). Based on Regents Bylaw 31, there is – at the very least – a plausible claim that Mr. Lyons has the authority to issue the relief sought by JD – *i.e.*, the release of his degree. Mr. Lyons appears to have a fairly direct connection with this enforcement matter.

b. <u>Takedown or Correction of Records</u>

In contrast, JD has not made sufficient allegations to support his contention that Mr. Lyons has the authority to execute a takedown or correction of records related to the alleged computer sabotage (*e.g.*, Ms. Gross's probable cause affidavit). While JD does allege that Mr. Lyons has "the authority to direct correction of disciplinary outcomes and student records maintained by UC Berkeley," SAC ¶ 26, JD bases that allegation, once again, on Regents Bylaw 31. But the bylaw does not clearly provide for this authority, stating more vaguely that the Chancellors are "responsible for the organization, internal administration, operation, financial management, and discipline of their campuses within the budget and policies approved by the Board and/or president of the University." https://regents.universityofcalifornia.edu/governance/bylaws/bl31.html. Mr. Lyons's authority, as pled, is general and undifferentiated, similar to the governor's authority in *Association des Eleveurs*. *Cf. Forward v. Macomber*, No. 24-4983, 2026 U.S. App. LEXIS 16656 (9th Cir. June 9, 2026) (where plaintiff company sued, *e.g.*, the secretary of the California Department of Corrections and Rehabilitation on the basis that certain state correctional facilities were leaching hazardous waste into the groundwater, concluding that there was an insufficient connection; the



United States District Court
Northern District of California

United States District Court
Northern District of California

relevant state statute simply stated that the defendant was vested with the supervision, management, and control of the state prisons, and there was nothing else suggesting that the secretary had responsibility to plan or administrate solid waste management).

The Court therefore dismisses all claims against Mr. Lyons to the extent the relief sought by JD is a takedown or correction of records such as the probable cause affidavit prepared by Ms. Gross.

C. Fourth Amendment Claim

Defendants next move for dismissal of JD's claim for violation of the Fourth Amendment. JD has asserted this claim against Mr. Lyons (in his official capacity) and Ms. Gross (in her individual capacity). The Fourth Amendment claim is based on two sets of events: (1) Ms. Gross subjected JD to an alleged custodial interrogation when she interviewed him in April 2022 at his house; and (2) JD's phone records were subject to a search based on a probable cause affidavit, prepared and submitted by Ms. Gross, which contained false or misleading statements or omissions.

1. Custodial Interrogation

Based on the face of the SAC, JD's custodial interrogation claim is time barred.[7] There is a two-year statute of limitations for the Fourth Amendment claim. *See Sain v. City of Bend*, 309 F.3d 1134, 1138 (9th Cir. 2002) (stating that "the statute of limitations for § 1983 actions is borrowed from state personal injury tort law"); Cal. Code Civ. Proc. § 335.1 (providing for a two-year statute of limitations for personal injury actions). Because Ms. Gross's interview of JD took place in April 2022, JD's custodial interrogation claim should have been filed, at the latest, by April 2024. However, JD did not file suit until December 2025.

/ / /

[7] As a general matter, a plaintiff is not required to plead around an affirmative defense such as the statute of limitations. *See United States CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019). But "[d]ismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper . . . if the defendant shows some obvious bar to securing relief on the face of the complaint." *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014). "In other words, dismissal based on an affirmative defense is permitted when the *complaint* establishes the defense." Monex, 931 F.3d at 972 (emphasis in original).

Even if the claim was not time barred, JD would fare no better. The SAC does not contain sufficient allegations suggesting that, at the time of the interview, his liberty was restricted in such a way that he was detained (*i.e.*, seized) for purposes of the Fourth Amendment. *See United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (stating that "[a] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restricted the liberty of a citizen" – *i.e.*, "'an officer restrains the freedom of a person to walk away'"). Notably, the interview took place at JD's home where, presumably, he was free to refuse to talk to Ms. Gross.

Moreover, even if there were a detention, JD has not alleged, *e.g.*, that Ms. Gross lacked reasonable suspicion or probable cause to detain him. *See United States v. Samilton*, 56 F.4th 820, 826 (10th Cir. 2022) (taking note of different types of police-citizen encounters: "'(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause'").

Finally, to the extent JD takes issue with the fact that Ms. Gross secretly recorded the interview, his allegation that he was, in effect, in custody actually weighs against any reasonable expectation of privacy. *See Gennusa v. Canova*, 748 F.3d 1103, 1110 (11th Cir. 2014) (noting that the recording of a conversation can be deemed a search, but indicating that a reasonable expectation of privacy, with respect to a recording of a conversation, is questionable where an individual has been arrested, is in police custody, or has "some indication that they [are] being monitored"). Moreover, the fact that the interview was secretly recorded does not inform the question whether the interrogation was custodial.

Accordingly, the Court dismisses the custodial interrogation claim. Because amendment of the claim would be futile based on the time bar alone, the Court does not give JD leave to amend the claim.

2. <u>Judicial Deception</u>

The second part of JD's Fourth Amendment claim is predicated on a on a judicial deception theory – *i.e.*, that Ms. Gross was able to obtain a search warrant against JD because she

made false or misleading statements or omissions in her probable cause affidavit. Defendants' main contention is that the judicial deception claim is time barred.[8] As indicated above, there is a two-year statute of limitations for a judicial deception claim. Because Ms. Gross applied for the search warrant in May 2022, and the warrant was executed that same month, *see* SAC ¶¶ 71, 217, Defendants suggest that JD should have filed suit by May 2024 – not December 2025.

In *Klein v. City of Beverly Hills*, 865 F.3d 1276 (9th Cir. 2017), the Ninth Circuit acknowledged that, "[i]n a traditional Fourth Amendment case, the plaintiff is placed on constructive notice of the illegal conduct when the search and seizure takes place." *Id.* at 1279. But

> [j]udicial deception claims, by their very nature, accrue differently. These claims involve false or misleading misrepresentations that may not be readily apparent at the time of the search. In order to discover the underlying illegality in a judicial deception case, the plaintiff must have access to the underlying affidavit. Only after examining the underlying affidavit can the plaintiff identify the critical facts showing that "[an officer] misled the . . . judge when applying for the warrant, and had the [judge] considered all of the facts that the [judge] would not have found probable cause." We therefore hold that the discovery rule applies to a judicial deception claim. [A plaintiff's] judicial deception claim . . . beg[ins] accruing *when the underlying affidavit becomes reasonably available*.

*Id.* (emphasis added). The Ninth Circuit added that, "[i]f a *diligent* plaintiff has pursued the underlying affidavit without success, accrual need not begin at the time of the search." *Id.* (emphasis added). In short, the discovery rule applies to the limitations analysis in this context.

In the instant case, JD argues that his judicial deception claim is not time barred because he did not actually get a copy of the probable cause affidavit until November 2025, and he promptly filed suit thereafter in December 2025. JD acknowledges that this was some three years after the affidavit was prepared and the search warrant executed, but maintains that the affidavit was not reasonably available to him at an earlier date as demonstrated by the diligence he exercised in getting a copy of the affidavit.

---

[8] Defendants also contend that Mr. Lyons does not have a sufficient connection to the alleged judicial deception because he did not personally participate in the alleged unconstitutional violation. But, as discussed above, Mr. Lyons is being sued in his official capacity only for prospective injunctive relief.

United States District Court
Northern District of California

JD's SAC does contain some allegations related to diligence. According to JD, although the search warrant was executed in May 2022, he did not learn of the warrant and its execution until June 4, 2022, when he was mailed certain warrant paperwork. *See* SAC ¶ 81. That paperwork did not include the probable cause affidavit. In addition, the paperwork did not include the number for the search warrant which would have enabled JD to get a copy of the affidavit. *See* SAC ¶ 168; *see also* SAC ¶ 81 (alleging that JD contacted the state superior court shortly after he learned of the warrant and its execution, but, "[w]ithout a warrant number, . . . court staff could not readily locate the warrant file by [JD's] name"). Because the District Attorney declined to file charges against JD, he could not use a criminal case number to locate the probable cause affidavit either. *See* SAC ¶ 234. JD contacted UCPD in December 2022 about getting the probable cause affidavit but was essentially rebuffed. *See* SAC ¶ 81 (alleging that, in December 2022, JD emailed UCPD, asking for "additional warrant materials" but was told that the paperwork he was sent in June 2022 was what UCPD was "required to provide"). In 2023 and 2024, JD sought "advice from attorneys . . . regarding how to locate the affidavit," and then, in March 2025, asked UCPD for "warrant materials" a second time. SAC ¶¶ 81, 225. UCPD directed him to UCPD Records, "after which [JD] pursued [California Public Records Act] requests and in-person submissions" in April and May 2025. SAC ¶ 81; *see also* SAC ¶ 225. According to JD, he finally got a copy of the probable cause affidavit from the state superior court file in November 2025, and he managed to locate the document by using a UCPD report number. *See* SAC ¶ 225 (alleging that JD "finally located the warrant file by using the UCPD report number as a reference point, and the court file contained the probable-cause affidavit"); *see also* SAC ¶ 234.

The allegations above are not sufficient to establish that JD was diligent and/or that the probable cause affidavit was not reasonably available until November 2025. For example, JD makes only a vague and conclusory allegation that, for two years (2023-2024), he consulted with attorneys about how to get a copy of the affidavit. In addition, JD concedes that he was able to get a copy of the affidavit based on the UCPD report number, but it is not entirely clear which UCPD report he is referencing, when that report was available to him, and why he could not have used that report earlier to get a copy of the probable cause affidavit. *See, e.g.*, SAC ¶ 70 (referring to

"the UCPD police report that Gross prepared and that was later transmitted to [the Center for Student Conduct] as part of the student conduct packet shared with [JD] in September 2022"); SAC ¶ 168 (alleging that, "[a]fter a protracted CPRA [California Public Records Act] process and delayed production timeline, UCPD ultimately released the sexual-battery police report after approximately six months (October 8, 2025)").

Accordingly, the Court dismisses the judicial deception claim because, based on the face of the complaint, the claim is time barred. The Court gives JD leave to amend so that he can make additional allegations to support his contention that he was diligent in attempting to obtain the affidavit.

D. Procedural Due Process Claim

JD's procedural due process claim is brought against Mr. Lyons, in his official capacity, and against Prof. Ajoy and Ms. Gross, in their individual capacities. SAC ¶¶ 229–237. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023).

With respect to the second element, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citations omitted); *see also Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1192 (9th Cir. 2015) (stating that "[w]hich protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake").

> [There is] a three-part inquiry to determine whether the procedures provided to protect a liberty or property interest are constitutionally sufficient. First, courts must look at the nature of the interest that will be affected by the official action, and in particular, to the "degree of potential deprivation that may be created." Second, courts must consider the "fairness and reliability" of the existing procedures and the "probable value, if any, of additional procedural safeguards." Finally, courts must assess the public interest, which "includes the administrative burden and other societal costs that would be associated with" additional or substitute procedures.

*Id*. at 1192-93 (quoting *Mathews*, 424 U.S. at 341, 343, 347).

/ / /

United States District Court
Northern District of California

JD argues that the individual defendants violated his rights by failing to give him sufficient process in two different proceedings: (1) the student conduct proceedings against JD, which were held to determine whether JD had engaged in misconduct (the alleged computer sabotage) and (2) the sexual misconduct proceedings against Prof. Ajoy, which were held to determine whether Prof. Ajoy had sexually assaulted JD. JD alleges as follows with respect to the two proceedings.

- ***Student conduct proceedings against JD***. In late 2022, UCB's Center for Student Conduct investigated JD for the alleged computer sabotage in Ajoy's lab. *See* SAC ¶¶ 58, 88. A hearing was held over two sessions, October 14 and December 2, 2022, before hearing officer Ms. Slone. *See* SAC ¶¶ 83, 88-90. According to JD, he was restricted in his ability to question Prof. Ajoy during the second session (*i.e.*, he was only permitted to provide written questions and not all questions were asked). *See* SAC ¶¶ 90-92. On December 5, 2022, Ms. Slone found JD responsible for the computer sabotage. SAC ¶ 97. That finding was the basis for UCB's hold on JD's completed degree. *See* SAC ¶¶ 5, 77, 98. JD appealed the conduct finding in July 2023, and a second outside adjudicator, Ms. Oppenheimer, upheld the finding in August 2023. *See* SAC ¶¶ 106-08.
- ***Sexual misconduct proceedings against Prof. Ajoy***. According to JD, Prof. Ajoy sexually assaulted him on October 7, 2021. *See* SAC ¶¶ 42, 57. JD made a complaint about the assault to OPHD, the department within UCB responsible for investigating sexual misconduct complaints. A hearing was eventually held on January 19, 2024, before Ms. Trigueros. SAC ¶¶ 109, 111-112. JD was completely excluded from that hearing while Prof. Ajoy and his counsel participated in JD's absence. SAC ¶¶ 111-121, 240(e).

Defendants move to dismiss the due process claim on several grounds: (1) none of the three individual defendants was personally involved in the alleged procedural violation; (2) JD has failed to allege a property or liberty interest; and (3) the claim is partially time barred. The Court addresses each argument below.

1. Causal Connection

Defendants argue that Prof. Ajoy, Ms. Gross, and Mr. Lyons cannot be held liable for any due process violation because Prof. Ajoy was a mere witness and accuser, Ms. Gross had resigned before the conduct hearings occurred, and Mr. Lyons was not Chancellor until years after the degree hold began.

The Court agrees that Prof. Ajoy and Ms. Gross – who have been sued in their individual capacities – are not proper defendants. JD's reliance on *Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978), is unavailing. There, the plaintiff was a prisoner who had accumulated earnings from doing work at a prison honor camp. After the plaintiff had allegedly violated certain camp rules, he was transferred back to the jail which resulted in the forfeiture of his earnings. According to the plaintiff, his earnings were forfeited without due process of law. One of the defendants sued was the county sheriff. The Ninth Circuit held that the sheriff was a proper defendant because

> personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Id*. at 743-44. The sheriff had a causal connection to the alleged violation of the plaintiff's due process rights because the sheriff was the "Chairman of the Committee charged with the responsibility of ordering [the plaintiff's] transfer from honor camp to the county jail," and the plaintiff was transferred even though the Committee never met and the sheriff never signed a transfer order on behalf of the Committee. *See id.* at 744.

The instant case is distinguishable from *Johnson*. In *Johnson*, the sheriff was an appropriate defendant because he failed to give the plaintiff the process that was allegedly due him. In contrast, here, JD does not allege that Prof. Ajoy or Ms. Gross had anything to do with the *process* afforded him in either the student conduct or Ajoy sexual misconduct proceedings. The process decisions were made by the hearing officers, not Prof. Ajoy or Ms. Gross. That, *e.g.*, Prof. Ajoy lied during the proceedings is a matter separate and distinct from the issue of what *process* JD was given during the proceedings. As JD has not adequately alleged that Prof. Ajoy or Ms.

Gross could have afforded him more or sufficient process in either proceeding, they cannot be held liable for JD's due process violation claim.

The analysis is different for Mr. Lyons. As discussed in Part II.B, *supra*, Mr. Lyons is a proper defendant – at least to the extent the prospective injunctive relief JD seeks is a release of his degree. As alleged, Mr. Lyons has a sufficient connection to (and authority over) the degree hold.

Accordingly, the Court dismisses the procedural due process claim against Prof. Ajoy and Ms. Gross. Dismissal is with prejudice because amendment would be futile. JD did not suggest in his papers or at the hearing any way in which Prof. Ajoy or Ms. Gross was connected to the process that he was given at either the student conduct or Ajoy sexual misconduct proceedings.

2. Student Conduct Proceedings

As noted above, JD asserts a violation of his procedural due process rights with respect to two different proceedings: (1) the student conduct proceedings against himself (for the alleged computer sabotage) and (2) the sexual misconduct proceedings against Prof. Ajoy. With respect to the former, Defendants argue for dismissal of the due process claim because JD has failed to allege a cognizable property or liberty interest and because the claim is time barred.

a. Property or Liberty Interest

According to JD, he was not given sufficient process during the student conduct proceedings which resulted in the deprivation of his degree (*i.e.*, the degree hold). Defendants argue that JD cannot claim a property interest in his degree because that interest never came to fruition: no degree was actually conferred. According to Defendants, degree conferral requires satisfaction of all graduation requirements, not just academic ones, including a requirement that a student remain in "good standing." Defendants contend that, even though JD has alleged he met all academic requirements for his degree, he has not alleged that he remained in good standing.

Defendants' position lacks merit. At this stage, all reasonable inferences are made in JD's favor. JD has implicitly asserted he was in good standing because the only basis for his lack of good standing was the finding that he had engaged in computer sabotage, and JD disputes that he engaged in such misconduct. Courts have recognized that a student can have a property interest in

a yet-to-be-conferred degree based on an implied contract theory. *See*, *e.g.*, *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 2011) ("[I]n stating that [the plaintiff] had no property interest in continuing his education, the [lower] court did not mention New York law's recognition of an implied contract between [a college or university] and its students, requiring the academic institution [to] act in good faith in its dealing with its students. Such an implied contract, recognized under state law, provides the basis for a property interest that would be entitled to constitutional protection.") (internal quotation marks omitted); *Alexander v. Kennedy-King College*, No. 88 C 2117, 1990 U.S. Dist. LEXIS 14997, at *14–15 (N.D. Ill. Nov. 2, 1990) ("[T]he payment of tuition to an educational institution ordinarily gives rise to an implied contract that the school will award a degree upon the student's satisfaction of the degree requirements established by the school.").

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), is also instructive by analogy. There, the government argued that civil service employees' property interests in continued employment were defined by the process the state chose to provide for determining "cause." The Supreme Court rejected that argument, holding that "'[p]roperty' cannot be defined by the procedures provided for its deprivation any more than can life or liberty," or the Due Process Clause "would be reduced to a mere tautology." *Id.* at 541. Just as the government in *Loudermill* could not use its own determination of "cause" to argue lack of a property interest, Defendants here cannot use their own student conduct determination – that JD lacked "good standing" – to argue his lack of a property interest in his degree. The argument amounts to the same kind of tautology rejected in *Loudermill*. JD has adequately alleged a property interest in his degree for purposes of the instant motion.

b. <u>Time Bar</u>

Although JD has alleged a cognizable property interest, his due process claim – as related to the student conduct proceedings – fails for an independent reason: it is time barred. The initial student conduct hearing took place in October and December 2022; JD's appeal was complete as of August 2023. Because JD did not file suit until December 2025, only conduct dated December 2023 or later is timely.

JD argues that the continuing violations doctrine can bring the student conduct proceedings within the limitations period. "The continuing violations doctrine functions as an exception to the discovery rule of accrual[,] allowing a plaintiff to seek relief for events outside the limitations period." *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 746 (9th Cir. 2019) (recognizing that the doctrine can apply to § 1983 claims). "[T]he essence of [the doctrine] is that 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period.'" *Id.* However, in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), the Supreme Court limited the applicability of the doctrine, holding that, if an act is discrete and takes place outside the limitations period, then the continuing violations doctrine cannot save a claim based on that act, even if the discrete act is related to acts that fall within the limitations period. "Each discrete . . . act starts a new clock." *Morgan*, 536 U.S. at 102, 113-14. The Court gave several examples of discrete acts in the employment context: "termination, failure to promote, denial of transfer, or refusal to hire." *Id*. at 114. In contrast, the continuing violations doctrine could apply to hostile work environment claims.

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, *in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative affect of individual acts.*

*Id.* at 115 (emphasis added). Post-*Morgan*, the Ninth Circuit has acknowledged that, "[e]xcept for a limited exception for hostile work environment claims . . . , the serial acts branch [of the continuing violations doctrine] is virtually non-existent." *Bird*, 935 F.3d at 748.

JD argues that the continuing violations doctrine saves his otherwise untimely due process claim based on the student conduct proceedings. He maintains that there was a continuing course of conduct by UCB to deny him his due process rights, *starting* with the student conduct proceedings (which took place outside the limitations period) and *continuing* with the Ajoy sexual misconduct proceedings (which took place within the limitations period). But the continuing violations doctrine has no application here because the alleged violation of due process that took

place with the student conduct proceedings was a discrete act. As alleged by JD, during the student conduct hearing that took place in December 2022, Ms. Slone (the hearing officer) required JD to have his camera off, mute his microphone, and submit questions in writing only. *See* SAC ¶¶ 90-92. This conduct was independently actionable once it occurred. In contrast to a course of conduct which can amount to harassment as noted in *Morgan*, nothing else was required to complete it as an unconstitutional act. *Cf. O'Donnell v. Vencor, Inc.*, 466 F.3d 1104, 1113 (9th Cir. 2006) (stating that "[e]ach discriminatory paycheck [the plaintiff] received constitutes a separate violation," and, therefore, "the continuing violation doctrine does not permit [the plaintiff] to recover back pay for discriminatory pay periods outside the applicable statute of limitations period").

The Court therefore dismisses the procedural due process claim based on the student conduct proceedings against JD. The dismissal is with prejudice as amendment would be futile. JD cannot plead around the time bar.

3. Ajoy Sexual Misconduct Proceedings

JD has also asserted a due process claim based on the Ajoy sexual misconduct proceedings. This claim is not time barred given that the Ajoy sexual misconduct hearing took place in January 2024, and JD filed suit in December 2025. But here, JD has failed to allege a cognizable property or liberty interest. At the hearing on Defendants' motion, JD admitted that the injury he suffered as a result of the allegedly insufficient process was a reputational injury only (*i.e.*, because the allegedly false narrative that he had committed computer sabotage was repeated during the proceedings). However, the Ninth Circuit has held that a reputational injury by itself is insufficient to support a due process claim. *See Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir. 2023) (stating that a "'stigma plus' due process claim may lie where reputational harm '[i]s accompanied by some additional deprivation of liberty or property"); *Fikre v. FBI*, 35 F.4th 762, 766 (9th Cir. 2022) (noting that "[d]amage to reputation alone is not actionable," but is cognizable if a plaintiff "was stigmatized in connection with the denial of a 'more tangible' interest"); *see also McCurdy v. Unruh*, No. 2:25-CV-02041-HLT-RES, 2025 WL 2336454, at *2-3 (D. Kan. Aug. 13, 2025) (stating there must be more than just an economic or reputational consequence).

United States District Court
Northern District of California

Furthermore, even if JD were to argue that the reputational injury combined with the degree hold supports a stigma plus theory, that argument would fail. JD was deprived of his degree in conjunction with the student conduct proceedings, not with the Ajoy sexual misconduct proceedings. Indeed, even if JD had "prevailed" in the Ajoy sexual misconduct proceedings (*i.e.*, Prof. Ajoy had been found to have sexually assaulted JD), that would not have established that JD did *not* commit computer sabotage. The two issues (and the harms therefrom) are separate and discrete.

The Court thus dismisses the procedural due process claim based on the Ajoy sexual misconduct proceedings. As above, dismissal is with prejudice because amendment would be futile. JD conceded at the hearing that he was asserting a reputational injury only.

E. <u>Equal Protection Claim</u>

JD's equal protection claim is brought against Prof. Ajoy and Ms. Gross, in their individual capacities, and against Mr. Lyons, in his official capacity. *See* SAC ¶¶ 238-45. In the claim, JD does not assert either disparate treatment or sexual harassment, but rather retaliation. According to JD, after he reported Prof. Ajoy's sexual assault to UCB (*i.e.*, engaged in protected activity), *see* SAC ¶ 239, multiple adverse actions were taken against him – *e.g.*, he was accused of computer sabotage (which harmed his reputation) and his degree was withheld. *See* SAC ¶¶ 240-41.

Defendants move to dismiss on several grounds: (1) the claim is partially time barred; (2) equal protection retaliation is not a cognizable theory; and (3) even if the theory is cognizable, JD has not plausibly alleged that the defendants at issue acted with sex-based animus.

1. <u>Time Bar</u>

The Court agrees that some of the equal protection claim is time barred. Specifically, any adverse actions that took place before December 2023 (two years before the filing of the complaint) are outside the statute of limitations. Thus, JD is precluded from asserting retaliation based on the withholding of his degree, which occurred in conjunction with the student conduct proceedings. To the extent JD argues that the continuing violations doctrine applies, the Court rejects that contention. The withholding of the degree was a discrete act – independently actionable once it occurred – and therefore, under *Morgan*, JD cannot rely on the continuing

United States District Court
Northern District of California

violations doctrine. JD cannot amend as to this part of his equal protection claim because amendment would be futile.

That being said, a portion of JD's equal protection claim is not time barred. For example, JD asserts that his reputation was harmed during the Ajoy sexual misconduct hearing in January 2024 because the claim that he sabotaged the computers in Prof. Ajoy's lab was repeated during the hearing. But for the reasons stated below, the claim is dismissed on the merits.

2. Cognizability and Sex-Based Animus

Defendants argue that, to the extent the equal protection claim is not entirely time barred, it should still be dismissed because JD has asserted only a claim for "equal protection retaliation" and such a claim is not cognizable.

Defendants are correct that a number of courts have held that a retaliation theory cannot be asserted as the predicate for an equal protection claim. For example, in *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020), an employee brought an equal protection retaliation claim against her employer, asserting that she was fired after she reported sex discrimination. The Fourth Circuit held that the claim was not viable because "[r]etaliation for reporting alleged sex discrimination imposes negative consequences on an employee because of the employee's report, not because of the employee's sex. . . . The necessary causal link is between the employee's complaint and the adverse action, not between her sex and the adverse action." *Id.* at 460. The fact that the subject matter of the employee's complaint was sex discrimination specifically was not enough to support a claim for equal protection. *See id.* at 459; *see also Boyd v. Ill. St. Police*, 384 F.3d 888, 898 (7th Cir. 2004) (stating that "'retaliating against a person for filing charges of sex discrimination is not the same as discriminating against a person on grounds of sex'"); *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) (noting that, if plaintiff was "contend[ing] she was dismissed because of her expressive activity, that claim arises under the First Amendment"; "to the extent [plaintiff] links her alleged retaliatory dismissal to her gender or race, that allegation constitutes part of her equal protection discrimination (i.e., hostile work environment sexual and racial harassment) claim," but "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause").

United States District Court
Northern District of California

But there may be circumstances where retaliation against a complaint about discrimination may itself be discriminatory. In *Maynard v. City of San Jose*, 37 F.3d 1396 (9th Cir. 1994), the plaintiff was a white man who brought a § 1983 claim based on the equal protection clause. The plaintiff did not assert that he was discriminated against on the basis of his own race but rather because he had provided assistance to a Black person. The district court instructed the jury that "the right to equal protection of the laws includes 'the right not [to] be subjected to retaliation, adverse employment action, and emotional distress because [a] person offers assistance to a Black person,'" and the Ninth Circuit agreed that this was a correct statement of the law. *Id.* at 1404. Thus, implicitly, the Ninth Circuit recognized that, in at least some circumstances, intentional discrimination may be inferred from the fact that the plaintiff suffered an adverse action after having engaged in activity related to a protected status (such as race or sex). But discriminatory retaliation was evident in *Maynard* because the plaintiff did not *complain* about discrimination based on race; rather, the plaintiff *actively assisted* a Black person, and that apparently was the reason for the retaliation. *Maynard* does not indicate that a complaint about race discrimination, *by itself*, would be enough to support an inference of intentional discrimination on the basis of race. Such a position would be problematic because a defendant could take an adverse action against a plaintiff simply because they made a complaint, and not because the complaint was about discrimination specifically.[9]

---

[9] Statutes, of course, may provide more protection than the Equal Protection Clause. Thus, *e.g.*, Title VII includes an anti-retaliation provision

> "to encourage victims to speak up to report violations. . . . "The reporting obligation [of Title VII] is essential to accomplishing Title VII's 'primary objective,' which is 'not to provide redress but to avoid harm.'" It is for this reason that Title VII's anti-retaliation provisions "provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination."
>
> Thus, employees complaining of Title VII violations are protected from retaliation "even when they complain of actions that are not actually unlawful under Title VII" if an employee's perception of a violation is "'objectively reasonable' under the circumstances known to her." Protecting Title VII complainants who raise their concerns, even when they are reasonably mistaken, serves the purpose of the statute.

In his papers, JD does not argue otherwise. Accordingly, for purposes of this order, the Court assumes that *Maynard* allows for an equal protection retaliation claim, but any such claim must still be anchored in intentional discrimination, *i.e.*, "that a defendant acted at least in part *because of* a . . . protected status." *Id.* (emphasis in original). The problem for JD is that he has not made sufficient allegations of intentional discrimination. According to JD, adverse actions were taken against him because he is a man, and not a woman; in other words, because he was a man complaining about sexual harassment by another man (instead of a woman complaining about sexual harassment by a man), he was treated unfavorably. But while there are allegations that JD was treated unfavorably, there is nothing in the allegations of the complaint to suggest that the reason for the unfavorable treatment by Defendants was because of JD's sex or the fact that this was a case of same-sex harassment as opposed to opposite sex harassment. JD's argument to the contrary rests on speculation rather than specific facts.

The Court therefore dismisses JD's equal protection retaliation claim but with leave to amend. JD may replead this claim (*i.e.*, the portion that is not time barred) if he can, in good faith and consistent with his obligations under Federal Rule of Civil Procedure 11, make allegations that he was treated unfavorably because he is a man or relatedly because the allegation involved same-sex, as opposed to opposite-sex, harassment. If JD chooses to amend the equal protection retaliation claim, he must also bear in mind who is an appropriate defendant for the claim. Ms. Gross, for example, does not appear to have been a part of the Ajoy sexual misconduct hearing which took place in January 2024. As for Prof. Ajoy, even though he was a part of the sexual misconduct hearing in January 2024, JD would have to show that Prof. Ajoy engaged in adverse actions *because* JD is a man as opposed to a woman – and not because JD had accused him of sexual misconduct.

/ / /

/ / /

---

*Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 723-724 (4th Cir. 2024).

F. Title IX Claim

Finally, JD brings a Title IX claim against the Regents only. "Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)).

JD's claim rests on two theories: (1) that UCB failed to adequately address Prof. Ajoy's alleged sexual assault after JD reported it and (2) that UCB retaliated against JD for engaging in protected activity – *i.e.*, for reporting the sexual misconduct. Defendants move to dismiss both theories.[10]

1. Failure to Address Harassment

Where a plaintiff brings a Title IX claim based on failure to address harassment post hoc (as distinguished from a claims that the defendant failure to take steps to prevent harassment in the first place[11]), they must establish the following:

> First, the school must have "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." Second, the plaintiff must have suffered harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school." Third, a school official with "authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf" must have had "actual knowledge" of the harassment. Fourth, the school must have acted with "deliberate indifference" to the harassment, such that the school's "response to the harassment or lack thereof [was]

[10] In their opening brief, Defendants challenged only the claim for failure to address harassment – which was not unreasonable given that the bulk of the allegations in the Title IX claim focused on that alleged failure. However, in his opposition brief, JD pointed out that his Title IX claim is also predicated on retaliation (as reflected in the title of the cause of action), not just failure to address harassment.

[11] JD's claim for failure to address harassment is a post-assault claim. JD does not assert a pre-assault claim. *See Karasek v. Regents of Univ. of Cal.*, 500 F. Supp. 3d 967, 970 (N.D. Cal. 2020) ("*Karasek II*") ("A post-assault claim alleges that a school's response to a complaint of sexual misconduct violated Title IX; a pre-assault claim alleges that the school maintained a policy of deliberate indifference to sexual harassment that created a heightened risk of it and, ultimately, led to a plaintiff's particular harassment.").

> clearly unreasonable in light of the known circumstances." This is a fairly high standard – a "negligent, lazy, or careless" response will not suffice. Instead, the plaintiff must demonstrate that the school's actions amounted to "'an official decision . . . not to remedy'" the discrimination. And fifth, the school's deliberate indifference must have "subject[ed the plaintiff] to harassment." Put differently, the school must have "cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it."

*Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020) ("*Karasek I*"); *see also Doe v. Univ. of the Arts*, No. 22-4561, 2025 U.S. Dist. LEXIS 123295, at *14 (E.D. Pa. June 30, 2025) (framing the elements as follows in the context of faculty-on-student harassment: (1) the plaintiff plausibly alleges sexual harassment by a teacher or professor; (2) an official with authority to take corrective action had actual notice; (3) the school's response was clearly unreasonable; and (4) the school's deliberate indifference caused the plaintiff to suffer discrimination).

Defendants attack the claim for failure to address harassment on multiple grounds. For purposes of this order, the Court addresses only two. First, Defendants argue that the claim is time barred. The Court agrees in large part. As alleged in the SAC, JD first made a complaint about the alleged sexual assault to OPHD (the UCB office "designated to receive and investigate sexual violence and sexual harassment . . . complaints," SAC ¶ 57) in February 2022. *See* SAC ¶¶ 8, 57. JD subsequently made two more reports about the sexual assault: in May 2022, to the Center for Student Conduct, and, in September 2022, to OPHD again. *See* SAC ¶¶ 78, 86. It was only after the latter complaint that any action was taken; specifically, OPHD issued a no contact directive between JD and Prof. Ajoy ("with the explicit exception of [Prof.] Ajoy's participation in [JD's] student conduct proceeding"), but it did "immediately open an investigation." SAC ¶ 86. To the extent JD asserts any of the above constituted a failure on the part of UCB to act, he could have and should have filed a Title IX claim within two years (*i.e.*, by 2024), *see Stanley v. Trs. of Cal. St. Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (borrowing from California's two-year personal injury limitations period for Title IX claims), but he did not do so. Consistent with the analysis above, the continuing violations doctrine does not apply because each of the failures to act (*e.g.*, failure to respond to JD's initial complaints, failure to immediately investigate) was discrete in nature.



United States District Court
Northern District of California

Second, even if part of the Title IX claim is not time barred – *e.g.*, JD suggests a failure to act based on the inadequacy of the January 2024 Ajoy sexual misconduct hearing – JD has not established that such failure to act caused him to undergo further harassment or made him vulnerable to it. *See Karasek I*, 956 F.3d at 1105 (fifth element); *see also Jackson*, 544 U.S. at 173 (noting that, under § 1681(a), a plaintiff must "'be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance'"). In this regard, it is noteworthy that, by January 2024, JD does not appear to have been working on campus in any capacity. Nor was he otherwise on campus as a student because, as alleged, he had finished the requirements for his degree. Moreover, at the hearing on the motion to dismiss, JD expressly admitted that, following the January 2024 Ajoy sexual misconduct hearing, he did not experience any further harassment by Prof. Ajoy. JD also cannot claim, as a Title IX injury, denial of the benefit of his degree: the degree hold was the result of the student conduct proceedings in 2022-2023, not the result of the Ajoy sexual misconduct hearing in 2024. JD was not denied his degree because UCB had failed to act on his complaint of sexual assault.

The Court therefore dismisses the failure-to-address-harassment claim, and with prejudice as amendment would be futile.

2. Retaliation

The second part of JD's Title IX claim consists of a claim for retaliation. According to JD, he has a viable claim for retaliation because (1) JD engaged in protected activity when he reported the sexual assault by Prof. Ajoy, *see* SAC ¶ 176, and (2) subsequently, UCB and/or its employees took a number of adverse actions against JD, which included but are not limited to Prof. Ajoy's withdrawal of his letter of recommendation, the accusation that JD had sabotaged the computers, and the hold on JD's degree. *See, e.g.*, SAC ¶ 177.

Similar to the claim for failure to address harassment, much of the claim for retaliation is time barred. For instance, Prof. Ajoy's withdrawal of the letter of recommendation – an independently actionable discrete act – took place in or about February 2022. The degree hold – also an independently actionable discrete act – was imposed as a result of the student conduct

proceedings in 2022-2023. Both of these alleged retaliatory acts took place outside the limitations period and are not subject to the continuing violations doctrine.

However, part of the retaliation claim falls within the limitations period, specifically, JD's claim that UCB repeated the false narrative of computer sabotage during the Ajoy sexual misconduct hearing in January 2024. JD claims that he suffered a reputational injury as a result of this retaliation. To the extent Defendants have suggested that JD must establish he was subject to retaliation because of his sex, *see Jackson*, 544 U.S. at 173 (noting that, under § 1681(a), "'[n]o person in the United States shall, *on the basis of sex*, . . . be subjected to discrimination'") (emphasis added), a Title IX retaliation claim is viable where the plaintiff alleges retaliation because they complained about sex discrimination. There is no need to prove the retaliation was motivated by, *e.g.*, the complainant's gender. Retaliation for filing a sex discrimination complaint is itself actionable. *See id.* at 174 (stating that "[r]etaliation against a person because that person has complained of sex discrimination is [a] form of intentional sex discrimination encompassed by Title IX's private cause of action"). In this regard, Title IX is similar to Title VII – *i.e.*, protecting against retaliation in order to ensure the effectiveness of the statute. *See id.* at 180 (noting that "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also 'to provide individual citizens effective protection against those practices'"; "this objective 'would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation'"); *cf. Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1114-15, 1121 n.5 (9th Cir. 2023) (holding that "[p]laintiff's retaliation claim is valid even though his discrimination claim is insufficiently pleaded[;] '[t]he protected status of [a plaintiff's complaints about sex discrimination] holds whether or not [the plaintiff] ultimately would be able to prove [his or her] contentions about discrimination'").

3. <u>Summary</u>

The Court dismisses JD's failure-to-address-harassment claim with prejudice. JD does not have leave to amend because it is clearly time barred. The Court also dismisses part of JD's retaliation claim as time barred. However, JD still has a timely retaliation claim based on the alleged false accusations – made during the January 2024 Ajoy sexual misconduct hearing – that

he sabotaged Prof. Ajoy's lab computers.

## III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. Specifically, the Court holds as follows.

- To the extent JD seeks prospective injunctive relief against Mr. Lyons (in his official capacity) in the form of a takedown or correction of records (*i.e.*, those repeating the allegedly false narrative of computer sabotage), the Court grants the motion to dismiss. JD has failed to show that Mr. Lyons has a fairly direct connection to the alleged unconstitutional acts. But Mr. Lyons is an appropriate defendant – at least at this juncture – to the extent the prospective injunctive relief sought by JD is release of his degree.
- The motion to dismiss the Fourth Amendment claim is granted. The custodial interrogation claim is, at the very least, time barred, and dismissal of the claim is with prejudice. The judicial deception claim is also time barred, but JD has leave to amend to address diligence.
- The motion to dismiss the procedural due process claim is granted. Neither Prof. Ajoy nor Ms. Gross has a causal connection to the allegedly insufficient process. Furthermore, the claim related to the student conduct proceedings is clearly time barred. As for the claim related to the Ajoy sexual misconduct proceedings, it is not time barred but suffers for an independent reason, *i.e.*, JD has failed to allege a cognizable interest. The due process claim is dismissed with prejudice.
- The motion to dismiss the equal protection retaliation claim is dismissed. Part of the claim is time barred. As to the part of the claim that is not time barred, JD has failed to allege that there was intentional discrimination – *i.e.*, that he was retaliated against because of his sex. The mere fact that he (a man) made a complaint about a sexual assault by another man is, by itself, insufficient to give rise to an inference of intentional discrimination. JD has leave to amend the part of the claim that is not time barred if he can, in good faith and in accord with his obligations under



United States District Court
Northern District of California

Rule 11, plead facts from which intentional discrimination on the basis of sex may reasonably be inferred. (Given the Court's ruling below on the Title IX retaliation claim, JD may not need to plead a claim for equal protection retaliation.)

- The motion to dismiss the Title IX claim is granted in part. The claim for failure to address harassment is partially time barred. To the extent the claim is not time barred, JD has failed to plead that he suffered any injury as a result of the failure to address harassment. The claim for failure to address harassment is thus dismissed in its entirety and with prejudice. The claim for retaliation is partially time barred but otherwise survives. JD has a timely retaliation claim based on the alleged false accusations – made during the January 2024 Ajoy sexual misconduct hearing – that he sabotaged Prof. Ajoy's lab computers.

JD has leave to file a third amended complaint consistent with the Court's rulings above. JD is not allowed to make any amendments other than those expressly permitted. If JD chooses to file a third amended complaint, it must be filed no later than **September 23, 2026**. If JD does not wish to file a third amended complaint and chooses instead to proceed with what remains of his SAC, then by **September 23, 2026**, he shall file a notice stating that he does not intend to amend. Defendants' response – whether to a third amended complaint or what remains of the SAC – shall be filed by **October 21, 2026**.

This order disposes of Docket No. 45.

**IT IS SO ORDERED**.

Dated: August 26, 2026



EDWARD M. CHEN
United States District Judge